## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

GENIUS GROUP LIMITED,

                    Plaintiff,

v.

PETER B. RITZ, MICHAEL MOE,
JOHN CLAYTON, and MICHAEL CARTER,

                    Defendants.

Civil Action No. 1:25-cv-21496

**JURY TRIAL DEMANDED**

## FIRST AMENDED COMPLAINT

### SUMMARY

Defendants Peter B. Ritz ("Ritz") and Michael Moe ("Moe"), as the controlling officers and directors of LZG International, Inc. ("LZG"), with the assistance of Defendants Michael Carter, a close business associate of Defendants Ritz and Moe, and Defendant John Clayton, the ultimate beneficial owner of LZG, conducted and participated, both directly and indirectly, in the affairs of LZG, and its wholly owned subsidiaries, through a pattern of mail and wire fraud, and extortion, for the object of acquiring and maintaining control of different microcap entities. First, the Defendants made false representations and omissions of material fact about, *inter alia*, the sufficiency of LZG's funds and LZG's purpose for the acquisition transaction, in order to fraudulently induce certain microcap companies to enter an acquisition agreement with LZG. Defendants then, *inter alia*, ceased making payment obligations towards liabilities and employees of the acquired businesses, concealed financial information from the managerial teams of the acquired businesses, and wired monies from the acquired businesses to Defendants Ritz's and Moe's personal bank accounts, to the acquired business' detriment. Defendants Ritz and Moe

furthered their scheme by committing additional acts of mail and wire fraud, as well as other acts of extortion and self-dealing, to takeover and loot the assets of the acquired entities, and then discontinue their business.  Finally, in furtherance of the scheme, Defendants Ritz and Moe communicated through mail and wire, additional misrepresentations and material omissions for the purpose of fraudulently concealing from LZG insiders and shareholders the diversion assets. Second, once inside the acquired entities, Defendants Ritz and Moe, with the assistance of Defendants Carter and Clayton, acted to coerce and extort the insiders of microcap companies for the purpose of taking over the business and looting the assets of the entities.

Plaintiff Genius Group Ltd. ("GNS" or "Genius"), the latest victim of Defendants Ritz and Moe, discovered their RICO scheme after being fraudulently induced into a sham asset purchase agreement with LZG and being alerted by LZG's shareholders of the same fraudulent pattern of fraud and self-dealing. After receiving this information, GNS took steps to hold Ritz and Moe to account and to prevent themselves from being similarly defrauded. However, rather than meet GNS's demands to address the claims of fraud and non-compliance, Defendants Ritz and Moe utilized LZG to attempt to take control of GNS through various acts of mail and wire fraud and extortion. When that failed, Defendants Ritz and Moe used the legal process to obtain a temporary restraining order and preliminary injunction to enjoin Plaintiff GNS from raising any funds to continue operating by submitting false and misleading statements of fact to the court.  Despite that GNS was granted in May 2025 by the U.S. Court of Appeals for the Second Circuit a temporary stay of the preliminary injunction, GNS already has incurred damages of more than $250,000,000, and its operations remain impaired during the pendency of the appeal.

Presently, Defendants Ritz and Moe are extorting GNS and its insiders with an open threat that, unless GNS complies with their demands to pay them millions more, so that Defendants Ritz

and Moe settle an independent lawsuit brought against them by the LZG shareholders,[1] GNS will face the same fate and suffer the same extreme cost to its shareholders as the other microcap entities that have been victimized and shuttered as a result of their scheme.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because Plaintiff Genius is asserting a claim under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961 et seq.

2.      This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over Plaintiff Genius's state law racketeering claims under Fla. Stat. § 895.03, because these state law claims arise out of the same "common nucleus of operative facts" as Plaintiff's claims arising under the federal RICO Act.

3.      Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or injuries giving rise to Plaintiff's claims occurred within this District.

## PARTIES

4.      Plaintiff Genius is a public limited company duly organized and operated under the Laws of Singapore, with its principal place of business located at 8 Amoy Street, #01-01 Singapore 049950.  Plaintiff Genius's shares are publicly traded on the New York Stock Exchange under the symbol "GNS."

5.      Defendant John Clayton is an individual residing in Salt Lake City, Utah.

6.      Defendant Clayton is the self-employed manager and beneficial owner of First Equity Holdings Corp. ("First Equity").  (*See* **exhibit 1**, *SEC v. John S. Clayton, et al.*, Case No.

---

[1] *Shawn Carey, et al. v. Michael Moe, et al.*, Case No. 2024-019773-CA-01 (CA 44) ("LZG Shareholders' Action") (Fl. Dist. Ct. Oct. 14, 2024); Removal Case No. 1:25-cv-21062-JEM (S.D.F.L. Mar. 7, 2025).

2:24-cv-918, Docket Entry ("DE") 1, Complaint ("Clayton Compl.") ¶ 17 (D. Utah Dec. 11, 2024)).

7.      Upon information and belief, Defendant Clayton also secretly controls, through his beneficial ownership, the following nominee-entities: Bryan Development, LLC ("Bryan Development"); Capital Communications, Inc. ("Capital Communications"); Compass Equity Partners, Inc. ("Compass Equity"); Empire Fund Managers, Inc. ("Empire Fund"); Investrio, Inc. ("Investrio"); Klaja Partners LLC ("Klaja Partners"); Liberty Partners, LLC ("Liberty Partners"); and Maestro Investments, Inc. ("Maestro Investments") (*see id*. ¶¶ 25-33); Broad Investments Partners, LLC; and Niki Group.

8.      In addition, Defendant Clayton does or did control the following nominal officers installed by him as the figureheads of his nominee-entities: Greg Popp, the designated officer of LZG; April Erickson, who, according to her LinkedIn Profile, is or was an administrative/executive assistant at First Equity; and Arthur James Ball, who, according to Utah Business Registration records, was or is as of September 13, 2024, the nominal manager of Klaja Partners.

9.      At all times relevant hereto, Defendant Clayton has owned the SEC-registered transfer agent, Standard Registrar & Transfer Company, Inc. ("SRTC"), LZG's transfer agent. (*Id*. ¶¶ 17, 19).

10.      At all times relevant hereto, by virtue of his stock ownership and his ability to direct the management and policies of LZG, Defendant Clayton controlled LZG, and therefore was an "affiliate" of, LZG.  (*See id*. ¶43).[2]

---

[2] Affiliates include officers, directors, and controlling shareholders, as well as any person, like Defendant Clayton, who is under common control with, or has common control of, an issuer, like LZG.  (**Exhibit 1**, Clayton Compl. ¶ 43).  *See also* 17 C.F.R. § 230.405 (defining "affiliate" and "control").

11.     Defendant Peter B. Ritz is an individual residing in the Commonwealth of Pennsylvania, with a permanent address located at 1230 Wrack Road, Rydan, Pennsylvania 19046.

12.     Since 2021 until the present, Defendant Ritz has been the CEO, CFO, and Secretary of LZG.

13.     In or around March 2024, Defendant Ritz became the Chief Revenue Officer (CRO) of Plaintiff Genius.

14.     Defendant Michael Moe is an individual residing in the State of Texas, with a permanent address located at 4125 Turtle Creek Boulevard, Dallas, Texas 75219.

15.     Since 2021 until the present, Defendant Moe has served on LZG's Board of Directors.

16.     In an SEC filing dated September 13, 2022, LZG began identifying Defendant Moe as its sole independent director.[3]

17.     Previously, since August 2021, Defendant Moe had served as Executive Vice Chair of the FatBrain Board of Directors.

18.     In or around June 2024, Defendant Moe was appointed to Plaintiff Genius's Board of Directors as the Non-executive Chairman.

19.     On or about June 20, 2024, Defendant Moe also joined the Board's three committees, the Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee.

20.     Defendant Michael Carter is an individual residing in the Commonwealth of Pennsylvania, and is the beneficial owner of St. Michaels Ventures, LLC ("St. Michaels

---

[3] *See* https://www.sec.gov/Archives/edgar/data/1126115/000121390022055586/f10k2022_lzginter.htm, at 11, dated Sept. 13, 2022 [reporting period Fiscal Year ("FY") ended May 31, 2022] (last accessed May 20, 2025); *compare with* https://www.sec.gov/Archives/edgar/data/1126115/000155479522000006/lzgi0104form8ka2.htm, at 15, dated Jan. 5, 2022 [report date Oct. 23, 2021] (last accessed May 20, 2025).

Ventures"), a major shareholder of LZG.

## FACTUAL BACKGROUND

21.    LZG is a Florida corporation, with its principal place of business located in New York, New York.  Its common stock was traded on the over-the-counter ("OTC") securities market under the symbol "LZGI."

22.    Beginning by 2009, Defendant Clayton maintained LZG as a public, nonoperating shell company with the purpose of merging with an operating microcap company.  (*See* **exhibit 1**, Clayton Compl. ¶ 110).

23.    Defendant Clayton installed Greg Popp as the nominal director and entire board of directors of LZG, when it was a shell company.

24.    However, Popp had no actual control over LZG. Instead, Popp signed required SEC filings and corporate documents as directed by Defendant Clayton or his staff. (*Id*.).   The filings contained various false statements, including that Popp held stock in LZG and that LZG owed moneys to certain entities secretly controlled by Defendant Clayton. (*Id*. (referred to as "Clayton Nominees")).

25.    Defendant Clayton has beneficially owned, indirectly through one or more of his nominees, more than six percent in 2023 and more than seven percent in 2024 of LZG shares. Defendant Clayton failed to file forms with the SEC related to his beneficial ownership of LZG stock, as required by the federal securities laws. (*Id*. ¶ 113).

26.    Since 2009, Defendant Clayton indirectly has owned, through First Equity, 20.08% of LZG's common stock and, through nominal LZG director Greg Popp, 4.79% of LZG's common stock, making Defendant Clayton the beneficial owner of approximately 25% of LZG.

27.    Since at least 2009, Defendant Clayton had been intimately involved with financing

5

the operations of LZG, often providing the sole source of funding for LZG.  (*See, e.g.*, *id*. ¶ 72).

28.     Upon information and belief, at all times relevant hereto, LZG was largely or entirely dependent on Defendant Clayton for financing, with Defendant Clayton often providing the sole source of LZG's funding. (*See, e.g., id*. ¶¶ 72-73).

29.     For instance, the IT Contribution Agreement contains a Schedule 4.03, disclosing the capitalization of LZG in three convertible promissory notes issued to (1) Greg Popp, dated April 20, 2010, with an outstanding unpaid principal and interest of $ 45,501; (2) First Equity, dated November 30, 2019, with an outstanding unpaid principal and interest of $147,923; and (3) Capital Communications, dated June 30, 2019, with an outstanding unpaid principal and interest of $107,245.

30.     Upon information and belief, all of the funds for these loans ultimately came from Defendant Clayton, and the loans were made for the benefit of Defendant Clayton. (*See, e.g.*, *id*. ¶¶ 77, 88).

### Defendant Clayton's Use of Nominee Entities to Fund LZG's Acquisition of FatBrain.

31.     In 2021, Defendant Clayton arranged for LZG to bring public FatBrain, LLC ("FatBrain"), an artificial intelligence technology company organized in Delaware, by acquiring its assets in a sale that was completed, and memorialized in an IT Asset Contribution Agreement, on or about October 23, 2021 ("IT Contribution Agreement").  (*See* **exhibit 1**, Clayton Compl. ¶¶ 38, 111).

32.     Following LZG's acquisition of FatBrain's IT, Defendant Clayton at times owned more than five percent of LZG stock and, directly or indirectly through one or more intermediaries, controlled LZG in numerous ways.  (*See id*. ¶ 111).

33.     Defendant Clayton directed LZG's operation and management by, inter alia, telling

LZG management, including Defendants Ritz and Moe, when to pay certain invoices and directly paying invoices on behalf of LZG. (*Id*.).  Defendant Clayton drafted LZG board resolutions and instructed a board member to sign such a resolution. (*Id*.).  Defendant Clayton also managed LZG's stock listing process. (*Id*.).

34.     The IT Contribution Agreement was executed on behalf of LZG, by nominal officer Greg Popp, and on behalf of FatBrain, by Managing Director Defendant Peter B. Ritz.

35.     As a result of the acquisition of FatBrain, LZG acquired marketable assets and initiated operations related to the development and sale of the FatBrain technology.  Thus, LZG no longer was considered a "shell company" based on the determination that LZG had more than nominal assets, other than cash, and more than nominal operations.[4]

36.     Immediately upon acquisition, L. Lee Perry, the nominal secretary/treasurer, and board of director of LZG, resigned from both positions, and Defendant Ritz became LZG's new CEO, CFO, Secretary, and Chairman of the Board of Directors of LZG.[5]

37.     On or about November 10, 2021, Defendant Ritz recruited former FatBrain employee, Shawn R. Carey, to join LZG/FatBrain as Chief Operating Officer (COO) in charge of Field Operations and Business Development for LZG.  Defendant Ritz also recruited former FatBrain employee, Rajarshi Das, to join LZG/FatBrain as Chief Scientist Officer (CSO).  (*See* **exhibit 2**, LZG Shareholders' Action, DE 1, Complaint ("LZG Shareholders' Compl.") ¶ 23).[6]

38.     On December 20, 2021, Defendant Michael Moe, the former Vice Chair of the

---

[4] *See* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001126115/000155479521000424/lzgi1223form8ka1.htm, at 19, dated Dec. 23, 2021 [reporting date Oct. 23, 2021] (last accessed May 5, 2025).

[5] *See* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001126115/000155479521000369/lzgi1028form8k.htm, at 3, dated Oct. 28, 2021 (last accessed May 20, 2025).

[6] *See* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001126115/000155479521000407/lzgi1124form8k.htm, at 6, dated Nov. 24, 2021 [reporting date Oct. 26, 2021] (last accessed May 5, 2025).

FatBrain Board of Directors, was added to LZG's Board of Directors.[7]

39.     As consideration for the FatBrain assets, LZG was required to issue to Defendant Ritz 10,000,000 shares of common stock, making Defendant Ritz the beneficial owner of approximately 97.5% of LZG's stock.

40.     However, upon information and belief, Defendant Clayton falsely represented in LZG's public SEC filings that the 10,000,000 shares were issued to Defendant Ritz on or about October 23, 2021.[8]

41.     Records maintained by LZG's transfer agent, Clayton-owned SRTC, show that no shares of LZG common stock were issued to Defendant Ritz before May 9, 2022, and that no shares in the denomination of 10,000,000 were issued to Defendant Ritz until March 26, 2024.

42.     On November 11, 2021, Defendant Clayton also issued to himself, indirectly through his nominees-entities, a total aggregate amount of 134,310 LZG shares, as follows: 50,310 to First Equity; 12,000 to April Erickson; 12,000 to Broad Investments Partners, LLC; 12,000 to Empire Funds Managers; 12,000 to J. Ball; 12,000 to Liberty Partners, 12,000 to Maestro Investments, and 12,000 to Niki Group.

43.     In June 2023, Clayton used Investrio, Inc. to acquire approximately $7,500,000 of Defendant LZG stock. (**Exhibit 1**, Clayton Compl. ¶ 112.)

---

[7] *See* note 4 at 14, *supra.*

[8] *See* https://www.sec.gov/Archives/edgar/data/1126115/000121390022055586/f10k2022_lzginter.htm, at 5, dated Sept. 13, 2022 [reporting period Fiscal Year ("FY") ended May 31, 2022] (last accessed May 15, 2025);

**Defendants Ritz, Moe, and Carter Utilize LZG
as a Vehicle to Acquire Additional FatBrain Assets.**

44.     Upon information and belief, Defendants Ritz and Carter began working together to raise money for LZG/FatBrain in 2021. (**Exhibit 2**, LZG Shareholders' Compl. ¶ 27).

45.     On October 13, 2021, Defendants Ritz and Moe entered LZG/FatBrain into a note subscription agreement with FinTekk AP, LLC, an entity related to Defendants Carter and Moe through its share ownership of RC-1, Inc., a Nevada corporation in which Defendants Moe and Carter are the majority shareholders.

46.     Upon information and belief, Defendants Ritz and Carter sought to raise funds from investors on the promise that such funds would be used by LZG/FatBrain to expand FatBrain's operations by acquiring other AI companies. (*Id.* ¶ 29).

47.     Beginning on or about October 26, 2021, LZG entered into private subscription agreements with investors based upon the condition that LZG would acquire additional assets of FatBrain and convert certain outstanding convertible promissory notes.[9]

48.     Defendants Ritz and Moe represented to investors that such funds were necessary to enable LZG "to launch the marketing of the FatBrain IT. . . . We currently believe that the gross proceeds that we may receive from our private subscription agreements . . . will allow us to build the required regulatory, quality and technical teams to market the FatBrain technology."[10]   (*See* LZG Shareholders' Compl. ¶ 29).

49.     Upon information and belief, based on the misrepresentations of Defendants Ritz

---

[9]  *See*  https://www.sec.gov/Archives/edgar/data/1126115/000155479521000407/lzgi1124form8k.htm,  at  6,  dated Nov. 24, 2021 [reporting date Oct. 26, 2021] (last accessed May 5, 2025).

[10]  https://www.sec.gov/Archives/edgar/data/1126115/000155479521000424/lzgi1223form8ka1.htm,  at  7,  17-18, dated Dec. 23, 2021 [reporting date Oct. 23, 2021] (last accessed May 5, 2025).

and Carter, LZG shareholders and other individual investors collectively invested in LZG more than $2,000,000, and a different group of investors, from the Middle East, injected into LZG more than $23,000,000.  (*Id*. ¶ 30).

50.     The additional FatBrain assets were acquired in an IT Asset Contribution Agreement dated April 19, 2022 ("April 2022 IT Contribution Agreement"), effective May 11, 2022, and LZG issued approximately 24,700,000 shares of common stock pursuant to the private subscription agreements.  (*See id*.).[11]

51.     Pursuant to the April 2022 IT Contribution Agreement, LZG acquired from FatBrain certain additional intellectual property assets in exchange for 80,000,000 shares of LZG common stock issued to the members of FatBrain, including Defendant Ritz;[12]  the assumption of a secured promissory note issued to Defendant Ritz, Shawn Carey, and Rajashi Das, in the original principal amount of $3,000,000; and the assumption and conversion at closing of several promissory notes issued by FatBrain between September 2021 and December 2021, and secured by the acquired assets, in the aggregate principal amount $2,070,000, convertible at $0.122 per share.[13]

52.     At closing, on May 11, 2022, the holders thereof immediately converted the notes into a total aggregate amount of approximately 17,000,000 shares of common stock.[14]

53.     The April 2022 IT Contribution Agreement was signed by Defendant Ritz on behalf of LZG, as CEO, and of FatBrain, as Manager.

---

[11]  *See*  https://www.sec.gov/Archives/edgar/data/1126115/000155479522000197/lzgi0517form8k.htm, at 2, dated May 16, 2022 [reporting date May 11, 2022] (last accessed May 5, 2025).

[12]  *Id*.

[13]  *Id*.; *see also*  https://www.sec.gov/Archives/edgar/data/1126115/000121390022055586/f10k2022_lzginter.htm, at F-7, F-8, dated Sept. 13, 2022 [reporting period FY end May 31, 2022] (last accessed May 1, 2025).

[14]  *Id*. at F-6; *see also* note 11, *supra*.

54.     Upon information and belief, based on records maintained by LZG transfer agent SRTC, the 80,000,000 LZG consideration shares were distributed on or about May 11 as follows: 30,240,000 shares to Rajarshi Das; 20,240,000 shares to Defendant Ritz; 11,520,000 shares to Shawn Carey; 9,000,000 shares to Defendant Moe;  and 9,000,000 shares to Defendant Carter.[15]

55.     Approximately one month prior thereto, on or about April 22, 2022, Defendants Moe and Carter executed proxy voting agreements authorizing Defendant Ritz as their proxy agent to vote their combined 18,000,000 shares.

56.     As a result, Defendant Ritz had the irrevocable right to vote the 18,000,000 shares issued to Defendants Moe and Carter, giving Defendant Ritz beneficial ownership of 48,240,000 shares, or 31.59%, of the outstanding LZG shares.[16]

57.     Finally, effective May 11, 2022, Defendant Clayton had LZG cancel the promissory note, dated April 20, 2010, issued to nominal LZG director Greg Popp, in the original principal amount of $23,500, and convert to stock two outstanding promissory notes issued to Defendant Clayton. The first note, dated June 30, 2019, issued to Defendant Clayton through Capital Communications, in the original principal amount of $70,000, was converted to 8,907,754 shares; and the second note, dated November 30, 2019, issued to Defendant Clayton through First Equity, in the original principal amount of $119,200, was converted to 900,000 shares of LZG common stock.

58.     Thus, on or about May 11, 2022, Defendant Clayton issued to himself an aggregate amount of 9,807,754 shares of LZG common stock.[17]

---

[15] *See* https://www.sec.gov/Archives/edgar/data/1126115/000121390022055586/f10k2022_lzginter.htm, at 10, dated Sept. 13, 2022 [reporting period FY end May 31, 2022] (last accessed May 13, 2025).

[16] *See id*.

[17] *See* https://www.sec.gov/Archives/edgar/data/1126115/000155479522000197/lzgi0517form8k.htm, at 2, dated May 16, 2022 [reporting date May 11, 2022] (last accessed Apr. 30, 2025).

59.     Upon information and belief, from its inception, Defendants Ritz and Moe exercised absolute control over FatBrain (**exhibit 2**, LZG Shareholders' Compl. ¶ 24), and once inside LZG, Defendants Ritz and Moe took the place of Defendant Clayton's nominee, Greg Popp, in conducting the management and operations of LZG.

60.     Upon information and belief, following LZG's acquisition of FatBrain, Defendants Ritz and Moe began secretly dismantling the operational structure of FatBrain.

61.     For instance, Defendants Ritz and Moe misrepresented in LZG's public SEC disclosure documents, LZG's intention to continue the employment of certain FatBrain employees, stating: "To assist with the orderly transition of management and operations," Defendants Ritz and Moe entered LZG into a management services agreement with FatBrain to retain FatBrain "to provide consulting and logistical support when needed to support operating [LZG's] business for a period of up to two years," effective October 23, 2021.[18]

62.     Although Shawn Carey and Rajarshi Das were recruited as employees of FatBrain, Defendants Ritz and Moe effectively ousted Carey and Das from the decisionmaking processes of FatBrain, and intentionally concealed from Carey and Das all financial, accounting, and other strategic business records of LZG/FatBrain.  (LZG Shareholders' Compl. ¶¶ 23, 26; *see also, e.g.*, *id*. ¶¶ 34-40).

### LZG'S GENERAL BUSINESS MODEL

63.     Following LZG's 2021 acquisition of FatBrain, Defendants Ritz and Moe were responsible for the operation and management of LZG, while Defendant Clayton remained in control.

64.     In 2022, under the operation and management of Defendants Ritz and Moe, and the

---

[18] *See* https://www.sec.gov/Archives/edgar/data/1126115/000121390022055586/f10k2022_lzginter.htm, at 11, dated Sept. 13, 2022 [reporting date May 31, 2022] (last accessed Apr. 21, 2025).

direction and control of Defendant Clayton, LZG acquired by fraudulent inducement at least three other business entities.

65.     Specifically, LZG would enter into similar purchase agreements, agree to provide a pittance of cash or cash equivalents, as well as LZG common stock, and in return, would receive a controlling interest in the acquired entity, and  appoint Defendant Ritz as an executive officer and Defendant Moe to the board of directors.

66.     Defendants Ritz and Moe fraudulently induced the sellers of the acquired entities to enter the acquisition agreements by making in, inter alia, SEC disclosure documents, press releases, and transaction documents, false representations and omissions of material fact as to, inter alia, the intentions of Defendants Ritz and Moe to continue and help grow the businesses targeted for acquisition; the commitment of Defendants Ritz and Moe to continue employment relationships; and the purpose of LZG's acquisition of the target entities.

67.     Defendants Ritz and Moe knew or should have known at the time these statements were made that they were false because neither Defendant Ritz nor Defendant Moe had any intention of performing the contractual promises, nor did Defendant Clayton have any intention of continuing to fund the growth of the businesses targeted for acquisition.

68.     Once inside the acquired entities, Defendant Ritz and Moe, at the direction and control of Defendant Clayton, seized the business operations, concealed the financials, ceased making payments towards liabilities, terminated employees, and diverted the revenues out of the acquired entities and into the personal bank accounts of Defendants Ritz and Moe.

69.     Below are the details of the various business entities targeted by Defendants in LZG's acquisition scheme in the year 2022, and carried out by Defendants through racketeering acts of mail fraud, wire fraud, and extortion.

### Defendants Ritz and Moe Utilize LZG
### as a Vehicle to Acquire Intellagents, LLC.

70. On or about February 23, 2022, LZG entered into an Asset Purchase Agreement with Intellagents, LLC ("Intellagents") ("Intellagents APA") to purchase certain Intellagents assets, primarily, its Smart Insurance Ecosystem Platform, to accelerate LZG's insurance focus.[19]

71. Intellagents is a Delaware company that, *inter alia*, integrates and aggregates data in the insurance sector.

72. Pursuant to the Intellagents APA, Intellagents agreed to sell and assign to LZG, and LZG agreed to purchase, substantially all of Intellagents' assets, properties, and rights for $3,000,000, to be paid to Intellagents at closing in a cash payment of $200,000 and the issuance of 2,800,000 shares of common stock valued at $2,800,000.

73. Subsequently, on February 25, 2022, the parties entered into an Updated Asset Purchase Agreement to better reflect the terms of the transaction that LZG agreed to purchase Intellagents' Smart Insurance Ecosystem Platform (the "Software Platform") and certain other assets identified in the Updated Asset Purchase Agreement for $3,000,000, minus $15,000 in working capital and the assumption of unpaid trade accounts payable to third parties in connection with the Software Platform.[20]

74. The Agreement was signed on behalf of LZG by CEO Defendant Ritz.

75. Upon information and belief, Defendants Ritz and Moe negotiated on behalf of LZG the terms of the Intellagents APA. (*See* **exhibit 2**, LZG Shareholders' Compl. ¶¶ 52-53).

---

[19] *See* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001126115/000155479522000081/lzgi0307form8k.htm, at 2, dated Mar. 7, 2022 [reporting date Mar. 7, 2022] (last accessed Apr. 21, 2025).

[20] *See* https://www.sec.gov/Archives/edgar/data/1126115/000121390022050170/ea164705-8k_lzginter.htm, at 1, 13, dated Aug. 22, 2022 [reporting date Aug. 17, 2022] (last accessed Apr. 21, 2025).

76.     Immediately upon LZG's acquisition of Intellagents, Intellagents became a part of LZG. (*Id*. ¶ 53).

77.     Upon information and belief, Defendant Ritz fraudulently induced Intellagents to sell to LZG substantially all of its assets by, *inter alia*, falsely promising to put money back into Intellagents to help grow the company. (*See id.* ¶ 50).

78.     For instance, Defendants Ritz and Moe represented in SEC filings that LZG "intends to incorporate the Software Platform into its current and future products, and will market those products directly and through distribution with value-added resellers and strategic partners."[21]

79.     Upon information and belief, at the time of the acquisition, Intellagents was developing, selling, and promoting new products. (*See* LZG Shareholders' Compl. ¶ 51).

80.     Upon information and belief, instead of funding the continued operation Intellagents, Defendants Ritz and Moe diverted and misappropriated for his own personal benefit the $1,000,000 revenues of Intellagents. (*Id.* ¶ 54).

81.     Defendants Ritz and Moe also falsely promised to Intellagents insiders, the public, and other potential acquisition targets that LZG, *inter alia*,

> will market [Intellagents'] products directly and through distribution with value-added resellers and strategic partners. Direct marketing efforts include the internet and email campaigns, tele-sales, and virtual and in person follow ups. [LZG] anticipate[s] having ten sales people able to work from anywhere.  Distribution efforts include relationships with global and regional systems integrators ("SIs"), value added resellers ("VARs"), independent software vendors ("ISVs"), vertical software application developers and combinations of the above.  Potential customers for LZG will include large systems integrators and F1000 insurance companies, small, regional, or specialty insurance providers, MGA's and core insurance system vendors and insuretechs.[22]

82.     However, upon information and belief, although Intellagents generated $1,000,000

---

[21] *See* note 20, *supra*.

[22] https://www.sec.gov/ix?doc=/Archives/edgar/data/0001126115/000155479522000081/lzgi0307form8k.htm, at 2, dated Mar. 7, 2022 [reporting date Mar. 7, 2022] (last accessed May 20, 2025).

in revenues shortly after the acquisition, Defendants Ritz and Moe stopped paying Intellagents' vendors and suppliers, and destroyed important business relationships that would have enabled Defendants Ritz and Moe to continue the business of Intellagents. (**Exhibit 2**, LZG Shareholders' Compl. ¶ 54).

83.     In addition, pursuant to the Intellagents APA, LZG was to assume certain contracts and IP agreements, including the employment agreements with Intellagents' officers, Eric Hall, CEO, Mark Stender, President, and Michael Cocca, Chief Technology Officer.[23]

84.     However, upon information and belief, Defendants Ritz and Moe stopped paying the salaries of the Intellagents' employees, which ultimately resulted in the Intellagents employees quitting and commencing lawsuits for failure to pay wages. (LZG Shareholders' Compl. ¶ 55).

85.     Moreover, Defendants Ritz and Moe refused to permit access to, and concealed from, the Intellagents' founders all of LZG's financial information.  (*Id*. ¶ 54).

86.     Upon information and belief, Defendants Ritz and Moe retained the monies that were promised through employment to certain Intellagents' officers and due for performance to certain former Intellagents' vendors and suppliers, and used the monies at least in part to fund LZG's acquisition of SO Technology Limited.

### Defendants Ritz and Moe Utilize LZG<br>as a Vehicle to Acquire SO Technology Limited.

87.     In September 2022, Defendants Ritz and Moe used LZG to acquire SO Technology Limited ("SO Tech"), a UK-based private limited company, engaged in the business of information technology consultancy.  (*Id*. ¶ 57).

88.     On or about September 22, 2022, LZG, through its wholly owned subsidiary, FatBrain Acquisition Company Limited ("FatBrain Acquisition"), entered into a Stock Purchase

---

[23] *See* note 22, *supra*.

Agreement ("SO Tech SPA") with Dent Global Limited ("Dent Global") and three individual sellers, to acquire all outstanding shares of SO Tech.[24]

89.     The SO Tech SPA was signed on behalf of LZG by President Defendant Ritz, and on behalf of FatBrain Acquisition by President Shawn Carey.[25]

90.     Upon information and belief, Defendants Ritz and Moe negotiated on behalf of LZG and its subsidiary FatBrain Acquisition, the terms of the SO Tech SPA.  (*See, e.g.*, **exhibit 2**, LZG Shareholders' Compl. ¶¶ 57, 59).

91.     Pursuant to the SO Tech SPA, the Sellers agreed to sell and assign to FatBrain Acquisition all ownership rights and outstanding equity interests in SO Tech, in exchange for an aggregate purchase price of $2,762,500, to be paid to the sellers as follows: (i) payment of $1,000,000 in cash and issuance of 170,000 shares of LZG common stock, at closing; and (ii) $700,000 in cash on December 31, 2022.[26]

92.     Having all outstanding equity interests in SO Tech, LZG indirectly owned, and Defendants Ritz and Moe directly controlled, all of its assets and liabilities.

93.     Upon information and belief, Defendants Ritz and Moe fraudulently induced the SO Tech sellers to enter into the SO Tech SPA through false representations and omissions of material facts in, *inter alia*, the transaction documents, press releases, and SEC disclosure documents.

94.     First, Defendants Ritz and Moe misrepresented in the SO Tech SPA the sufficiency of LZG's funds, by stating that LZG and its wholly owned subsidiary, FatBrain Acquisition, "has

---

[24] *See* https://www.sec.gov/Archives/edgar/data/1126115/000121390022059432/ea166396-8k_lzginternat.htm, at 2, 5, dated Sept. 27, 2022 [reporting date Sept. 27, 2022] (last accessed May 5, 2025).

[25] *See id*. at 22.

[26] *See id*. at 5.

sufficient cash on hand or other sources of immediately available funds . . . to enable it to make payment of the Purchase Price and consummate the transaction contemplated by this Agreement."

95.     While the total acquisition price was approximately $2,800,000, upon information and belief, Defendants Ritz and Moe intentionally structured the deal in a way that enabled them to divert to themselves $1,700,000 of investor funds, by committing LZG to pay at closing only the 170,000 shares of LZG common stock, and to defer the entire cash payment of $1,700,000. (**Exhibit 2**, LZG Shareholders' Compl. ¶¶ 58-59).

96.     On October 13, 2022, pursuant to the SO Tech SPA, Defendants Ritz and Moe issued 80,000 LZG shares to Dent Global and 30,000 LZG shares each to Stephen Gray, Mark Purdy, and Richard Burch.

97.     Defendants Ritz and Moe materially breached the SO Tech SPA by failing to comply on behalf of LZG with its terms.  (*See id*. ¶ 60).

98.     Upon information and belief, at no time did Defendants Ritz and Moe make the deferred cash payment to the SO Tech sellers, instead misappropriating in part for their own personal use the $1,700,000 in investor funds, thereby causing LZG a multi-million dollar loss on the SO Tech deal.  (*See id*. ¶¶ 59-61).

99.     Approximately one year later, on or about October 2, 2023, as a result of LZG's failure to comply with the terms of the SO Tech SPA, Defendants Ritz and Moe were forced, pursuant to a contract term that anticipated LZG's breach, to sell back to Dent Global for $1 the total share capital of SO Tech.

100.     At the same time, Defendants Ritz and Moe, on behalf of LZG, retained Defendant Carter to provide "advisory and consulting services," pursuant to an Advisory Services Agreement dated October 1, 2023.

101.    Defendants Ritz and Moe also falsely described the purpose of LZG's acquisition of SO Tech and the intentions of LZG to continue and grow the business of SO Tech.

102.    For example, Defendants Ritz and Moe stated in publicly-filed SEC disclosures that SO Tech is a

> design and technology company creating web and mobile applications for mid-market enterprises, helping to accelerate growth and expand operation. . . . SO Tech specializes in delivering large-scale digital design, development and online product experiences to a global list of clients. Led by Managing Director, Mark Purdy, SO Tech brings years of experience working with mid-market enterprises in the areas of eCommerce, eLearning, customer portal and application development to enhance and enrich LZG's subscriber experience.[27]

103.    Defendant Ritz stated in a press release dated September 27, 2022, that SO Tech's "design automation enables FatBrain's global SMEs [star enterprises of tomorrow] and subscribers to realize simple, uncomplicated experiences to tell their tailored brand stories."

104.    Defendant Ritz further represented in SEC filings that SO Tech, among other companies, was acquired "to expand [LZG's] international operations and further focus [LZG's] efforts on software development and IT consulting[,]"[28] and that SO Tech was "being integrated into the world-wide business of [LZG]."[29]

105.    However, upon information and belief, Defendants Ritz and Moe had no intention of growing the business or continuing the operations of SO Tech.  Instead, once inside SO Tech, Defendants Ritz and Moe immediately squandered LZG's relationship with SO Tech's "global list of clients."

106.    For instance, just prior to the September 2022 SO Tech acquisition, for the first

---

[27]    https://www.sec.gov/Archives/edgar/data/1126115/000121390022059432/ea166396-8k_lzginternat.htm,    at    1, dated Sept. 27, 2022 [reporting date Sept. 27, 2022] (last accessed May 20, 2025).

[28]    https://www.sec.gov/Archives/edgar/data/1126115/000165495423004751/lzgi_10q.htm, at 18, dated Apr. 14, 2023 [For the quarterly period ended Feb. 28, 2023] (last accessed May 13, 2025).

[29]    https://www.sec.gov/Archives/edgar/data/1126115/000165495423000638/lzgi_10q.htm, at 17, dated Jan. 17, 2023 [reporting period ended Nov. 30, 2022] (last accessed May 13, 2025).

three months ended August 31, 2022, LZG had two customers that accounted for $1,204,305 and 49.5% of total sales.  Defendant Ritz represented that LZG "expects to maintain this relationship with these customers."[30]  For the first six months ended November 30, 2022, LZG did not have any customers with greater than 10% of consolidated sales.[31]  For the nine months ended February 28, 2023, LZG had two Kazakhstani customers, unrelated to LZG's acquisition of SO Tech, with greater than 10% of consolidated sales.[32]

107.    Upon information and belief, Defendants Ritz and Moe made no meaningful effort to maintain SO Tech's customer relationships.

108.    In addition, Defendants Ritz and Moe falsely stated LZG's commitment to maintain the employment of certain members of the SO Tech leadership team in order to "maintain or grow the performance" of SO Tech.

109.    The SO Tech SPA provides that members of the leadership team, Mark Purdy, Stephen Gray, and Richard Burch, were expected to remain employed at LZG through at least December 31, 2022.

110.    Defendants Ritz and Moe even represented in SEC disclosures that SO Tech Managing Director Mark Purdy's "years of experience" would be utilized "to enhance and enrich LZG's subscriber experience."[33]

111.    Upon information and belief, no member of the SO Tech leadership team, including Purdy, was permitted by Defendants Ritz and Moe to perform any meaningful work on behalf of

---

[30] https://www.sec.gov/Archives/edgar/data/1126115/000165495422013824/lzgi_10q.htm, at 10, dated Oct. 17, 2022 [For the quarterly period ended August 31, 2022] (last accessed May 13, 2025).

[31] *See* note 29 at 11.

[32] https://www.sec.gov/Archives/edgar/data/1126115/000165495423004751/lzgi_10q.htm, at 11, dated Apr. 14, 2023 [For the quarterly period ended Feb. 28, 2023] (last accessed May 13, 2025).

[33]    https://www.sec.gov/Archives/edgar/data/1126115/000121390022059432/ea166396-8k_lzginternat.htm,    at    1, dated Sept. 27, 2022 [reporting date Sept. 27, 2022] (last accessed Apr. 23, 2025).

LZG.

112.     In fact, about one year after Dent Global reacquired SO Tech from LZG in October 2023, Dent Global sold to EMG Worldwide, Inc. ("EMG Worldwide"), on or about December 23, 2024, 100% of the share capital of SO Tech.

113.     Upon information and belief, EMG Worldwide is an entity founded by Defendant Carter.

114.     At the same time, on December 23, 2024, Defendant Carter also became, and remains today, the sole director of SO Tech.

115.     Upon information and belief, Defendant Carter conspired with Defendants Ritz and Moe to conceal from, *inter alia*, potential target business, including Plaintiff GNS, by acquiring himself, indirectly through his intermediary, EMG Worldwide, the assets of SO Tech.  Defendant Carter purposefully acted in furtherance of the acquisition scheme, for the benefit of Defendants Ritz and Moe, to obviate any need for Defendants Ritz and Moe to file any SEC-mandated disclosure of their material breach of the SO SPA.

116.     In addition, upon information and belief, help them stave off litigation brought against by the SO Tech sellers, by giving certain members of the SO Tech team, including Mark Purdy, Stephen Gray, and Daniel Priestley, employment positions with a related entity, Entrepreneurs Management Group (EMG), LLC, also founded, upon information and belief, by Defendant Carter.

117.     Upon information and belief, Defendants Ritz and Moe intentionally concealed by omitting from every disclosure document filed with the SEC, the failure of the SO Tech transaction and the reacquisition of SO Tech by related party Defendant Carter, as well as their diversion of investor funds. (*See, e.g.*, **exhibit X**, LZG Shareholders' Compl. ¶ 62).

118.    Upon information and belief, Defendants Ritz and Moe retained the monies that were due as consideration to the SO Tech sellers and promised through employment to certain SO Tech leaders, and used the monies at least in part to fund LZG's acquisition of Predictive Black Limited.

### Defendants Ritz and Moe Utilize LZG
### as a Vehicle to Acquire Predictive Black Limited.

119.    In November 2022, Defendants Ritz and Moe used LZG's wholly-owned subsidiary, FatBrain Acquisition, to purchase from shareholders all outstanding equity interests in Predictive Black Ltd. ("Predictive Black"), a UK-based innovator of real-time cash management, financial insights and business wellness for small and medium-sized enterprises ("SMEs").  (*Id*. ¶ 63).

120.    In a Share Purchase Agreement dated November 14, 2022 ("Predictive Black SPA") Defendants Ritz and Moe acquired, through FatBrain Acquisition, all outstanding shares and ownership interests in Predictive Black.[34]

121.    Having acquired all outstanding equity interests in Predictive Black, LZG thereby indirectly owned, and Defendants Ritz and Moe directly controlled, all of its assets and liabilities.

122.    Upon information and belief, Defendants Ritz and Moe negotiated on behalf of LZG the terms of the Predictive Black SPA. (*See id*. ¶¶ 63-64).[35]

123.    The total acquisition price was $3,300,000, to be delivered as follows: (i) $80,000 paid in cash and 540,000 shares of LZG common stock delivered at closing; (ii) $220,000 cash

---

[34] https://www.sec.gov/Archives/edgar/data/1126115/000165495422015468/lzgi_8k.htm, at 2, dated Nov. 16, 2022 [reporting date Nov. 14, 2022] (last accessed Apr. 21, 2025).

[35] Two of the plaintiffs in the LZG Shareholders' Derivative Action against LZG *et al*. is Zitah McMillan-Ward, Predictive Black's representative in the Predictive Black SPA, and Emanual Valadakis, a signatory of the SPA on behalf of Predictive Black.  (*See* **exhibit 2**, LZG Shareholders' Complaint).

payment on January 1, 2023; (iii) $300,000 cash payment on or before January 31, 2023.

124.    However, upon information and belief, Defendants Ritz and Moe, once again, intentionally structured the deal to enable LZG to deliver at closing only the $80,000 cash payment and the 540,000 LZG shares, while deferring for several months LZG's payment of the remaining $520,000.  (**Exhibit 2**, LZG Shareholders' Compl. ¶¶ 64-65).[36]

125.    On November 30, 2022, pursuant to the Predictive Black SPA, Defendants Ritz and Moe issued 163,512 LZG shares to Zitah McMillian-Ward, 150,228 LZG shares Emanual Valadakis, 125,874 LZG shares to Christopher Young, 27,108 LZG shares to Kirk Monteverde, and 19,008 LZG shares to James Burton.

126.    Upon information and belief, Defendants Ritz and Moe fraudulently induced the Predictive Black sellers to enter the Predictive Black SPA both by falsely representing and by omitting material facts about the transaction in, *inter alia*, transaction documents, press releases, and required SEC filings.

127.    First, Defendants Ritz and Moe falsely represented the sufficiency of LZG's funds by stating that LZG "has sufficient cash on hand or other sources of immediately available funds, to enable it to make payment of the Purchase Price and to consummate the transaction contemplated by this Agreement."

128.    However, upon information and belief, Defendants Ritz and Moe caused LZG to make only the initial cash payment of $80,000, thereby breaching the Predictive Black SPA, and to date, still owe the sellers of Predictive Black the remaining amount of $520,000.  (**Exhibit 2**, LZG Shareholders' Compl. ¶ 65).

129.    Defendants Ritz and Moe also misrepresented in SEC filings that LZG acquired

---

[36] *See* note 34 at 1, *supra*.

Predictive Black in order "to expand [LZG's] international operations and further focus [LZG's] efforts on software development and IT consulting," and that Predictive Black was "being integrated into the world-wide business of [LZG]."[37]

130.    Defendant Ritz stated in a press release: "With the Predictive Black subscription, any businesses can quickly and easily wargame critical decisions on price, product and revenue cycles. Play out the worst to best scenarios and optimize for profit - all while grounded within the context of outcome dynamics realized by their market peers."

131.    However, upon information and belief, within six to eight months of the acquisition, Defendants Ritz and Moe stopped paying the salaries of Predictive Black employees. When Predictive Black's leadership complained to Defendants Ritz and Moe, they were ignored, receiving from Defendant Ritz no communication at all.  As a result, Predictive Black's leadership resigned, leaving Predictive Black entirely in the hands of Defendants Ritz and Moe. (*See* LZG Shareholders' Compl. ¶ 66).

132.    According to publicly-filed corporate disclosures, both Predictive Black CEO Zitah McMillan-Ward and CFO/COO Emanual Valadakis were terminated from their positions on or about July 31, 2023.

133.    Upon information and belief, once Predictive Black's leadership resigned, Defendants Ritz and Moe, effectively ending the business.  (*Id*.).

134.    Publicly-filed corporate documents reveal that, on January 9, 2024, Predictive Black received in the London Gazette formal notice from the Registrar of Companies that Predictive Black would be struck off the Register and dissolved in two months.  On February 9, 2024, the compulsory strike-off action was suspended after the Register received an objection to

---

[37] https://www.sec.gov/Archives/edgar/data/1126115/000165495423004751/lzgi_10q.htm, at 18, dated Apr. 14, 2023 [reporting date Feb. 28, 2023] (last accessed Apr. 21, 2025).

the striking off.

135.    Upon information and belief, after the resignation of Predictive Black's leadership, Defendants Ritz and Moe laid off every other Predictive Black employee. (*Id*. ¶ 67).

136.    Upon information and belief, Defendants Ritz and Moe had no interest in the business of Predictive Black, but rather the leadership of Predictive Black has stated that  it was all merely "smoke and mirrors" to Defendants Ritz and Moe. (*Id*.).

137.    Upon information and belief, Defendants Ritz and Moe retained the monies that were due as consideration to the Predictive Black sellers, in the amount of $520,000, and used the monies at least in part to fund LZG's acquisition of Prime Source Group.

<u>**Defendants Ritz and Moe Utilize LZG**</u>
<u>**as a Vehicle  to Acquire Prime Source Group**</u>.

138.    On or about June 17, 2022, Defendants Ritz and Moe entered FB PrimeSource Acquisition, LLC ("PrimeSource Acquisition"), a newly formed and wholly owned LZG subsidiary, into a Master Stock Purchase Agreement ("MSPA"), dated May 17, 2022, with two Kazakhstani nationals, Yevgeniy Chsherbinin ("Chsherbinin") and Victor Nazarov ("Nazarov"), to acquire Prime Source, a Kazakhstani corporation, and its affiliates, Prime Source Innovation, Prime Source — Analytical Systems, Digitalism, and InFin-IT Solution (collectively, with Prime Source, referred to as "Prime Source Group" or "PSG").[38]

139.    Pursuant to MSPA, PrimeSource Acquisition acquired from Chsherbinin and Nazarov all interests in Prime Source Group, including all of its assets and liabilities, for an agreed upon purchase price of $18,000,000, to be paid by LZG pursuant to a payment schedule.[39]

---

[38]  https://www.sec.gov/Archives/edgar/data/1126115/000121390022034859/ea161823-8k_lzginter.htm,  at  1,  dated June 24, 2022 [reporting date June 21, 2022] (last accessed May 5, 2025).

[39]  *See* https://www.sec.gov/Archives/edgar/data/1126115/000165495423000638/lzgi_10q.htm, at 7, 14, Jan. 23, 2023 [reporting period ended Nov. 30, 2022] (last accessed May 5, 2025).

140.    In order to finance the transaction, Defendants Ritz and Moe issued to each of the PSG owners a promissory note of $6,000,000, payable pursuant to a schedule, with final payment due on December 31, 2023.

141.    The MSPA was signed on behalf of PrimeSource Acquisition by Defendant Ritz, as CEO, and on behalf of PSG by its principals, Chsherbinin and Nazarov.

142.    Upon information and belief, Defendants Ritz and Moe negotiated on behalf of LZG and PrimeSource Acquisition the terms of the MSPA.

143.    Upon information and belief, due to the close, preexisting relationship between Defendants Ritz and Moe and PSG owners Chsherbinin and Nazarov, Defendants Ritz and Moe structured differently this deal. (*See* **exhibit 2**, LZG Shareholders' Compl. ¶ 70).

144.    For instance, unlike their other acquisitions, Defendants Ritz and Moe committed LZG to paying in cash the full $18,000,000 purchase price. (*Id.*).   Yet, on March 22, 2024, Chsherbinin was issued 10,000,000 shares of LZG common stock.

145.    Upon information and belief, Defendants Ritz and Moe made in, *inter alia*, SEC disclosures, transactions documents, and press releases, misleading and untrue statements and omissions of material facts in describing to the public and to other potential business-acquisition targets, including Plaintiff Genius, the purpose of LZG's purported acquisition of PSG.

146.    For instance, Defendants Ritz and Moe made misleading statements in the MSPA about the benefits of the acquisition to LZG: "Prime Source's IT engineering scale paired with FatBrain's peer intelligence AI and accessible subscription model enables tens of millions of businesses across the Near East, Central and South Asia to join the data cloud and AI revolution."[40]

147.    Defendants Ritz and Moe held out to the public Prime Source as the largest

---

[40] *See* note 38, *supra*.

independent IT solutions provider in Kazakhstan, engaged in the business of software development, technology solutions, data management, and strategic IT consulting.[41]

148.    In a press release announcing the consummation of the transaction, Defendant Ritz spoke about the purpose of the PSG acquisition: "There are more than 213 million global growth businesses, so-called SMEs, building the economy of the future today. This acquisition allows FatBrain to turbo-charge these businesses with powerful AI and peer intelligence solutions that have historically only been available to a few of the largest companies."

149.    Defendants Ritz and Moe also promised in SEC filings that the business of Prime Source "is being integrated into the world-wide business of [LZG]."[42]

150.    Defendants Ritz and Moe further represented that LZG "acquired Prime Source to expand [its] international operations and further focus [LZG's] efforts in software development and IT consulting."

151.    However, upon information and belief, Prime Source never delivered any products or performed any services.  (*See* **exhibit 2**, LZG Shareholders' Compl. ¶ 81).

152.    Defendants Ritz and Moe misrepresented and omitted material facts from, *inter alia*, SEC disclosures, transactions documents, press releases, and Kazakhstani media reports, regarding  the nature and terms of the PSG transaction.

153.    For example, the MSPA contains a term regarding the post-closing control of PSG providing that, after closing, Prime Source "shall be managed by or at the direction of" PrimeSource Acquisition, and that PrimeSource Acquisition "will delegate authority and responsibility to manage and direct the operation of [Prime Source] . . . subject to [PrimeSource

---

[41] *See* note 39 at 1, *supra*.

[42] https://www.sec.gov/Archives/edgar/data/1126115/000121390022055586/f10k2022_lzginter.htm, at 5, dated Sept. 13, 2022 [reporting date May 31, 2022] (last accessed Apr. 21, 2025).

Acquisition's] supervision and control."[43]

154.    However, upon information and belief, Defendants Ritz and Moe had absolutely no supervisory authority over Chsherbinin and Nazarov, and exercised absolutely no managerial control over PSG.

155.    Although, in public SEC disclosures, Defendants Ritz and Moe characterized the MSPA as effecting "the change of ownership and the change in the form of management and governance" of Prime Source (*see id*), the deal was described differently by Chsherbinin in statements given to Kazakhstani media:

> We have a complex transaction structure, which assumes that we are building a single holding. In order for the holding to receive maximum capitalization and total revenue, the shares in Prime Source were sold 100% to an American partner. The idea is to combine our efforts and financial capabilities to build a large corporation. . . . [T]his is a kind of merger, as a result of which we become the owners of a single large structure.

156.    Chsherbinin stated that "in terms of resources and performance of work, according to the law, we remain a completely Kazakhstani company," and noted that Prime Source will continue to pay 100% of taxes within Kazakhstan.

157.    Contrary to the information released in LZG's public SEC disclosures, Defendant Ritz made statements to the Kazakhstani press confirming Chsherbinin's description that "once the company equities are bought from Prime Source owners, FatBrain will not change the management structure of the firm."

158.    Defendant Ritz also stated at a Kazakhstani press conference that LZG's "fundamental position" in the transaction "is not to change the structure of the asset."

159.    Chsherbinin further explained that "Prime Source works as before, remaining

---

[43]    https://www.sec.gov/Archives/edgar/data/1126115/000121390022034859/ea161823-8k_lzginter.htm,    at   15, MSPA § 5.02, dated May 17, 2022, filed with Form 8-K dated June 24, 2022 [reporting date June 21, 2022] (last accessed Apr. 25, 2025).

legally a Kazakhstani company. At the same time, by joining forces with our American partners, we are entering global markets and new opportunities"

160.    Upon information and belief, based in part on the totality of the Kazakhstani media reports, the real purpose of the transaction simply was to gain access to a larger pool of wealthy U.S. investors.

161.    Upon information and belief, Defendants Ritz and Moe used the acquisition as yet another opportunity to conduct another round of funding and raise even more money for their own personal use.  (*See* **exhibit 2**, LZG Shareholders' Compl. ¶ 71).

162.    Upon information and belief, Defendants Ritz and Moe were able to raise more funds from investors by falsely representing, to the public and to other potential target businesses, that the additional capital was necessary to complete LZG's purchase of PSG. (*Id*. ¶ 72).

163.    Upon information and belief, Defendants Ritz and Moe knowingly misrepresented to new investors that the PSG deal would generate for LZG tens of millions of dollars in revenues and would position LZG as an international AI company. (*Id*. ¶ 73).

164.    For instance, upon information and belief, after wasting away without explanation the monies raised from their U.S. investors, Defendants Ritz and Moe devised a plan to deceive new investors located in the Middle East into investing $16,000,000, in exchange for shares of LZG common stock. (*Id*. ¶¶ 74-75.)

165.    Upon information and belief, Defendants Ritz and Moe instructed the Dubai investors to transfer their funds to FatBrain's bank account, rather than to LZG's, for two reasons. (*Id*. ¶ 76).  First, Defendants Ritz and Moe were the only two individuals with full access to and control over the FatBrain bank accounts. Second, by receiving the funds through FatBrain, Defendants Ritz and Moe were able to conceal further from shareholders, future business

associates, including Plaintiff Genius, and even from LZG's then-CFO and in-house accountant, their misappropriation of LZG funds.   (*See id.* ¶ 77).

166.    Upon information and belief, Defendants Ritz and Moe did not use those funds to acquire the PSG assets, but instead diverted through Prime Source other LZG funds, by channeling those funds through fraudulent payments to Prime Source's bank account in Kazakhstan.  (**Exhibit 2**. LZG Shareholders' Compl. ¶¶ 78-79).

167.    Specifically, upon information and belief, Defendants Ritz and Moe orchestrated with Prime Source's owners a fraudulent scheme through which Prime Source regularly would bill and send invoices to LZG for work that Prime Source allegedly performed for Defendant Ritz, and LZG would pay Prime Source millions of dollars in fees for work never performed. (*Id.* ¶ 80).

168.    However, upon information and belief, Prime Source never delivered any products or performed any services, and all of Defendant Ritz's demands for work were fraudulent and intended to allow stolen funds to flow from LZG to Prime Source. (*Id.* ¶ 81).

169.    Upon information and belief, the payments from LZG to Prime Source, as well as the fact that Prime Source should have been, but was not, generating millions of dollars in revenues for LZG, raised the concerns of LZG's then-CFO and in-house accountant. (*Id.* ¶ 82).

170.    On numerous occasions, LZG's accountant requested to inspect the records justifying those expenses, and demanded to review LZG's bank statements confirming the amounts and the basis for the payments to Prime Source. (*Id.* ¶ 83).

171.    Upon information and belief, Defendant Ritz refused to provide LZG's accountant with any explanation and denied all requests to inspect the bank statements and other corporate records of LZG. (**Exhibit 2**, LZG Shareholders' Compl. ¶ 84).

172.    Similarly, upon information and belief, Prime Source also refused to share with

LZG's accountant Prime Source's financials and even refused to assist LZG in completing the audit required for LZG to remain a publicly-traded company. (*Id*. ¶ 85).

173.    Upon information and belief, Defendants Ritz and Moe retained the monies that were received from Middle East investors, in the amount of $16,000,000, and due as consideration to the PSG sellers, and used the monies at least in part to fund LZG's acquisition of Plaintiff Genius.

174.    Commission of the underlying predicate acts of mail and wire fraud enabled Defendants Ritz and Moe to utilize LZG intentionally to make misrepresentations of fact to, and to conceal from, the public and to insiders of microcap companies, for the purpose of fraudulently inducing those insiders, their microcap companies, and other potential future business acquisition targets, including Plaintiff GNS, to enter into acquisition agreements with LZG.  These false statements and omissions of fact as to the past and present and promises as to the future made by Defendants Ritz and Moe in all of the foregoing acquisition transactions, accompanied by their concealment and deception, was intended to and did fraudulently induce Plaintiff GNS into entering the APA with LZG.  Had Plaintiff GNS known of the fraudulent acquisition scheme, it would not have entered into the APA with LZG and would not have engaged in any business with Defendants Ritz and Moe.

### LZG'S BUSINESS MODEL APPLIED TO PLAINTIFF GENIUS
### The Asset Purchase Agreement

175.    Upon information and belief, by late 2023, LZG ran out of money, had its stock delisted for its delinquency in filing mandatory SEC disclosures, and could not retain an accounting firm to audit its financials. (**Exhibit 2**, LZG Shareholders' Compl. ¶ 102).

176.    In or around October 2023, Defendants Ritz and Moe sought to offload on an unsuspecting buyer LZG's ever-growing list of liabilities.

177.     Upon information and belief, Defendants Ritz and Moe planned to conduct another acquisition scheme, this time targeting Plaintiff Genius, a public company whose shares are publicly traded on the NYSE. (*See id*. ¶¶ 104, 106).

178.     Upon information and belief, Defendants Ritz and Moe targeted Plaintiff Genius in part because of its international operations that would allow Defendants Ritz and Moe to falsely, but plausibly, present the transaction to investors as the expansion of LZG into the global learning sector. (*Id*. ¶ 107).

179.     Defendant Ritz, in his capacity as CEO and a director of LZG/FatBrain, met with Roger Hamilton ("Hamilton"), the founder, CEO, and a director of Plaintiff Genius, to discuss the potential sale of LZG's assets to Plaintiff Genius.

180.     In an Asset Purchase Agreement dated January 24, 2024 ("LZG-GNS APA"), between LZG and Plaintiff Genius, Defendants Ritz and Moe agreed on behalf of LZG to sell, and Plaintiff Genius agreed to purchase, 100 percent of the stock of LZG subsidiary PrimeSource Acquisition.  (*See* **exhibit 3**, LZG-GNS APA § 2.1, dated Jan. 24, 2024).

181.     Plaintiff Genius was fraudulently induced to enter into the LZG-GNS APA on the basis false statements and omissions of material facts, made with the intent to deceive by Defendants Ritz and Moe in, *inter alia*, transaction documents, public SEC filings, and press releases, about the nature and value of the PSG assets that Plaintiff Genius believed to be purchasing through PrimeSource Acquisition.

182.     First, Defendants Ritz and Moe falsely represented to Plaintiff Genius that PrimeSource Acquisition held the same PSG assets that LZG had purchased from Chsherbinin and Nazarov, including: (i) Prime Source LLP;  (ii) Digitalism LLP;  (iii) InFin-IT-Solution LLP;  (iv) Prime Source Innovation, LLP;  and (v) Prime Source-Analytical Systems LLP.  (*See id*., Exhibit

1, List of Assets, at 32).

183.    In reality, upon information and belief, at all times relevant hereto, Prime Source Acquisition was a shell company, without any actual ownership or possessory rights to the PSG assets, which at all times remained the property of Chsherbinin and Nazarov.

184.    Defendants Ritz and Moe further misrepresented to Plaintiff Genius that the PSG assets had a value of at least $18,000,000, the purchase price that LZG agreed to pay for PSG.

185.    Based on the statements made by Defendants Ritz and Moe, Plaintiff Genius agreed to a purchase price of $15,000,000 paid in cash to LZG, to fund certain liabilities that LZG was to incur in connection with its original purchase of PSG under the terms of the LZG-GNS APA; and 73,873,784 shares of GNS common stock issued to LZG.  (*See id*. §§ 1.1(bb); 7.6).

186.    Plaintiff Genius also relied on false and misleading statements knowingly made by Defendants Ritz and Moe about the purpose of LZG's asset sale and the prospective benefits of the transaction to Plaintiff Genius.

187.    Defendants Ritz and Moe intentionally misled Plaintiff GNS to believe, and to restate in its public SEC filings and press releases:

> The partnership between Genius Group and FatBrain AI[44] will enable the delivery of a full end-to-end AI Educational Ecosystem" which would include the integration and utilization of "FatBrain AI's SAAS [Software as a Service] solutions to share peer intelligence, industry trends and leaderboards. . . . The parties intend to launch globally the overarching AI Educational Ecosystem in early 2024.

(*Id*. at 125).[45]

188.    Defendant Ritz stated in a December 11, 2023 press release issued by Plaintiff

---

[44] "FatBrain AI refers to FB PrimeSource Acquisition LLC, a Delaware based company, acquired in March 2024. FatBrain was acquired from FatBrain AI (LZG International by Genius Group Ltd and has five subsidiaries located in Kazakhstan." (GNS Form 20-F, https://www.sec.gov/Archives/edgar/data/1847806/000149311522401963/form20-f.htm, at Brief Glossary, filed May 15, 2024 [for the fiscal year ended Dec. 31, 2023] (last accessed May 14, 2025)).

[45] GNS Press Release, re: Genius Group Launches AI Education Ecosystem in Partnership with FatBrain AI, dated Dec. 11, 2023, https://www.sec.gov/Archives/edgar/data/1847806/000149311522304314/ex99-1.htm, at 1.

GNS:

> "Earlier this year we reported revenue growing by 130% Q/Q on average to $44+ million TTM across our group, and confirmed our expanded commitment to delivering AI-based SAAS solutions to take full advantage of the AI Revolution. Our partnership with Genius Group enables us to accelerate our own timeline by delivering the training alongside the peer intelligence that our clients are demanding. We are extremely excited about the growth that this will bring in 2024 and beyond."[46]

189.    In fact, upon information and belief, the PSG assets were worthless to Plaintiff Genius since the entity that it had agreed to purchase, PrimeSource Acquisition, was a shell, with no useful purpose or marketable value independent of its purported ownership rights in PSG.

190.    Defendants Ritz and Moe also knowingly made false statements and illusory promises about their intentions, and the roles that they intended to play, within Plaintiff GNS.

191.    For instance, as part of the consideration, Defendants Ritz and Moe negotiated for a change of membership on Plaintiff Genius's Board of Directors to include the existing LZG board members, *i.e.*, Defendant Moe, and for a change of Plaintiff Genius's Executive Team to include as a member, pursuant to a management agreement, LZG CEO Defendant Ritz.  (**Exhibit 3**, LZG-GNS APA § 7.8).

192.    Thus, pursuant to the terms of the LZG-GNS APA, Plaintiff Genius appointed Defendant Ritz as its Chief Revenue Officer and Defendant Moe as the Chairman of its Board of Directors.  Defendant Ritz also continued as President of the newly-acquired LZG subsidiary, PrimeSource Acquisition.

193.    Defendants Ritz and Moe fraudulently induced Plaintiff GNS into agreeing to their appointments by misrepresenting their intentions to join Plaintiff GNS as "accomplished technology and education entrepreneurs and investors."[47]

---

[46] *See* note 45 at 2, *supra*.

[47] GNS Press Release, re: Additional Details of FatBrain AI Transaction, dated Mar. 18, 2024, https://www.sec.gov/Archives/edgar/data/1847806/000149315224010222/ex99-1.htm, at 1; *see also* GNS Press

194.    Defendants Ritz and Moe also falsely held themselves out to Plaintiff Genius as indispensable to the successful integration and maximal capitalization of PrimeSource Acquisition/FatBrain within Plaintiff Genius.

195.    For instance, Defendant Moe stated in a press release issued by Plaintiff GNS on April 19, 2024:

> There has never been a more exciting time in education than in this current Age of AI, and I believe Genius Group holds a unique position, with its AI capabilities and innovations, to make the most of this once-in-a-lifetime opportunity to revolutionise education. I look forward to being a part of the Genius team and the future we are going to build together.[48]

196.    Based on Defendant Moe's representations, CEO Hamilton was led to believe that:

> Michael brings a wealth of experience in high growth companies and in the Edtech market in particular, and he shares the same excitement that we have about the revolutionary impact that AI is having on the future of learning. He has already been providing invaluable advice and connections, and guiding us forward on our growth plans. Michael is an exceptional addition to Genius Group, and we are very fortunate to have him join us both as a shareholder and as the new Chairman of our Board.

(*Id*.).

197.    Defendant Moe stated in another press release issued by Plaintiff GNS on April 26:

> The combination of Genius Group and FatBrain AI comes at a pivotal time when AI is combining with learning to create new and revolutionary education systems. I'm extremely excited to be a part of the future growth plans of Genius Group, both as a shareholder and as a member of its board. I believe that the Company has a fantastic future ahead in the ever-growing need for AI training and entrepreneur education.[49]

198.    These statements caused CEO Hamilton falsely to believe that:

> FatBrain AI has benefited from a very special group of early investors who have extensive experience in building cutting-edge education companies as well as a vision for the future of AI in education. We have been looking for shareholders who can add their expertise and experience in addition to their investment to support our future growth, and we're grateful for the support and advice we've already received from this incredible group of global leaders in education.

---

Release, re: Genius Group Announces 2023 Financial Results, dated May 15, 2024, https://www.sec.gov/Archives/edgar/data/1847806/000149315224019678/ex99-1.htm, at 3.

[48] GNS Press Release, re: Genius Group Appoints Leading Edtech Investor Michael Moe as Board Chairman, dated Apr. 19, 2024, https://www.sec.gov/Archives/edgar/data/1847806/000149315224015280/ex99-1.htm.

[49] GNS Press Release, re: Leading Education Entrepreneurs join Genius Group as New Shareholders, dated Apr. 26, 2024, https://www.sec.gov/Archives/edgar/data/1847806/000149315224016058/ex99-1.htm.

(*Id*.).

199.     Upon information and belief, once the LZG-GNS transaction closed on or about March 18, 2024, Defendants Ritz and Moe issued both at their own discretion, to themselves, friends, and associates, and at the direction of Defendant Clayton, to himself, his nominees, and the nominal officers of those nominees

200.     As a result of the transaction, in April 2024, Defendant Ritz received 12,427,876 shares of GNS common stock, or 6.68% of outstanding shares, and Defendant Moe received 5,524,945 shares of GNS common stock, or 2.97% of outstanding shares.  (**Exhibit 2**, LZG Shareholders' Compl. ¶ 135).  Prime Source CEO Chsherbinin[50] received 3,249,968 GNS shares, or 1.75% of outstanding shares.

201.     Additionally, on March 22, 2024, only four days after the LZG-GNS transaction closed, Defendants Ritz and Moe inexplicably issued to Chsherbinin 10,000,000 shares of LZG common stock.  (Exhibit, Class Action Compl. ¶ 142).

### The Scheme to Encumber, and to Conceal the Encumbrance of, the Prime Source Group Assets.

202.     The PSG assets accounted for the majority of the deliverables, and 100% of the operating revenue, that Plaintiff Genius reasonably believed, based on false representations made by Defendants Ritz and Moe, it was acquiring through PrimeSource Acquisition.[51]

203.     On or about January 10, 2024, a mere two weeks before the signing of the LZG-GNS APA on January 24, Defendants Ritz and Moe executed on behalf of PrimeSource Acquisition a series of agreements with Chsherbinin and Nazarov, conveying to Chsherbinin and

---

[50] Yevgeniy Chsherbinin also goes by Eugene Sherninin.

[51] *See* GNS Press Release, re: Additional Details of FatBrain AI Transaction, dated Mar. 18, 2024, https://www.sec.gov/Archives/edgar/data/1847806/000149315224010222/ex99-1.htm.

Nazarov the unconditional right to repossess from LZG the PSG assets in the event that LZG failed to make timely payment of its debt owed in connection with LZG's original purchase of PSG.

204.     The January 10, 2024 documents include a standstill agreement between PrimeSource Acquisition and Chsherbinin ("Chsherbinin Standstill Agreement"), a standstill agreement between PrimeSource Acquisition and Nazarov ("Nazarov Standstill Agreement"), a debt settlement agreement between PrimeSource Acquisition and Chsherbinin (Chsherbinin Debt Settlement Agreement"), a debt settlement agreement between PrimeSource Acquisition and Nazarov ("Nazarov Debt Settlement Agreement") (collectively with Standstill Agreements, the "Power of Attorney").  (**Exhibit 4**, Power of Attorney dated Jan. 10, 2024).

205.     The Standstill Agreements revised the payment terms of the promissory notes that LZG had issued to Chsherbinin and Nazarov in connection with LZG's alleged purchase of PSG, to allow for repayment in two installments, due on January 31, 2024, and on March 31, 2024.

206.     The collective effect of these agreements was to transfer back to Chsherbinin and Nazarov, at their will, dominion and control over PSG.

207.     Defendants Ritz and Moe fraudulently induced Plaintiff Genius to enter the LZG-GNS APA, first, by knowingly misrepresenting the nature of the rights that Plaintiff GNS believed it was acquiring through PrimeSource Acquisition, and then, by intentionally concealing from Plaintiff GNS throughout the due diligence process, material facts about the existence and  effect of the January 10 agreements.  (*See id*.).

208.     Defendants Ritz and Moe repeatedly misrepresented to Plaintiff Genius, in email communications sent, and public SEC disclosures filed, by wire transmission, that LZG was the true and unconditional owner of the PSG assets and, as such, could transfer them free of all Encumbrances.  (*See, e.g.*, **exhibit 3**, LZG-GNS APA § 2.1).

209.    Defendants Ritz and Moe knew at the time these statements were made that they were false, since Defendants Ritz and Moe had just executed the agreements conveying to Chsherbinin and Nazarov ownership rights superior to and enforceable against Plaintiff Genius.

210.    Defendants Ritz and Moe intentionally omitted this fact, and made patently false representations and warranties in APA, that LZG and its wholly owned subsidiary, PrimeSource Acquisition, owned the PSG assets "free and clear of all Encumbrances."

211.    The false representations and warranties contained in the APA previously and repeatedly were communicated to Plaintiff Genius in the form of draft agreements and transaction documents sent by email by Defendants Ritz and Moe, on behalf of LZG.

212.    Defendants Ritz and Moe proceeded successfully in their scheme to fraudulently induce Plaintiff Genius to enter into the APA when the transaction closed on or about March 14, 2024.

213.    On or about March 13, 2024, Defendants Ritz and Moe entered LZG into a certain Bill of Sale, Assignment and Assumption Agreement ("SAA Agreement") with Plaintiff Genius, acknowledging the parties' entry into the APA and falsely representing to Plaintiff Genius that LZG "hereby sells, conveys, transfers, assigns and delivers" to Plaintiff Genius "free and clear of all Encumbrances, all of [LZG's] right, title and interest in, to and under the Assets (as set forth in Exhibit A hereto)[.]"  (**Exhibit 5**, SAA Agreement § 2).  Exhibit A to the SAA Agreement set forth the various assets, including, most significantly here, PrimeSource Acquisition's "100% stock ownership of five companies organized under Kazakhstan law and operating in Kazakhstan," *i.e.*, the PSG assets.  (*Id.* at 11).

214.    Defendants Ritz and Moe furthered their scheme to defraud Plaintiff Genius by using the wires, primarily email, to communicate to Plaintiff Genius these false statements of fact.

215. Plaintiff Genius reasonably relied on the misrepresentations of Defendants Ritz and Moe, that LZG could transfer freely and fully the PSG assets, in seeking board approval of the transaction and deciding to enter into the APA.

216. Defendants Ritz and Moe knew or were reckless in not knowing that their false statements and fraudulent omissions would, and did, induce Plaintiff Genius to accept the terms of the APA and enter into the transaction with LZG and its wholly owned subsidiary, PrimeSource Acquisition.

217. But for these misrepresentations as to the true ownership and possessory rights of the PSG assets, and the material omissions as to the encumbrance on and inalienability of the PSG assets, Plaintiff Genius would not have transacted business with Defendants Ritz and Moe or with LZG and its wholly owned subsidiary, PrimeSource Acquisition.

**Plaintiff Genius Made Multiple Payments to LZG Before Learning
of the Fraudulent Scheme of Defendants Ritz and Moe.**

218. Under the APA, Plaintiff Genius had agreed to pay a maximum amount of $15,000,000 in LZG liabilities held by PrimeSource Acquisition. Plaintiff Genius reasonably relied on the assurances from Defendants Ritz and Moe when it began to make payments to LZG to satisfy its debt.

219. When Plaintiff Genius inquired about where to send payment to Chsherbinin and Nazarov for the PSG assets pursuant to the MSPA between LZG and Chsherbinin and Nazarov, Defendant Ritz demanded that Plaintiff Genius transfer by wire directly to LZG the $15,000,000, and falsely represented that LZG would then transfer by wire payment to Chsherbinin and Nazarov.

220. Defendant Ritz convinced Genius CEO Hamilton that payment to Chsherbinin and Nazarov should go through LZG, because Defendant Ritz had an established relationship with both

Chsherbinin and Nazarov.

221.    Plaintiff Genius CEO Hamilton reasonably relied on Defendant Ritz's misrepresentations that such payments were being sent to Chsherbinin and Nazarov, when Plaintiff Genius began in good faith to make payments toward LZG's debt and for what it believed to be the PSG assets.

222.    Specifically, the following payments were made from Plaintiff Genius to LZG:

   a.   January 29, 2024        $1,000,000;
   b.   April 4, 2024           $750,000;
   c.   April 30, 2024          $750,000;
   d.   May 3, 2024             $20,000;
   e.   May 24, 2024            $194,180;
   f.   May 28, 2024            $1,000,000;
   g.   June 20, 2024           $81,000;
   h.   June 25, 2024           $2,000,000; and
   i.   August 5, 2024          $800,000.

223.    To date, Plaintiff Genius has paid LZG a sum of $6,595,180.  All such payments were sent by wire from Plaintiff Genius to Defendants Ritz and Moe, through LZG.

**Plaintiff Genius Learns of the Encumbrance
on the PSG Assets Only After Execution of the APA.**

224.    On or about March 29, 2024, after learning of the existence of the undisclosed, secret agreements with Chsherbinin and Nazarov, Hamilton, the CEO of Plaintiff Genius, demanded that Defendant Ritz produce copies of the agreements.

225.    On March 29, 2024, Defendant Ritz sent by email to Hamilton a Dropbox link containing various documents, and insisted that the Power of Attorney was among the documents sent.

226.    However, the Dropbox link did not contain the subject documents, and Hamilton further pressed Defendant Ritz for the documents.  CEO Hamilton finally received by email, later on March 29, 2024, the subject agreements that were executed on January 10, 2024.

227.     CEO Hamilton reviewed the agreements and immediately, on the same day, called a Genius Board Meeting to discuss the matter.

228.     Defendants Ritz and Moe falsely represented in phone calls to CEO Hamilton and to individual Board members that PSG was a legitimate asset that could be delivered to Plaintiff Genius per the APA.  Based on these knowingly false assurances, the Board agreed to give Defendants Ritz and Moe more time to resolve amicably the issue.

229.     In an email to Defendants Ritz and Moe on March 29, CEO Hamilton suggested three options to rectify the breaches and salvage the transaction: a) Chsherbinin and Nazarov extinguish their Power of Attorney over the PSG assets; b) Plaintiff GNS and LZG enter into an amendment canceling the transaction in the event that LZG does not secure ownership of the PSG assets; or c) Chsherbinin and Nazarov acknowledge that the transaction presents a serious issue as to the ownership of and possessory rights to PSG and agree to a 30-day extension for repayment of the second installment of LZG's debt under the Standstill Agreements, due on March 31, 2024, while the parties resolve the matter.

230.     During the five-month period between March 2024 and August 2024, Defendants Ritz and Moe failed to secure a return of the Power of Attorney from Chsherbinin and Nazarov, and Plaintiff Genius's attempts to integrate PSG into its business operations were met with obstruction and obfuscation.

231.     During this time, Chsherbinin, the CEO of PSG, increased the purchase price of PSG from $18,000,000, as agreed to in March 2024, to more than $24,000,000 by August 2024, which meant that PSG no longer could be purchased for the maximum contractual amount of $15,000,000, as provided in the APA.

232.     On August 29, 2024, the Board of Directors of Plaintiff Genius held a board

meeting where Defendants Ritz and Moe continued their fraudulent scheme by falsely reassuring Plaintiff Genius and the Board that the PSG assets could be transferred by LZG to Plaintiff Genius as stated in the APA.

233. Relying on Defendant Ritz's prior representations about his close relationships with Chsherbinin and Nazarov, the Board tasked Defendant Ritz with negotiating a settlement with Chsherbinin and Nazarov, including a reasonable payment schedule, to ensure that Plaintiff Genius would receive the PSG assets.

234. Despite his assurances, Defendant Ritz failed to achieve this.

## Defendants Ritz and Moe Attempt by Coercion
## to Take over the Business of Plaintiff Genius.

235. Also during this period, between May and August 2024, multiple LZG shareholders contacted Plaintiff Genius to raise their concerns of mismanagement and potentially fraudulent misconduct on the parts of Defendants Ritz and Moe. (*See, e.g.*, **exhibit 2**, LZG Shareholders' Compl. ¶¶ 164-65).

236. Specifically, the LZG shareholders informed Plaintiff Genius of multiple breaches of the APA by Defendants Ritz and Moe, including, as relevant here:

  a. that Defendants Ritz and Moe had fraudulently and without LZG shareholder approval, issued to themselves millions LZG shares by obtaining from the APA a greater percentage of GNS shares (*see, e.g.*, *id*. ¶¶ 145, 155);

  b. that Defendants Ritz and Moe had entered LZG into the APA without LZG shareholder approval (*see, e.g.*, *id*. ¶ 157); and

  c. that Defendants Ritz and Moe, by and on behalf of LZG, unlawfully sold the PSG assets at a time when LZG's assets, including the same PSG assets, were subject to a lien in connection with a $3,000,000 loan made to LZG by an LZG insider (*see, e.g.*, *id*. ¶ 162).

237. By September 2024, in response to the LZG shareholders' allegations of fraud, Plaintiff Genius had demanded that Defendants Ritz and Moe provide proof of compliance with the APA, otherwise Plaintiff Genius would not authorize the release of the GNS shares that were

held in escrow during the six-month restricted period, with Plaintiff Genius's transfer agent, VStock Transfer, LLC.

238.   On September 16, 2024, Plaintiff Genius CEO Hamilton communicated to Defendants Ritz and Moe that the GNS shares received under the APA would remain restricted and withheld until Defendants Ritz and Moe delivered to Plaintiff Genius the following:

    a.  written proof of LZG shareholder approval for the issuance of all LZG shares, with a fully-approved capitalization table;

    b.  assurance that all assets purchased under APA could be freely and fully transferred by LZG, as represented in the APA, and were not encumbered, as alleged by the LZG shareholders; and

    c.  satisfactory security on the PSG assets, including power of attorney on PSG shares held in escrow, and a management contract with the PSG CEO Sherbinin, as was understood to be in place at time of the APA and as recently requested by the Genius Board.

239.   Neither Defendant Ritz nor Defendant Moe provided any of the requested information, or even responded at all to Hamilton's email.

240.   At the same time, during the month of September, Plaintiff Genius was preparing to hold an Extraordinary General Meeting on September 18, 2024, to obtain the shareholders' vote to approve a reverse stock split in order to avoid being delisted by the NYSE, as required by the terms of a $5,000,000 note issued to Plaintiff GNS by a major investor.

241.   Defendants Ritz and Moe deliberately withheld their votes and breached a Voting Agreement dated April 29, 2024, executed by all major GNS shareholders, to vote in favor of the reverse stock split.

242.   By breaching their voting agreements, Defendants Ritz and Moe knowingly caused Plaintiff Genius to breach the loan agreement with its investor and to incur a $ 1,000,000 penalty fee.

243.   Upon information and belief, Defendants Ritz and Moe purposefully did not vote

as promised in a deliberate attempt to pressure Plaintiff Genius to unlawfully release the escrowed GNS shares that were owed to the LZG shareholders under the LZG-GNS APA.

244.    On September 18, 2024, Hamilton wrote to Defendants Ritz and Moe conveying the damage that they were intentionally causing to Genius and requesting a reply. Again, none was received.

245.    On or about Sunday, September 22, 2024, while Plaintiff GNS CEO Hamilton was away on his honeymoon, Defendant Moe took advantage of CEO Hamilton's absence by secretly convening and unlawfully holding, in violation of Singapore law, a board meeting for the purpose of having himself voted in as CEO of Plaintiff GNS.[52]

246.    Defendant Moe did not invite to the September 22 board meeting all of the Plaintiff GNS board members, convening instead only Richard Berman, Salim Ismail, and Riaz Shah.

247.    Through a series of false representations and fraudulent omissions, Defendant Moe was able to persuade the only Board members present to vote out and immediately terminated Hamilton as CEO.

248.    For instance, Defendant Moe lobbied the votes of the attending board members by castigating Hamilton's performance as CEO and blamed Plaintiff GNS's poor financial condition on the public market's distrust of Hamilton.  Defendant Moe cited as evidence necessitating Hamilton's immediate removal, *inter alia*, the decreasing price of GNS stock and that Plaintiff GNS's revenues were much lower than projected in the first half of fiscal year 2022.

249.    However, Defendant Moe intentionally omitted from the voting members' consideration, the material facts that Plaintiff GNS's financial position was caused primarily by, and resulted directly from, the failed Prime Source deal.  Defendant Moe also deliberately did not

---

[52] *See* https://www.sec.gov/Archives/edgar/data/1847806/000149315224041094/form6-k.htm, dated Oct. 15, 2024.

disclose that he and Defendant Ritz acted intentionally to cause the failure of the Prime Source deal.

250.    Upon information and belief, Defendant Moe secretly held this unauthorized board meeting, with only a few select board members, for the purpose of wrongfully taking over control of Plaintiff GNS and gaining authority of the $150,000,000 At-The-Market (ATM) funding arrangement, which recently, in the week prior, had been approved by the SEC.

251.    Upon information and belief, Defendant Moe was highly motivated to install himself instantaneously as the CEO of Plaintiff GNS in order to solve his own and Defendant Ritz's personal financial troubles with the cash and shares of Plaintiff Genius.

252.    For instance, if Defendant Moe had succeeded in his attempted boardroom coup, Defendant Moe, as CEO of Plaintiff Genius, would have been able to override Hamilton's refusal to release the approximately 73,000,000 GNS shares that were being held in escrow for the LZG shareholders due to the inability of Defendants Ritz and Moe to produce proof that the original LZG shares had been issued with shareholder approval.

253.    Additionally, as GNS CEO, Defendant Moe would have had unfettered access to the ATM funds and could simply have paid off the LZG shareholders who had been complaining about the fraud and misconduct of Defendants Ritz and Moe since in or around June 2024.

254.    Upon CEO Hamilton's return from abroad, on or about September 23, 2024, Defendant Moe presented Hamilton with an invalid board resolution effecting Hamilton's immediate termination and appointing Defendant Moe as CEO and Chairman of the Board of Plaintiff GNS.[53]

255.    The Board Resolution was fraudulently obtained to the extent that Defendant Moe

---

[53] *See* https://www.sec.gov/Archives/edgar/data/1847806/000149315224037932/form6-k.htm, dated Sept. 24, 2024.

falsely represented the material facts of the matter and purposefully did not consult for approval with Plaintiff GNS's lawyers.

256.    For instance, the Board Resolution intentionally misrepresented the circumstances of Hamilton's forced separation from Plaintiff Genius, calling it a "mutually agreeable arrangement."

257.    Upon information and belief, attorney Ben Stack, of Faegre Drinker Biddle & Reath LLP, drafted without authorization the unlawful board resolution.

258.    Plaintiff GNS engaged Stacke, on or about April 9, 2024, for the limited purpose of "representation in connection with certain capital market initiatives."  Ultimately, however, the need of Plaintiff GNS to utilize Stacke's services did not arise.

259.    The April 9 engagement letter also provided that Stacke was not permitted to represent the interests of individual board members.  However, Stacke attended the September 22 unauthorized board meeting, where he held himself out as the Secretary of Plaintiff GNS and a member of Plaintiff GNS's legal team, but, upon information and belief, Stacke was acting for the benefit of Defendants Moe and Ritz.

260.    Upon information and belief, Stacke purposefully failed to notify Plaintiff GNS's corporate counsel in Singapore and its SEC lawyer of the Sunday, September 22, board meeting, to disallow their attendance and participation thereat.

261.    Upon information and belief, Stacke knew or was reckless in not knowing that the secretive board meeting was not lawfully convened.

262.    On or about September 24, 2024, based on the same allegations of fraud and misconduct, Defendant Ritz was terminated from his position as Chief Revenue Officer of Plaintiff

GNS.[54]

263.    On September 25, 2024, improperly ousted-CEO Hamilton, together with Plaintiff Genius's lawyers and management team, called an Emergency Board Meeting to fully discuss the allegations of fraud and ongoing misconduct against Defendants Ritz and Moe made by the LZG shareholders and by several former business associates of Defendants Moe and Ritz, the full details of which Defendant Moe intentionally had concealed from the GNS management team and other board members at the September 22 board meeting.

264.    Upon information and belief, Defendant Moe brought Ben Stacke to the board meeting on or about September 25, for the purpose of legitimizing, with the imprimatur of Big Law, the unauthorized September 22 board meeting and the resulting invalid Board Resolution that replaced CEO Hamilton with Defendant Moe.

265.    In addition, upon information and belief, after the September 25 board meeting, Stacke had a number of conversions with various individual board members where he lauded the character of Defendant Moe and opined on the exceedingly low probability of Defendant Moe's guilt, all while purporting to the legal representative of Plaintiff GNS.

266.    Defendant Moe brought Stacke to the board meeting on September 30, 2024, again without the authority of the proper GNS parties, where Stacke admitted that his participation was at the behest of Defendant Moe.  On or about October 23, 2024, Plaintiff GNS terminated its engagement with Stacke.

267.    On September 30, the Board passed a series of resolutions that established, *inter alia*, an investigation committee, the engagement of an independent investigator and retention of litigation counsel to take any actions necessary to protect the interests of Plaintiff GNS in relation

---

[54] *See* https://www.sec.gov/Archives/edgar/data/1847806/000149315224037932/form6-k.htm, dated Sept. 24, 2024.

to the allegations made by the LZG shareholders, the resignation of Defendant Moe as Chairman of the Board of Plaintiff GNS.[55]

268.    The board resolutions also affirmed that Hamilton remained as the CEO of Plaintiff GNS and replaced Defendant Moe as the chairman of the board with Director Salim Ismail. (*Id.*).

269.    Even after the failure of their boardroom coup, both Defendants Ritz and Moe persisted in their attempts to influence the decisionmaking of Plaintiff GNS board members, leading to two weeks of internal conflict and resulting in a threat of a GNS shareholder lawsuit against the four Board members who executed the invalid board resolution terminating CEO Hamilton, including Defendant Moe, for acting in breach of their fiduciary duties.

270.    This compelled Plaintiff GNS's management team and a group of majority GNS shareholders to engage a Singapore law firm to better understand its legal options against all four signatory-Board members and to demand their immediate resignations from Plaintiff GNS.

271.    This led to the voluntary resignation of all four of the offending Board members, including Defendant Moe, on or about October 9, 2024.[56]

272.    During this period, the same LZG shareholders that had been complaining about the fraud and misconduct of Defendants Ritz and Moe since in or around June 2024, proceeded to file individually and on behalf of LZG two lawsuits against, *inter alia*, Defendants Ritz and Moe, based upon the same conduct.

273.    The LZG shareholders filed a class action in the District Court for the Southern

---

[55] *See also* https://www.sec.gov/Archives/edgar/data/1847806/000149315224038950/form6-k.htm, dated Oct. 1, 2024.

[56] *See also* https://www.sec.gov/Archives/edgar/data/1847806/000149315224041094/form6-k.htm, dated Oct. 15, 2024.

District of New York on October 4, 2024,[57] and a derivative action in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida on October 14, 2024.[58]

274.    Having some understanding of the pattern and practice of fraudulent conduct committed by Defendants Ritz and Moe, and their continued active participation in the misconduct while inside Plaintiff Genius, Plaintiff Genius's management hired private investigators in Kazakhstan to learn the involvement of the purported sellers of PSG, Chsherbinin and Nazarov, and to investigate the movement of funds that Plaintiff Genius had paid to Defendants Ritz and Moe, through LZG/FatBrain.

275.    Investigators uncovered that Nazarov, whom Chsherbinin and Defendants Moe and Ritz blamed for unilaterally and continually increasing the purchase price of PSG, in fact was not the ruthless, multi-millionaire entrepreneur that they had painted him to be.  Instead, he is or was an insolvent individual residing at the same address as PSG, who has or had bailiffs monitoring his bank accounts and is or was banned from leaving the country of Kazakhstan.

276.    Upon information and belief, the funds being sent by Plaintiff GNS for Nazarov's purported 50% share of PSG were being paid to someone else that may be, according to allegations in the LZG Shareholders' lawsuit, Defendants Ritz and Moe themselves.

277.    Defendants Ritz and Moe both were questioned about their knowledge of Nazarov, to which Defendant Moe replied that he had never met Nazarov and Defendant Ritz sent to CEO Hamilton, as proof of Nazarov's existence, a picture of a half-naked man in a Kazakhstan sauna.

278.    Later, at a meeting between Plaintiff Genius CEO Hamilton and Defendant Ritz in

---

[57] *Shawn Carey et al., individually and on behalf of all others similarly situated v. Michael Moe et al.*, Case No. 1:24-cv-07551-MKV (S.D.N.Y. Oct. 4, 2024) ("LZG Shareholders' Class Action")

[58] *Shawn Carey et al., individually and on behalf of LZG v. Michael Moe et al.*, Case No. 2024-019773-CA-01 (CA 44) (Fl. Dist. Ct. Oct. 14, 2024) ("LZG Shareholders' Derivative Action"); Removal Case No. 1:25-cv-21062-JEM (S.D.F.L. Mar. 7, 2025).

New York City on February 27, 2025, Defendant Ritz admitted "I will never know if Victor [Nazarov] is real or not… if he's fictitious, he's fictitious." (**Exhibit 6**, Transcript of Feb. 27, 2025 Meeting with Ritz at 17).

### Defendants Ritz and Moe Attempt to Extort Plaintiff Genius in Furtherance of the Acquisition Scheme.

279.     On or about October 27, 2024, in a truly ridiculous letter that for the first time since the inception of the relationship accuses CEO Hamilton of materially breaching the LZG-GNS APA and causing LZG at least $65,000,000 in damages, Defendants Ritz and Moe proposed, under the guise of a mutually-beneficial resolution, that the parties rescind the LZG-GNS APA.

280.     In the Letter, Defendants Ritz and Moe attempt fraudulently to induce Plaintiff GNS to submit to their proposal by threatening to team up with the same LZG Shareholders that had only days earlier instituted two separate actions against, *inter alia*, Defendants Ritz and Moe, and by falsely stating that

> Since the filing of their original complaint, these LZG[] shareholders have expressed interest and willingness to combine their efforts with the efforts of Messrs. Michael Moe and Peter Ritz . . . Messrs. Moe and Ritz in their positions as management and board members of LZG[] are now disposed to work with those LZG[] shareholders who have filed against GNS to affect [*sic*] a resolution of the claims.[59]

281.     Defendants Ritz and Moe intentionally omitted from their letter seeking rescission the material facts that plainly contradict the allegations of CEO Hamilton's breach of the LZG-

---

[59] It is true that CEO Hamilton and Plaintiff GNS were named as defendants in the LZG Shareholders' Class Action, filed on October 4, 2024, and that Plaintiff GNS initially was a named defendant in the LZG Shareholders' Derivative Action, filed on October 14, 2024.

However, the LZG Shareholders' voluntarily dismissed the Class Action, pursuant to Fed. R. Civ. P. 41(a)(1)(i), on February 25, 2025. (*See* 1:24-cv-07551-MKV, DE 43, Notice of Voluntary Dismissal (S.D.N.Y. Feb. 25, 2025)). And, on March 24, 2025, Plaintiff GNS was voluntarily dismissed, pursuant to Fed. R. Civ. P. 41(a)(1)(i), from the LZG Shareholders' Derivative Action. (*See* Case No. 1:25-cv-21062-JEM, DE 36, Notice of Voluntary Dismissal of Defs. Eric Pulier and GNS (S.D.F.L. Mar. 24, 2025)).

Upon information and belief, Plaintiff GNS was dismissed individually from the Derivative Action for the reason that the LZG Shareholders now consider Plaintiff GNS and CEO Hamilton to have been similarly defrauded and victimized by Defendants Ritz and Moe and LZG.

GNS APA or that would tend to absolve of liability CEO Hamilton, for the purpose of misleading Plaintiff GNS as to the magnitude and materiality of any purported breaches by it of the APA. (*Id.*).

282.    Defendants Ritz and Moe stated falsely that they had agreed to team up with the LZG Shareholders, pooling together their collective efforts and superior resources, to jointly go after Plaintiff GNS and CEO Hamilton.

283.    Had Defendants Ritz and Moe successfully intimidated Plaintiff GNS into submission, Defendants Ritz and Moe effectively would have placed in the middle of their dispute with the LZG Shareholders, Plaintiff GNS in order to force Plaintiff GNS to pay to the LZG Shareholders a settlement for the benefit of resolving the lawsuits against Defendants Ritz and Moe.

284.    On November 11, 2024, Defendants Ritz and Moe sent a follow-up letter to "inform" Plaintiff GNS of the LZG-GNS APA and LZG's "willingness to deliver to GNS all 'Purchase Price' shares (7,387,378) of GNS for the complete release of LZG[]'s assets."  (**Exhibit 7**, LZG Notice of Rescission dated Nov. 11, 2024).

285.    Both the October 27 and November 11 letters were signed by Defendant Ritz, as CEO of LZG, and Defendant Moe, as Executive Chairman of LZG.

286.    CEO Hamilton clarified in an email to Defendants Ritz and Moe on November 13, 2024, that rescission of the APA would require LZG to return not only the 7,387,378 GNS shares, but also the $6,595,180 that Plaintiff Genius had paid in cash toward the PSG asset, and require Plaintiff Genius, not to "release" the PSG asset, but only to agree not to receive it from LZG, because Plaintiff Genius could not return what it never received.

287.    On or about November 19, 2024, CEO Hamilton and Defendant Ritz met in London

where the parties signed a proposed settlement agreement based on Defendant Ritz's insistence that any agreement would require Defendants Ritz and Moe receiving an additional $3,000,000 to settle the LZG Shareholders' Class Action and the LZG Shareholders' Derivative Action. CEO Hamilton explained that any final settlement among the parties would require the approval of Plaintiff GNS's Board.

288. Thereafter, Plaintiff GNS's Board of Directors agreed to a rescission of the LZG-GNS APA, where Plaintiff GNS would release LZG's assets, and LZG would return the approximately 7,300,000 GNS shares and return in the form of a loan approximately $6,500,000 in GNS funds.

289. Ultimately, however, the Board of Plaintiff GNS did not approve the additional $3,000,000 payment to Defendants Ritz and Moe, due to their various prior violations of trust and breaches of the LZG-GNS APA.

290. On or about November 26, 2024, CEO Hamilton spoke by phone with Defendant Ritz, and the parties agreed on the final terms to be included in the settlement agreement, which did not include the additional $3,000,000 payment.

291. CEO Hamilton sent Defendant Ritz, on or about November 27, a draft settlement agreement, to be reviewed by the parties' respective lawyers and approved by their respective boards of directors.

292. On or about the same day, Defendant Ritz objected to CEO Hamilton's November 28 draft settlement agreement on the ground that this version did not contain the additional $3,000,000 payment to Defendants Ritz and Moe to enable "the termination of the legal cases [against Defendants Ritz and Moe] filed in the Federal courts of Florida and New York."

293. After some more back and forth, on or about December 2, 2024, Defendant Ritz

sent to CEO Hamilton a counter-proposed settlement agreement that included, *inter alia*, the additional $3,000,000 payment.

294.    Upon information and belief, Defendants Ritz and Moe sought to extract from Plaintiff GNS as a personal benefit, the additional $3,000,000 payment for the purpose of paying off the LZG Shareholders to settle the actions brought against, *inter alia*, Defendants Ritz and Moe.

295.    Plaintiff Genius's Board immediately saw this eleventh hour request for an additional $3,000,000, for nothing in return, as a clear extortion attempt by Defendants Ritz and Moe, and refused to settle with the additional term.  Instead, Plaintiff Genius's Board voted to proceed with arbitration to resolve the matter.

296.    On November 7, 2024, Plaintiff Genius filed in the District Court for the Southern District of New York a petition for a temporary restraining order and preliminary injunction in aid of arbitration, to protect the shares of GNS common stock subject to arbitration.  (*Genius Group Ltd. v. LZG International. Inc., Michael Moe, Peter Ritz* ("GNS Petition Action"), Case No. 1:24-cv-08464-KPF, DE 1, Petition for TRO and PI in Aid of Arbitration (S.D.N.Y. Nov. 7, 2024)).

297.    Subsequently, on or about December 17, 2024, the preliminary injunction was entered on the consent of Defendants Ritz, Moe, and LZG.  (*See id*., **exhibit 8,** DE 34, Stipulation and Order for Entry of PI on Consent (Dec. 17, 2024)).

298.    However, in February, Defendants Ritz and Moe proceeded to file a petition for their own temporary restraining order and preliminary injunction to prevent Plaintiff Genius from being able to utilize its $150,000,000 ATM funding line, issue shares, raise funds or grow its Bitcoin Treasury.  (*See id*., DE 58, Order to Show Cause for TRO (Feb. 14, 2024)).

299.    Defendants Ritz and Moe effectively defrauded the court by submitting false

statements, which have no basis in fact, in order to convince the court to grant a temporary restraining order and preliminary injunction, which the court did on, February 14, 2025 (*see id*., DE 62, Order Granting LZG TRO), and March 13, 2025 (*see id*., DE 99, Order Granting LZG PI), respectively.

300.    As a result, Plaintiff Genius had been operating under severe undue financial straits as a result of Defendants Ritz's and Moe's willingness to defraud the court in furtherance of their acquisition scheme to facilitate the collapse of Plaintiff Genius, being restricted by court order from conducting its normal business as a public company, and incurring $500,000 in damages *daily* for nearly three months, from February 14, 2025, until May 6, 2025.[60]

301.    Defendants Ritz's and Moe's fervent extortion of Plaintiff Genius was at its most egregious at a meeting, sought by Defendant Ritz, that took place in New York on February 27, 2025, between Defendant Ritz, CEO Hamilton and Eva Mantziou, Plaintiff Genius's Chief Legal Officer and Chief People Officer, one day before the court hearing to extend the temporary restraining order enjoining Plaintiff Genius from its regular business practices.

302.    At the meeting, Defendant Ritz acknowledged the cost that the temporary restraining order imposed on Plaintiff Genius's business and proposed that Plaintiff Genius pay an additional $5,000,000 to Defendant Ritz, so that he may take PSG and repackage it under a new business, effectively defrauding both LZG's and Plaintiff Genius's shareholders out of the combined $15,000,000 already paid for the PSG asset, for nothing in return.

303.    Defendant Ritz threatened that if Plaintiff GNS didn't comply, he could bankrupt

---

[60] On May 6, 2025, the Second Circuit granted Plaintiff Genius's motion to stay pending appeal the enforcement of the preliminary injunction issued against it, deciding that Plaintiff Genius had "made a strong showing that it is likely to succeed on the merits and suffers clear irreparable injury absent a stay, warranting a stay pending appeal." (*Genius Group Limited v. LZG International, Inc., et al*, Appeal No. 25-630 (2d Cir), ECF No. 26 at 2).  Although Plaintiff Genius may at this moment resume normally operating its business, the damage is done.  Plaintiff Genius has suffered in damages an amount no less than $25,000,000 representing in part the harm caused by the inability to raise capital to sustain its operations, during the nearly three-month period of its improper enjoinment.

LZG to ensure that Plaintiff GNS received nothing from the arbitration, stating, "if I leave this thing, you will never see your money … so let's say you give me … well you already invested six and a half million dollars. Give me another … five million bucks. I'm just picking a number, okay? … The good thing about LZGI, I control it. The bad thing about LZGI right now, it has this six and a half million liability that you point out, and it has liabilities every which way…." (*See* **Exhibit 6**, Ritz Tr. at 11-12).

304.     CEO Hamilton confronted Defendant Ritz on his scheme, asking "you are saying you think it's okay for you to go and sell or raise money and own and build Prime Source separately while at the same time still not settling the arbitration on Prime Source?" (*Id.* at 21).

305.     Defendant Ritz replied, "Again, I don't want to kind of give you how that will proceed, but there is a situation in which LZGI is fighting this arbitration because the party is LZGI, and Prime Source can move on itself…," and then detailing how he would proceed with the fraudulent scheme and naming others as participants, including Defendant Moe. (*See id.* at 21, 32).

306.     The plan that Defendants Ritz and Moe had at the outset for Plaintiff GNS to succumb to their fraudulent acquisition scheme has since become clear to Plaintiff GNS.

307.     Upon information and belief, Defendants Ritz and Moe planned, either to fraudulently induce, under the guise of the PSG asset sale, Plaintiff Genius into paying monies, through LZG/FatBrain, to bank accounts wholly controlled by, and for the personal benefit of, Defendants Ritz and Moe; or to extort the monies from Plaintiff Genius, under the threat of an abuse of the legal process by Defendants Ritz and Moe to fraudulently seek and improperly maintain a financially-devasting injunction against Plaintiff Genius.

308.     Plaintiff Genius was just the latest victim in the current chapter of Defendant Ritz's

and Moe's long running acquisition scheme, carried out in part through their concerted acts of mail fraud, wire fraud and extortion.

**The Damage and Ongoing Injuries to Plaintiff Genius's Business**

309.    Plaintiff GNS has suffered grave and direct injuries to its business and property.

310.    Since the date that Defendants Ritz and Moe managed to get a temporary restraining order against Plaintiff GNS, on February 14, 2025 (24-cv-8486, DE 62), until the Second Circuit's decision to stay pending appeal the court's March 13 order granting their preliminary injunction, on May 7, 2025 (2d Cir., 25-630, DE 26.1 (May 7, 2025)), Plaintiff GNS, an emerging company, has suffered immeasurable damage to its business, both in terms of the loss of its operations and to its goodwill, *inter alia*.

311.    In addition to the $500,000 per week in lost funding Plaintiff Genius had incurred for over six weeks due to being prohibited from the normal use of its ATM funding agreement, Defendants Ritz and Moe were aware that the prolonged restriction on Plaintiff Genius's funding to maintain normal operations would lead, and has led, to a precipitous drop in Plaintiff Genius's share price and market capitalization.

312.    As of today, Plaintiff GNS has lost $27,500,000 in direct funding that is not recoverable from the market, based on an 11-week period at an average of $2,500,000 per week. This has massively impacted the business operations of Plaintiff GNS, which relies on these funds, and pushed Plaintiff GNS from a growing, thriving business, to a business that would have been bankrupt within a matter of months.

313.    Plaintiff GNS had to downsize due to not having the funds to maintain operations, cutting more than 30% of its workforce and operations, and had to cancel marketing that has led to the loss of more than $1,000,000 in monthly revenue.

314.     Plaintiff GNS also has had to shelve all M&A activities, which will cause Plaintiff GNS to miss growth targets that it  had set for the year, with an additional $10,000,000 in revenue lost for the year.

315.     In April 2025, Plaintiff GNS had to cancel loans to recover the funds at great cost to it. Plaintiff GNS lost a total of $7,000,000 in exchange losses and cancellation fees which it would not have been forced to do if not for the improperly-obtained preliminary injunction.

316.     Upon information and belief, the preliminary injunction was obtained by Defendants Ritz and Moe with the intent to financially cripple Plaintiff GNS by preventing it from raising money to fund its operations.

317.     Upon information and belief, Defendants Ritz and Moe sought the preliminary injunction against Plaintiff GNS for the purpose of sabotaging its business.  As a result, Plaintiff GNS lost the entirety of the SEC-approved $250,000,000 ATM funding line.

318.     Even with the temporary stay of the preliminary injunction, Plaintiff GNS has forever lost this $250,000,000 ATM funding, and now is permitted to raise by ATM only a "baby shelf," *i.e.*, up to 30% of Plaintiff Genius's market capitalization, or $10,000,000.

319.     Upon information and belief, in order to prolong the litigation, Defendants Ritz and Moe filed incorrect papers on the bond, causing delay and additional legal work to rectify.

320.     In addition to the costs of this litigation, Plaintiff GNS has to date incurred approximately $700,000 in attorneys' fees and costs to defend itself against the improperly obtained preliminary injunction.

321.     In total, the damages that Plaintiff GNS has directly incurred as a result of the improper preliminary injunction alone is more than $250,000,000, warranting a treble damages award of at least $750,000,000.

322.    All of the foregoing harm was foreseeable by the Defendants and was directly and proximately caused by conduct alleged herein.

**RICO Acts: Wire Fraud, Mail Fraud, and Extortion**

323.    As alleged herein, since 2021, LZG has been engaged in an acquisition scheme of purchasing or otherwise acquiring targeted business entities, by making false representations and omissions of material fact in publicly-filed SEC disclosure documents, press releases, and transaction documents, for the purpose of fraudulently inducing these targeted entities to enter into purchase agreements with LZG.

324.    Defendants Ritz and Moe committed mail fraud and wire fraud by knowingly devising and/or participating in a scheme to fraudulently induce businesses targeted for acquisition with or by LZG to enter acquisition agreements; Defendants Ritz and Moe did so willingly with an intent to defraud; and Defendants Ritz and Moe used the U.S. mails and/or the interstate wires for the purpose of executing the acquisition scheme.  *See Langford v. Rite Aid of Alabama, Inc.*, 231 F.3d 1308, 1312 (11th Cir. 2000); *see also* 18 U.S.C. §§ 1341, 1343.

**COUNT I**
**Violation of Racketeer Influenced and Corrupt Organizations Act,**
**18 U.S.C. § 1962(c) and Fla. Stat. § 895.03(3)**
**(Against Defendants Peter Ritz and Michael Moe)**

325.    This Count arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) and Fla. Stat. § 895.03(3).  The allegations of paragraphs 63 through 174 are incorporated herein by reference.

326.    18 U.S.C. § 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a

pattern of racketeering activity . . ."[61]

327. Defendants Ritz and Moe are "persons" under 18 U.S.C. § 1961(3) because they are individuals capable of holding a legal or beneficial interest in property.[62]

328. LZG is a legal corporation engaged in, or the activities of which affect, interstate and foreign commerce, and thus constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4) and Fla. Stat. § 895.02(5).[63]

329. Since 2021, Defendants Ritz and Moe were employed by LZG, the enterprise, either as controlling officers or directors, and intentionally conducted and participated, directly and indirectly, in the operation and management of LZG, and its wholly owned subsidiary, PrimeSource Acquisition, through a pattern of racketeering activity,[64] described in paragraphs 175 through 201, that involved the predicate acts of mail fraud, wire fraud, and extortion.

330. Since 2021, Defendant Ritz has been the CEO, CFO, and Secretary of LZG (*see* ¶ 12, *supra*), Defendant Moe has been a director on LZG's Board of Directors (*see* ¶ 15, *supra*).

331. Defendants Ritz and Moe, together and with intent to defraud, knowingly participated in a fraudulent scheme to acquire different microcap companies with the false promise of helping those companies grow their business, and once the acquisition agreement was signed, Defendants Ritz and Moe took over control of the acquired microcap companies, through

---

[61] Fla. Stat. § 895.03(3) reads: "It is unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity . . ."

[62] A "person" is defined to include "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

[63] An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *see also* Fla. Stat. § 895.02(5) (defining "enterprise" as "any individual, sole proprietorship, corporation, business trust, union chartered under the laws of this state, or other legal entity, or any unchartered union, association, or group of individuals associated in fact although not a legal entity; and it includes illicit as well as licit enterprises and governmental, as well as other, entities. . . .").

[64] A "pattern of racketeering activity" "requires at least two acts of racketeering activity," the last of which occurring "within ten years … after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

additional acts of mail and wire fraud and extortion, and looted and diverted by wire the assets of the acquired microcap companies, until the point of insolvency.

332.    Specifically, Defendants Ritz and Moe, with intent to defraud Plaintiff Genius, managed and operated LZG and its wholly owned subsidiary, PrimeSource Acquisition, to fraudulently induce Plaintiff Genius to acquire the assets of PrimeSource Acquisition, by making false promises through the wires, including in SEC filings electronically posted to the public EDGAR database, to the shareholders and insiders of Plaintiff Genius, including the CEO, that, once acquired by Plaintiff Genius, Defendants would remain the controlling officers and directors of PrimeSource Acquisition and assist Plaintiff Genius in integrating into its business the PSG assets.

333.    In furtherance of their scheme to fraudulently induce Plaintiff Genius to acquire the PSG assets, Defendants Ritz and Moe intentionally concealed from the insiders of Plaintiff Genius, including its CEO, LZG's financial history and condition, by failing to identify during the due diligence process the existence of LZG's liabilities with respect to the PSG assets, and misrepresented the ability and intent of LZG, and its wholly owned subsidiary, PrimeSource Acquisition, to consummate the transaction and transfer the PSG assets.  These misrepresentations and omissions of material fact were made, *inter alia*, by electronic communications, including by email, and in publicly filed SEC documents.

334.    Plaintiff Genius relied on the misrepresentations and omissions of material facts made by Defendants through wire communications and in public SEC filings, and was fraudulently induced into entering into the asset purchase agreement with LZG and its wholly owned subsidiary, Prime Source Acquisition, to acquire the PSG assets and certain of LZG's liabilities.

335.    In reliance on Defendants' misrepresentations of LZG's financial condition and

ability to consummate the acquisition, Plaintiff Genius forwarded by wire to LZG sums in excess of $6,000,000 for the purpose of purchasing the PSG assets. Upon information and belief these funds were instead diverted by wire transfer to Defendants Ritz and Moe for their personal use.

336.   In furtherance of the same scheme to fraudulently induce Plaintiff Genius to purchase the PSG assets, Defendants Ritz and Moe negotiated to remain as the controlling officers of the newly-acquired PrimeSource Acquisition and join Plaintiff Genius by falsely representing, by electronic communications and public SEC filings, their desire and intent to assist Plaintiff Genius with the integration into Plaintiff Genius's business of the PSG assets and to conduct the affairs of the newly-acquired PrimeSource Acquisition in the best interests, to help grow and expand, the business of Plaintiff Genius.

337.   Defendants Ritz and Moe falsely represented that LZG possessed the necessary funds to consummate the asset purchase transaction. Defendants Ritz and Moe engaged in acts of mail and wire fraud by electronically communicating in SEC filings posted to a public database, these false representations and illusory promises in furtherance of their scheme to have LZG takeover Plaintiff Genius and misappropriate for their own personal use, Plaintiff Genius's business and assets.

338.   Through the use of wire communications (*i.e.*, telephone and email), Defendants Ritz and Moe induced Plaintiff Genius into executing the LZG-GNS APA on January 24, 2024, whereby LZG obtained more than $6,000,000 and 73,873,784 shares of Plaintiff Genius common stock from Plaintiff Genius in exchange for encumbered title to the PSG Assets by means of a fraudulent material misrepresentation by omission between January 10, 2024, and March 29, 2024.

339.   Prior to entering into the LZG-GNS APA, Defendants Ritz and Moe participated in the same or similar schemes to defraud no fewer than three other entities by inducing those entities,

through wire communications, into entering fraudulent transactions for the personal financial benefit of Defendants Moe and Ritz, as alleged in paragraphs 70 through 174.

340. The actions described herein constitute a pattern of racketeering activity by Defendants Ritz and Moe—two or more predicate acts of fraud by wire.[65]

341. As a direct and proximate result of Defendants Ritz's and Moe's racketeering activity, Plaintiff Genius has been injured with regard to its property because Defendants Ritz and Moe, among other things: (i) pocketed $6,595,180.00 that Plaintiff Genius paid toward the purchase of encumbered title to the PSG Assets; (ii) prevented Plaintiff Genius from utilizing the common shares transferred to Defendants Ritz and Moe pursuant to the LZG-GNS APA to raise additional working capital pursuant to the ATM Agreement; (iii) caused Plaintiff Genius to lose over $15,000,000 in working capital by improperly seeking injunctive relief for the sole purpose of extorting Plaintiff Genius to pay millions of dollars to Defendants Ritz and Moe; and (iv) will cause Plaintiff Genius to suffer damages in the amount of no less than $250,000,000 in lost working capital should Plaintiff Genius lose access to its ATM funding agreement.

342. Therefore, pursuant to the provisions of 18 U.S.C. § 1964(c), Plaintiff Genius is entitled to treble damages against Defendants Ritz and Moe as allowed herein, as well as costs and reasonable attorney's fees.

### COUNT II
### Violation of Racketeer Influenced and Corrupt Organizations Act,
### 18 U.S.C. § 1962(a) and Fla. Stat. § 895.03(1)
### (Against Defendants Ritz and Moe)

343. This Count arises under the Racketeer Influenced and Corrupt Organizations Act,

---

[65] Pursuant to 18 U.S.C. § 1343, fraud by wire occurs when "whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice…." 18 U.S.C. § 1343.

18 U.S.C. § 1962(a) and Fla. Stat. § 895.03(1).  The allegations of paragraphs 175 through 308 are incorporated herein by reference.

344.    18 U.S.C. § 1962(a) makes it unlawful "for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . in which such person has participated as a principal within the meaning of [18 U.S.C. § 2], to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."[66]

345.    The basic purpose of section 1962(a) is to prevent racketeers from using their ill-gotten gains to operate, or purchase a controlling interest in, a legitimate business.

346.    Defendants Ritz and Moe are "persons" under 18 U.S.C. § 1961(3) because they are individuals capable of holding a legal or beneficial interest in property.

347.    Under section 1962(a), the "enterprise" is the vehicle for the use or investment of RICO proceeds.  Here, the enterprise is Plaintiff Genius, a Singapore legal entity that does business in the U.S. and has some effect both on interstate and foreign commerce.

348.    Defendants Ritz and Moe violated section 1962(a) by fraudulently obtaining funds from a pattern of racketeering activity, described in paragraphs 70 through 174, that began with making, through the mails and wires, false statements and omissions of material fact to the third-party business entities targeted by Defendants for acquisition with or by LZG, and then used or invested those funds to acquire an interest in Plaintiff Genius.

---

[66] Fla. Stat. § 895.03(1) reads: "It is unlawful for any person who has with criminal intent received any proceeds derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, whether directly or indirectly, part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation of any enterprise."

349.    Specifically, Defendants Ritz and Moe secured income indirectly from acts of mail and wire fraud by fraudulently inducing business acquisition targets, including Intellagents, SO Tech, Predictive Black, and Prime Source Group, to enter acquisition agreements with LZG or its subsidiary, through false representations and omissions of material fact as to the past and present and through promises as to the future.

350.    Defendants Ritz and Moe committed acts of mail and wire fraud as "principals," with intent or knowledge, rather than by mistake or accident.

351.    Then, Defendants Ritz and Moe used or invested the funds fraudulently retained from LZG's acquisition and operation of Intellagents (*see* ¶ 86, *supra*), SO Tech (*see* ¶ 118, *supra*), Predictive Black (*see* ¶ 137, *supra*), and PSG (*see* ¶¶ 173-174, *supra*), to further the acquisition scheme by acquiring an interest in Plaintiff Genius.

352.    Defendants Ritz and Moe used that income to fund LZG's acquisition transaction with Plaintiff Genius, through additional acts of mail and wire fraud, proffering precisely the same false representations and omissions of material fact intended to fraudulently induce Plaintiff Genius to acquire LZG subsidiary PrimeSource Acquisition.  (*See* ¶¶ 175-217, *supra*).

353.    Defendants Ritz and Moe reinvested a portion of the funds retained from the acquisition scheme committed against the other victims to expand the scheme to acquire an interest in Plaintiff Genius, which continuously has harmed Plaintiff Genius.

**COUNT III**
**Violation of Racketeer Influenced and Corrupt Organizations Act,**
**18 U.S.C. § 1962(d) and Fla. Stat. § 895.03(4)**
**(Against Defendant Michael Carter)**

354.    This Count arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d) and Fla. Stat. § 895.03(4).  The allegations of paragraphs 87 through 118 are incorporated herein by reference.

355.    18 U.S.C. § 1962(d) makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."[67]  Here, Defendant Carter conspired with Defendants Ritz and Moe to engage in the conduct prescribed by subsections (a) and (c).

356.    Defendants Ritz, Moe, and Carter are "persons" under 18 U.S.C. § 1961(3) because they are individuals capable of holding a legal or beneficial interest in property.[68]

357.    Defendants Ritz, Moe, and Carter acted as a group persons that associated informally, with the purpose of conducting illegal activity, and therefore are an association in fact constituting an "enterprise" within the meaning of 18 U.S.C. § 1961(4) and Fla. Stat. § 895.02(5).[69]

358.    Defendant Carter conspired with Defendants Ritz and Moe to conceal from the public, including Plaintiff Genius, that Defendants Ritz and Moe materially breached the SO Tech SPA by failing to remit the $1,700,000 deferred cash payment and that, as a result, the SO Tech acquisition was rescinded and sold back to its owners for $ 1.  (*See* ¶¶ 97-98, *supra*).

359.    Defendant Carter manifested by word and action an agreement with Defendants Ritz and Moe to facilitate the acquisition scheme through the commission at least two predicate acts.

360.    First, after Defendants Ritz and Moe lost SO Tech in a forced resale, Defendant Carter agreed himself to acquire, indirectly through his intermediary, EMG Worldwide, the assets of SO Tech.

---

[67] Fla. Stat. § 895.03(4) reads: "It is unlawful for any person to conspire or endeavor to violate any of the provisions of subsection (1), subsection (2), or subsection (3),"

[68] A "person" is defined to include "any individual or entity capable of holding a legal or beneficial interest in property."  18 U.S.C. § 1961(3).

[69] An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4); *see also* Fla. Stat. § 895.02(5) (defining "enterprise" as "any individual, sole proprietorship, corporation, business trust, union chartered under the laws of this state, or other legal entity, or any unchartered union, association, or group of individuals associated in fact although not a legal entity; and it includes illicit as well as licit enterprises and governmental, as well as other, entities. . . .").

361.     Defendant Carter purposefully acted in furtherance of the acquisition scheme, for the benefit of Defendants Ritz and Moe, to obviate any need for Defendants Ritz and Moe to file any SEC-mandated disclosure of their material breach of the SO SPA. (*See* ¶¶ 112-115, *supra*).

362.     In addition, Defendant Carter helped Defendants Ritz and Moe stave off litigation against LZG by the SO Tech sellers, by giving certain members of the SO Tech team, including Mark Purdy, Stephen Gray, and Daniel Priestley, employment positions with a related entity, Entrepreneurs Management Group (EMG), LLC, also founded by Defendant Carter.  (*See* ¶¶ 116-117, *supra*).

363.     By acquiring SO Tech and employing its sellers, Defendant Carter acted intentionally to facilitate the acquisition scheme by covering up Defendants' conversion of the deferred cash payment due under the SO Tech SPA and the unmitigated failure of the SO Tech deal caused by Defendant Ritz's and Moe's self-dealing.

364.     Defendant Carter furthered the acquisition scheme by allowing Defendants Ritz and Moe to avoid detection as fraudsters and to assure the secrecy of the acquisition scheme.

365.     Defendants Ritz and Moe were able to, and did, omit from, *inter alia*, required SEC disclosure documents, and conceal from Plaintiff Genius during the due diligence process, the details of their breach of the SPA and resulting failure of the SO Tech transaction.

366.     As a result, Plaintiff Genius was not able to learn of the fraud and misconduct committed by Defendants Ritz and Moe in relation to the SO Tech acquisition.

**<u>COUNT IV</u>**
**Violation of Racketeer Influenced and Corrupt Organizations Act,**
**<u>18 U.S.C. § 1962(b), (d) and Fla. Stat. § 895.03(2)</u>**
**(Against Defendants Ritz, Moe, and John Clayton)**

367.     This Count arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(b) and (d) and Fla. Stat. § 895.03(4).  The allegations of paragraphs 87 through

118 are incorporated herein by reference.

368.     18 U.S.C. § 1962(d) makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."[70] Here, Defendant Clayton conspired with Defendants Ritz and Moe to engage in the conduct prescribed by subsections (b).

369.     18 U.S.C. § 1962(b) makes it unlawful "for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."[71]

370.     Section 1962(b) prohibits the takeover of legitimate businesses through racketeering activity.

371.     Defendant Clayton is a RICO "person" under 18 U.S.C. § 1961(3) because he is an individual capable of holding a legal or beneficial interest in property.

372.     Under 1962(b), the "enterprise" is the "victim" of the racketeers and is most likely to be a legitimate business.  Here, the enterprise is Plaintiff Genius, a Singapore legal entity that does business in the U.S. and has some effect both on interstate and foreign commerce.

373.     By virtue of his stock ownership of LZG, Defendant Clayton conspired with Defendants Ritz and Moe to carry on the fraudulent acquisition scheme through a pattern of racketeering that included acts of mail fraud and wire fraud, described in paragraphs 70 through 173.

374.     Specifically, Defendant Clayton conspired with Defendants Ritz and Moe to

---

[70] Fla. Stat. § 895.03(4) reads: "It is unlawful for any person to conspire or endeavor to violate any of the provisions of subsection (1), subsection (2), or subsection (3),"

[71] Fla. Stat. § 895.03(2) reads: "It is unlawful for any person, through a pattern of racketeering activity . . ., to acquire or maintain, directly or indirectly, any interest in or control of any enterprise or real property."

acquire an interest in and control of Plaintiff Genius from a pattern of racketeering activity that included acts of mail fraud and wire fraud through false representations and omissions of material fact, described in paragraphs 175 through 324, that fraudulently induced Plaintiff Genius to enter the LZG-GNS APA.

375.    Plaintiff Genius was injured by Defendants' obtaining an interest in it through the employment of Defendants Ritz, as CRO, and Moe, as chairman of the board, and by Defendants' attempts to take control of Plaintiff Genius, just like the other entities victimized by the acquisition scheme.

376.    Plaintiff Genius has suffered incalculable damages to its business operations and goodwill.

377.    For instance, Defendants Ritz and Moe were able to control the accounting, flow, and distribution of funds paid by Plaintiff Genius to LZG toward the PSG assets.  As a result, Plaintiff Genius was fraudulently induced into making additional payments for the PSG assets that were encumbered and not transferable to it.  (*See, e.g.*, ¶¶ 218-223).

378.    Also, Plaintiff Genius was injured when Defendants attempted to oust CEO Hamilton from his position by making false representations and omissions of material fact to the board of directors to persuade members to vote out CEO Hamilton and put in his place Defendant Moe.  (*See* ¶¶ 224-271, *supra*).

379.    Specific contracts, relationships, and opportunities were negatively impacted as a direct result of the scheme to defraud Plaintiff GNS, carried out by Defendants Ritz and Moe, with the assistance of Defendant Carter and the financial support of Defendant Clayton, by their false representations and omissions of material facts sent to Plaintiff GNS and CEO Hamilton through the mails and wires.  (*See* ¶¶ 240-244, *supra*).

## COUNT V
### Violation of Racketeer Influenced and Corrupt Organizations Act,
### 18 U.S.C. § 1962(d) and Fla. Stat. § 895.03(4)

380.    This Count arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d) and Fla. Stat. § 895.03(4).  The allegations of paragraphs 63 through 324 are incorporated herein by reference.

381.    18 U.S.C. § 1962(d) states it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

382.    Through words or actions, Defendants Ritz and Moe, as persons employed by, or associated with the enterprise, LZG, agreed to participate in conducting the affairs of LZG.

383.    Through LZG, Defendants Ritz and Moe agreed to participate in two or more predicate acts prohibited by 18 U.S.C. § 1961.

384.    Specifically, upon information and belief, Defendants Ritz and Moe intentionally agreed to and conspired to, by and through their agents and/or on behalf of themselves as individuals, to conduct and participate in the affairs of the enterprise by fraudulently inducing the purchase of multiple companies or sale of encumbered assets by wire, in the manner alleged in Count I, paragraphs 175 through 201, *supra*.

385.    Upon information and belief, Defendants Ritz and Moe knew that their predicate acts were part of a scheme to fraudulently induce the purchase of multiple companies or the sale of encumbered assets by wire for the purpose of obtaining money or property, and nonetheless agreed to the commission of those acts to further the schemes described above.  Such conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c) in the manner alleged in Count I, paragraphs 175 through 201, *supra*, in violation of 18 U.S.C. § 1962(d).

386.    As a direct and proximate result of the foregoing conspiracy, the overt acts taken in

furtherance of that conspiracy, and the violations of 18 U.S.C. § 1962(d), Plaintiff Genius has been injured in its business and property because Defendants Ritz and Moe, among other things: (i) pocketed $6,595,180.00 that Plaintiff Genius paid toward the purchase of encumbered title to the Prime Source Assets,  (ii) prevented Plaintiff Genius from utilizing the common shares transferred to Defendants Ritz and Moe pursuant to the APA to raise additional working capital pursuant to the ATM Agreement; (iii) caused Plaintiff Genius to lose over $15,000,000 in working capital by improperly seeking injunctive relief for the sole purpose of extorting Plaintiff Genius to pay millions of dollars to LZG; and (iv) will cause Plaintiff Genius to suffer damages in the amount of no less than $250,000,000.

## JURY DEMAND

Genius demands a trial by jury on all issues properly so tried.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons set forth in Counts I and II, Genius seeks a verdict and judgment against Ritz and Moe as follows:

A. Awarding Plaintiff Genius monetary damages in the amount of no less than $250,000,000;

B. Awarding Plaintiff Genius legal fees, including expenses incurred in the attempts to combat Defendants' RICO violations through the legal system;

C. Awarding treble damages, attorney's fees and court costs pursuant to 18 U.S.C. § 1964(c) and 772.104(1), Fla. Stat. (2024); and

D. Awarding any such other relief the Court deems just and proper.

Respectfully Submitted,

**THE BASILE LAW FIRM P.C.**

*/s/ Alyssa Feldman*
Alyssa Feldman, Esq. *(Pro Hac Vice)*
390 N. Broadway, Ste. 140
Jericho, New York 11753
Tel.:    (516) 455-1500
Email:  alyssa@thebasilelawfirm.com

Agapija Cruz, Esq.
365 Fifth Avenue S.
Suite 202
Naples, Florida 33472
Tel.:    (239) 232-8400
Email:  agapija@thebasilelawfirm.com

Mark R. Basile, Esq. *(Pro Hac Vice)*
390 N. Broadway, Ste. 140
Jericho, New York 11753
Tel.:    (516) 455-1500
Email:  mark@thebasilelawfirm.com

Joseph F. Rose, Esq. *(Pro Hac Vice)*
390 N. Broadway, Ste. 140
Jericho, New York 11753
Tel.:    (516) 455-1500
Email:  joe@thebasilelawfirm.com

*Counsel for Plaintiff Genius Group Limited*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 20th day of May 2025, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

*/s/ Alyssa Feldman*