UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**GENIUS GROUP LIMITED,**

Plaintiff,

Case No. 1:25-cv-21496-Artau

v.

**PETER B. RITZ, MICHAEL MOE, et al.,**

Defendants.

---

**DEFENDANTS' MOTION TO DISMISS AMENDED
COMPLAINT AND SUPPORTING MEMORANDUM OF LAW**

Defendants Peter B. Ritz and Michael Moe move to dismiss the Amended Complaint filed by Plaintiff Genius Group Limited.

## I.    Introduction

This case is the antithesis of a racketeering action.  It is nothing more than a soured business deal, being separately arbitrated now, improperly and implausibly dressed up by Plaintiff as racketeering in an effort to transform a private contractual dispute into a claim under the Racketeer Influenced and Corrupt Organizations Act ("**RICO**"). Courts in this district and around the country routinely reject this abusive litigation tactic.  This Court should do the same.

In 2024, Genius Group Limited ("**Genius**" or "**Plaintiff**") entered into an Asset Purchase Agreement ("**APA**") to buy the assets, and assume certain liabilities, of LZG International, Inc.'s ("**LZG**") subsidiary, PrimeSource Group ("**PrimeSource**"). The APA was straightforward: Genius would pay LZG $15 million in cash (primarily to

retire the debt LZG owed to PrimeSource's original owners) and issue approximately 74 million Genius shares to LZG. But Genius then withheld payment, refused to release shares, and turned on LZG's principals through a calculated campaign of misleading public accusations,[1] internal corporate maneuvers, and a barrage of overlapping lawsuits across multiple jurisdictions.

Plaintiff now attempts to rebrand this one-off, failed deal as a sprawling "racketeering enterprise" under the federal and Florida civil RICO statutes. In doing so, Plaintiff misapplies RICO in exactly the way that courts in this Circuit have long prohibited – misusing the statute to mutate "garden-variety business disputes into civil RICO actions." See *Hyundai Motor Am. Corp. v. EFN W. Palm Motor Sales, LLC*, 641 F. Supp. 3d 1321, 1334 (S.D. Fla. 2022). The Amended Complaint's purported "RICO Acts" underscore this abuse, consisting almost entirely of alleged misstatements and omissions in SEC filings, press releases, and transaction documents to induce acquisitions by LZG (Am. Compl. ¶ 323)[2]. These allegations sound in securities fraud, which controlling precedent has long barred as civil RICO

---

[1] Genius's CEO, Roger Hamilton, has publicly touted on the Company's X (formerly Twitter) page that the "litigation dividend" from this suit could be as much as $7.00 per share—on a stock currently trading for under $1—without ever acknowledging that such a recovery is impossible given Defendants' combined net worth. Those promotional statements appear to have had their intended effect: Genius's share price spiked in the days surrounding the announcement, and millions of new shares entered the market and were purchased at artificially inflated prices by investors unaware that Plaintiff's purported $750 million claim is illusory.

[2] Unless otherwise noted, all paragraph citations in this Brief correspond to the First Amended Complaint, DE 17.

predicates. The remainder is supposed "extortion" through litigation conduct (¶¶ 279–308), another category barred for decades as RICO predicate acts.

Even setting those categorical bars aside, the pleading fails to satisfy RICO's substantive and procedural requirements. The alleged "enterprise" is simply LZG acting through its officers and directors – corporate conduct that does not qualify as a distinct RICO enterprise. Plaintiff has not pled two valid predicate acts as required: its mail and wire fraud allegations are conclusory, lack the "who, what, when, where" detail Rule 9(b) demands, and involve communications occurring only *after* the transactions closed, making them temporally incapable of being "in furtherance" of any supposed scheme. Nor can Plaintiff establish the required "pattern" of racketeering: the alleged conduct lasted only months, far short of the "substantial period" needed for closed-ended continuity. Plaintiff's vague claims that the conduct essentially *could* continue likewise cannot support open-ended continuity. These are not technical defects but fatal substantive flaws. The federal and state RICO claims should be dismissed with prejudice.

Outside the courtroom, the consequences of Plaintiff's lawsuit are devastating. In the real world, it is almost impossible for Ritz and Moe to move on to the next stage of their lives while confronting public accusations of being racketeers. Plaintiff's CEO is leveraging this lawsuit as a smear campaign, repeating the allegations on Reddit and X, and deliberately inflicting reputational harm that is both immediate and long-lasting. Ritz and Moe bring this to the Court's attention so that it is aware of the

human cost of Plaintiff's misuse of the civil RICO statute, and the damage Plaintiff is causing by weaponizing this meritless litigation.

Civil RICO is not a catch-all to address buyer's remorse, internal corporate strife, or hard-fought litigation. It is a narrow, demanding cause of action only intended for genuine patterns of criminal racketeering activity – not to force garden-variety business disagreements into federal court. For the reasons set forth below, Defendants Ritz and Moe respectfully request that the Court dismiss the Amended Complaint with prejudice.

## II.    **Plaintiff's Allegations**

Plaintiff's sprawling, five-count, seventy-page First Amended Complaint is saturated with rhetoric about "fraud," "extortion," and supposed abuses of corporate governance.  Stripped of the florid characterizations and taken at face value solely for purposes of this Motion,[3] Genius's factual allegations reduce to a handful of core assertions:[4]

Starting in October 2021, LZG acquired FatBrain LLC ("**FatBrain**"), a Delaware artificial intelligence start-up co-owned and run by Defendant Peter Ritz. (¶¶ 31, 34–35). According to the Amended Complaint, this deal transformed LZG into

---

[3] On a motion to dismiss, the Court accepts a complaint's well-pleaded factual allegations as true and construes them in the light most favorable to the plaintiff. *See Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010). "However, conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

[4] Without admitting the accuracy of any allegation in the First Amended Complaint, Defendants Moe and Ritz present the following synopsis of Plaintiff's factual assertions solely for purposes of this Motion.

an operating company for SEC purposes. (¶ 35) The company issued large blocks of shares to Defendant John Clayton, his affiliates (¶¶ 40–43), and Defendant Peter Ritz in exchange for the FatBrain assets (¶ 39). Once the FatBrain acquisition closed, the prior management team stepped aside, and Defendant Ritz became LZG's CEO, CFO, and Chairman. Defendant Michael Moe, formerly FatBrain's Vice-Chairman, joined LZG's board. (¶¶ 36, 38).

With FatBrain integrated, Defendants Ritz and Moe began raising capital to propel the business with help from Defendant Michael Carter, a significant LZG shareholder (¶¶ 20, 44). As part of the fundraising efforts, Genius claims that Defendants made misleading statements, but does not identify what was said, to whom, when, in what context, or how those statements were actually misleading (¶¶ 44–49).

In the nine months between February and November 2022, LZG acquired several small companies: Intellagents (¶¶ 70–86), SO Technology Ltd. (¶¶ 87–118), Predictive Black Ltd. (¶¶ 119–137), and finally PrimeSource Group, an IT business in Kazakhstan (¶¶ 138–174). Plaintiff says these acquisitions were secured by misrepresentations in SEC filings and press releases about LZG's plans to grow each company. (*See, e.g* ¶ 66). But by Plaintiff's own admission, these purported misrepresentations happened *after* the acquisitions. (*See, e.g.,* ¶¶ ¶ 70 (on or about 2/23/22 LZG entered into Asset Purchase Agreement with Intellagents), ¶¶ 77-78 (Ritz induced Intellagents to sell to LZG and citing, as an example, a SEC filing dated

8/22/2022), and ¶ 81 (Ritz and Moe promised Intellagents that LZG would market Intellagents' products in a SEC filing dated 3/7/22)).

Plaintiff also claims that Defendants Ritz and Moe intended to dismantle these micro companies and divert their funds. (¶¶ 66–68). These accusations are not only conclusory but largely lifted from other litigation, in particular, a Florida derivative action in which Genius itself was originally named as a defendant. (¶¶ 63–174).[5]

Plaintiff strains to recast these routine business transactions as a grand RICO conspiracy. But its allegations are riddled with speculation and unconnected events in which it played no role, and of which it has no knowledge, stitched together solely to manufacture the appearance of a "pattern" or "scheme" as required under RICO. Stripped of that padding, the actual dispute began only when Plaintiff itself later entered the picture.

In October 2023, Defendants Ritz and Moe met with Genius's CEO, Roger Hamilton, to discuss a potential sale of PrimeSource to Genius (the "**PrimeSource Acquisition**"). Within three months of their initial meeting, on January 24, 2024, the parties finalized an agreement whereby Genius acquired 100% of the PrimeSource assets, and related liabilities, from LZG (¶¶ 175–180 & Ex. 3). Under the terms of the deal, Genius agreed to issue 74 million shares of GNS stock for distribution to LZG's shareholders and pay $15 million to LZG (two-thirds of which was earmarked to retire LZG's debt to PrimeSource's former owners). (¶¶ 185–186).

---

[5] *See Shawn Carey et al v. Moe, Ritz, et al*, pending in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Case No. 2024-019773-CA-44.

As an ancillary part of the deal, Defendant Ritz became Genius's Chief Revenue Officer, Defendant Moe assumed the role of Board Chairman, and Hamilton remained as CEO (¶¶ 192–196).

The months after closing brought tension. Dissident LZG shareholders purportedly wrote to Genius complaining about liens and perceived favoritism to Ritz and Moe. (¶¶ 235–236). In September 2024, the friction boiled over. Genius says Ritz and Moe breached a Voting Agreement by declining to support a share split Hamilton wanted. (¶¶ 241–243). Genius then alleges that on September 22, 2024, they attempted a "boardroom coup," voting to remove Hamilton and appoint Moe as interim CEO. (¶¶ 245–246). Hamilton fired Ritz two days later (¶ 262), pushed through resolutions restoring himself as CEO (¶ 268), and by October 9, 2024, secured the resignation of the directors who had backed his removal. (¶¶ 269–271). Genius concedes the alleged "coup" failed — Ritz and Moe never took over the company. (¶ 271).

October 2024 brought lawsuits—not from Genius, but from dissident LZG shareholders. On October 4, 2024, LZG's shareholders filed a securities class action in the Southern District of New York against Genius, Hamilton, LZG, Ritz, and Moe. (¶ 273). Ten days later, they filed a derivative suit in Florida state court naming the same individuals. (¶¶ 58, 273). Between October and November 2024, Defendants Ritz and Moe tried to negotiate a global settlement, including those shareholder claims. Genius calls these settlement proposals "extortion," but admits its board rejected them. (¶¶ 279–295). Then, on November 7, 2024, Genius filed an injunctive

7

action in New York seeking to stop LZG from voting on or disposing of Genius's escrowed shares, and an injunction was entered with Moe and Ritz's consent. (¶¶ 296–297). Later, LZG secured a separate injunction preventing Genius from using $150 million in post-transaction offering proceeds to buy Bitcoin—a move Genius made after LZG could not vote their shares to stop it. (¶¶ 298–299).

All of this unfolded against the backdrop of an arbitration filed by Genius against LZG under the APA's arbitration clause, which will go to trial in the next several months. In sum, Plaintiff's narrative of a so-called racketeering "scheme" is no more than a series of overlapping legal disputes—shareholder litigation, contractual injunctions, and arbitration—none of which involve any cognizable racketeering conduct.  At bottom, these proceedings should be seen for what they are: a self-described "nuclear" attack on the former principles of LZG to smear their reputations and exert settlement pressure with outrageous claims of $750 million in so-called "business disruption" damages. The flaws in the Amended Complaint cannot be cured. It should be dismissed in its entirety, with prejudice.

## III.   <u>Argument</u>

### a.  Legal Standard

Rule 12(b)(6) permits dismissal when a complaint fails to state a claim upon which relief can be granted. To withstand such a motion, a plaintiff must do more than offer "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (extending *Twombly*). Instead, a complaint must set forth

factual matter sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plausibility requires more than a sheer possibility that a defendant acted unlawfully; the pleaded facts must allow the court to draw a reasonable inference of liability, not merely a conceivable one. *Iqbal*, 556 U.S. at 678.

Although the Court must accept well-pleaded factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (internal quotations omitted). Conclusory statements, unwarranted deductions, and speculative assertions do not suffice. *Am. Dental Ass'n*, 605 F.3d at 1288-89; *Klusmeier v. Bell Constructors, Inc.*, 469 F. App'x 718, 720 (11th Cir. 2012). Where the well-pleaded facts "do not permit the court to infer more than the mere possibility of misconduct," the complaint "has alleged—but it has not 'shown'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (citation modified). Likewise, allegations that are "merely consistent with" liability "stop[] short of the line between possibility and plausibility of entitlement to relief." *Id.* at 678 (internal quotations omitted). To survive dismissal, the facts alleged must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

In cases sounding in fraud, the pleading burden is even higher, and "the circumstances constituting fraud" must be stated *with particularity*. Fed. R. Civ. P. 9(b). This heightened standard "serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370–71

(11th Cir. 1997) (internal quotation marks omitted). Civil RICO claims are subject to this heightened burden. *Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1316-17 (11th Cir. 2007).

> ### b. The Private Securities Litigation Reform Act Bars Plaintiff's Attempt to Repackage Alleged Securities Fraud as RICO.

In 1995, to curb abusive and meritless litigation, Congress enacted the Private Securities Litigation Reform Act (the "**PSLRA**"). Among other things, the PSLRA amended 18 U.S.C. § 1964(c), the civil RICO cause of action, to add an express prohibition:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor . . . except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception . . . does not apply to an action against any person that is criminally convicted in connection with the fraud . . . .

Through this amendment, Congress "narrow[ed] the type of conduct that can qualify as a predicate act under RICO." *Eagletech Commc'ns Inc. v. Citigroup, Inc.*, No. 07-60668-CIV, 2008 WL 3166533, at *9 (S.D. Fla. June 27, 2008). And it made equally clear that plaintiffs may *not* evade this bar through artful pleading:

> The Conference Committee intends that a plaintiff may not plead other specified offenses, ***such as mail fraud or wire fraud***, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud.

H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. 47 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 746 (emphasis added).

Courts apply this bar broadly. Conduct need only be "in connection with" the purchase or sale of securities to be "actionable as securities fraud" under the PSLRA; the plaintiff need not plead, or even be able to plead, a securities law cause of action. *See Loftin v. KPMG LLP*, No. 02-81166-CIV, 2003 WL 22225621, at *5-6 (S.D. Fla. Sept. 10, 2003) ("the PSLRA bar applies to warrant dismissal of [plaintiff's] RICO claim with prejudice."). So long as the alleged fraud "coincides" with a securities transaction and the events are not "independent," the PSLRA forecloses *any* civil RICO claim. *Adams v. Rothstein*, No. 11-616888, 2012 WL 1605098 at *5 (S.D. Fla. May 8, 2012) (citing *SEC v. Zandford*, 535 U.S. 813, 819 (2002)) (dismissing with prejudice purported RICO claims pled as mail/wire fraud because the alleged scheme was "in connection" with the purchase or sale of securities).

Here, the gravamen of Plaintiff's Amended Complaint is that Defendants Ritz and Moe made "false representations and omissions of material fact" in order to induce the owners of microcap companies (and Plaintiff Genius) to sell their shares[6] so Defendants could "loot" those companies' assets after their acquisition. *See, e.g.*, Am. Compl. ¶¶ 66-67, 77, 81, 93-94, 101-05, 108-11, 117, 126-31, 145-59, 181-98, 207-17. Plaintiff distills this theory in paragraph 174:

> Commission of the underlying predicate acts of mail and wire fraud enabled Defendants Ritz and Moe to . . . fraudulently induc[e] those insiders, their microcap companies, and . . . Plaintiff GNS, to enter into acquisition agreements . . . Had Plaintiff GNS known of the fraudulent acquisition scheme, it would not have entered into the APA . . . .

---

[6] Parenthetically, it is hard to see how the Genius transaction even fits into Plaintiff's "buy and loot" story. LZG didn't buy Genius; Genius bought shares belonging to LZG.

Genius likewise confirms at ¶¶ 323-324 that the alleged predicate acts of "wire fraud, mail fraud, and extortion" are all part of an "acquisition scheme" in which Defendants made purported misrepresentations in SEC-filed disclosure documents, press releases, and transaction documents for the purpose of securing the sale of securities.

Genius's Amended Complaint is a textbook securities fraud pleading.  It alleges misstatements and omissions of material fact made "in connection with" the purchase or sale of securities. The PSLRA squarely prohibits using such conduct as a RICO predicate, whether cast directly as "securities fraud," or indirectly as "mail/wire fraud."  Plaintiff's attempt at re-labeling does not save its RICO claim from the PSLRA bar.

Because the entirety of Genius's alleged RICO scheme is "in connection with" the purchase or sale of securities, the complaint as a whole is defective as a matter of law and must be dismissed with prejudice. This conclusion is consistent with the well-established approach taken by the courts in this Circuit, which have repeatedly applied the PSLRA bar to dismiss civil RICO claims at the pleading stage. *See, e.g., Licht v. Watson*, 567 F. App'x 689, 693 (11th Cir. 2014) (affirming dismissal of petitioner's RICO claim based on alleged "fraud in the sale of securities" under PSLRA and rejecting argument that securities bar did not apply where RICO claim relied upon "defendants' inflated marketing campaigns, press releases, interviews, false valuations, and activity reports"); *Dusek v. JPMorgan Chase & Co.*, 132 F. Supp. 3d 1330, 1353-54 (M.D. Fla. 2015) (dismissing RICO count where plaintiffs alleged

defendant "committed mail and wire fraud" by sending customers "periodic trade confirmations reflecting trades in their accounts that, in fact, did not occur" because such conduct was "integrally related to the purchase and sale of securities.").

### c. Alleged "Extortion" Through Litigation Conduct and Corporate Governance Disputes Are Not Actionable Predicate Acts Under RICO.

It is decades old, black-letter law that litigation activity – whether the filing of lawsuits, submission of affidavits, or making of settlement demands – cannot serve as a RICO predicate act. *See, e.g.*, *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1087–88 (11th Cir. 2004) (per curiam) (affirming dismissal; filing of litigation documents does not constitute racketeering activity and noting that "we doubt that the filing of a lawsuit could ever be 'wrongful' for the purposes of RICO"); *Ippolito v. Florida*, 824 F. Supp. 1562, 1575 (M.D. Fla. 1993) (granting summary judgment for defendant because "the initiation of a law suit cannot constitute a predicate act, even if that law suit is malicious."); *Town of Gulf Stream v. O'Boyle*, No. 15-80182-CIV, 2015 WL 3970612, at *2 (S.D. Fla. June 30, 2015), *aff'd*, 654 F. App'x 439 (11th Cir. 2016) (threatening to sue or actually suing someone does not constitute a predicate act under RICO); *Gordon Food Serv., Inc. v. Price Armstrong, LLC*, No. 6:20-CV-2273-GAP-GJK, 2021 WL 7448881, at *5 (M.D. Fla. July 8, 2021) (holding that lawsuits and "purported threats to file future lawsuits . . . cannot, as a matter of law, constitute the predicate act of extortion.").

The Eleventh Circuit has emphasized the policy rationale behind excluding litigation conduct as a RICO predicate, noting that it is "troubled by *any* use of this

federal criminal statute to punish civil litigants," and that "allowing litigants to be charged with extortion would open yet another collateral way for litigants to attack one another." *United States v. Pendergraft*, 297 F.3d 1198, 1207-08 (11th Cir. 2002). In that vein, *Pendergraft*, is particularly instructive here.

In *Pendergraft*, the court held that the threat of filing litigation, "even if made in bad faith and supported by false affidavits," was not "wrongful" within the meaning of the Hobbs Act, *id.* at 1205, one of the few crimes Congress has enumerated as a qualifying RICO act. This holding applies with great force to all of Genius's allegations referencing fraudulent statements submitted to the courts (Am. Compl. ¶ 299) and supposed extortionate lawsuits. Genius's other allegations about settlement communications fare no better. Courts have repeatedly rejected RICO theories premised on settlement demands or proposals made in pending litigation. *See, e.g., FindTheBest.com, Inc. v. Lumen View Tech. LLC*, 20 F. Supp. 3d 451, 454 (S.D.N.Y. 2014) (dismissing RICO claim where predicate acts arose from allegation that defendants "filed frivolous patent infringement lawsuits against various businesses and demanded nuisance settlements"); *Edelson PC v. Bandas Law Firm PC*, No. 16-C-11057, 2018 WL 723287, at *8 (N.D. Ill. Feb. 6, 2018) ("The court thus declines to depart from the long line of precedent under which demanding payment while threatening to bring or continue litigation does not constitute a predicate act of extortion.").

The last bits of the Amended Complaint that are not securities fraud or litigation conduct are an exposition of post-closing corporate governance disputes

14

such as shareholder complaints to Genius about Ritz and Moe, the alleged breach of a voting agreement, board actions to remove Hamilton, and Hamilton's subsequent retaliation in removing Ritz and Moe from the company. (Am. Compl. ¶¶ 235–271). Even accepting these allegations as true, they amount, at most, to potential claims for breach of fiduciary duty against Ritz and Moe. But here as well, breach of fiduciary duty is not an enumerated RICO predicate act. *See, e.g., Manion v. Freund*, 967 F.2d 1183, 1186 (8th Cir. 1992) ("Breach of fiduciary duty is not one of the specified state crimes listed in the definition of 'racketeering activity,' 18 U.S.C. § 1961(1)."); *LaVay Corp. v. Dominion Fed. Sav. & Loan Ass'n*, 830 F.2d 522, 529 (4th Cir. 1987) ("A RICO claim may not be based on a single noncriminal breach of fiduciary duty, for under no circumstances could a breach of fiduciary duty constitute a pattern of racketeering activity."); *Frank v. Ocean 4660, LLC*, No. 11-cv-62004, 2012 WL 12911035, at *4 (S.D. Fla. Jan. 30, 2012) ("[A litigant] cannot fit a square peg in a round hole by squeezing garden-variety business disputes into civil RICO actions.").

In short, neither the litigation and settlement conduct described in the Amended Complaint, nor the alleged corporate governance infighting, constitutes actionable racketeering activity. *See, e.g., Raney*, 370 F.3d at 1088 (affirming dismissal of petitioner's RICO claim and deciding that the "alleged conspiracy to extort money through the filing of malicious lawsuits" were not predicate acts of extortion or mail fraud under RICO); *Kim v. Kimm*, 884 F.3d 98, 104 (2d Cir. 2018) (collecting cases and affirming dismissal of petitioner's RICO claim because "allegations of frivolous, fraudulent, or baseless litigation activities—without more—

15

cannot constitute a RICO predicate act."). Though the Amended Complaint seeks to inflate a simple deal-gone-bad into a RICO opera, it does so only by ignoring well-settled and decades old law which should have been considered before this case was brought. The Amended Complaint is irreparably flawed, in its entirety, and should be dismissed with prejudice.

### d. Plaintiff Fails to Allege Two Actionable Predicate Acts of Racketeering.

#### i. Plaintiff Fails to Plead the Alleged Predicate Acts with the Required Level of Specificity.

"To survive a motion to dismiss, RICO claims based solely on fraud-related predicate acts such as mail [or] wire . . . fraud, must be plead with particularity." *Magnifico v. Villanueva*, 783 F. Supp. 2d 1217, 1227 (S.D. Fla. 2011). Predicate acts of mail and wire fraud "merit particular scrutiny" and must be pled to the heightened standard of Rule 9(b). *Wilson v. EverBank, N.A.*, No. 14-CIV-22264, 2015 WL 1600549, at *2 (S.D. Fla. Apr. 9, 2015) (internal quotations omitted).

"Under Rule 9(b), the Plaintiffs must allege (1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997). This standard is very exacting: "Simply specifying particular dates and contents of communications cannot automatically constitute a valid claim that a defendant violated 18 U.S.C. § 1962(c) without also plausibly alleging the existence of a long-term criminal enterprise." *Am. Dental Ass'n*, 605 F.3d at 1292–93.

16

Here, Plaintiff has failed to allege fraud with particularity as to Defendants Ritz and Moe. The Amended Complaint lumps them together in sweeping accusations that they made "false representations and omissions of material fact" in connection with several acquisitions by LZG—Intellagents, SO Tech, Predictive Black Ltd., PrimeSource, and ultimately the Genius transaction—but is devoid of the specificity Rule 9(b) demands. *See, e.g., id.* at 1291 ("The plaintiff must allege facts with respect to each defendant's participation in the fraud"); *Hi-Tech Pharms., Inc. v. Hodges Consulting, Inc.*, 230 F. Supp. 3d 1323, 1329 (N.D. Ga. 2016) ("In a [RICO] case involving multiple defendants, the complaint may not lump together all of the defendants."). But with respect to each acquisition, Plaintiff points only to generalized categories of communications—SEC filings, press releases, and "transaction documents"—without identifying the *precise statement* or misrepresentation within those documents, the exact language alleged to be false, who authored or approved it, or the manner in which it allegedly misled the target company. This is plainly insufficient as a matter of law. *See Brooks*, 116 F.3d at 1380–81 (describing what a plaintiff must plead to satisfy Rule 9(b)).

The timeline allegations themselves underscore the deficiency. For Intellagents, Plaintiff cites SEC filings from March and August 2022 but does not plead the statement's actual text, identify whether Ritz or Moe was the declarant, or explain how those filings caused any party to act. The SO Tech allegations hinge on press releases and disclosures months after closing, again without any substance beyond conclusory labels that they "misrepresented" LZG's intentions. For Predictive

17

Black, Plaintiff identifies one SEC filing from April 2023 but offers no detail about the statement's content, its falsity, or how it induced the seller to act. The PrimeSource allegations likewise reference after-the-fact filings announcing the deal but provide no particularized facts connecting a specific wire transmission to the alleged scheme.

Even with respect to the LZG/Genius transaction itself, Plaintiff fails to allege with precision the "who, what, when, where, and how" Rule 9(b) requires: no false statement is quoted verbatim (or with any particulars at all),[7] and no location or timing of communication is alleged. Most significantly, there also is no explanation given for how the statements were transmitted by wires or mails in furtherance of the scheme. Merely asserting that asset lists, SEC documents, or press releases were "false" or misleading is the type of conclusory pleading Rule 9(b) forbids.

Equally fatal under *Brooks*, the Amended Complaint offers only broad, conclusory assertions about what Defendants "gained"—ownership stakes, control, or purchase price proceeds—without linking that gain to any specific misrepresentation that is pleaded with the required detail. *Brooks,* 116 F.3d at 1380–81. Likewise, under *American Dental*, Plaintiff's recitation of dates and communications, absent concrete facts giving rise to a *reasonable* (not just plausible) inference of their falsity, and the role they played in the so-called criminal enterprise, is not enough to state a claim under § 1962(c) of the RICO Act. *Am. Dental Ass'n*, 605 F.3d at 1292–93.

---

[7] *See, e.g.,* ¶ 184 (alleging Ritz and Moe misrepresented the value of the PrimeSource assets but failing to identify who made the alleged misrepresentation, when it was made, or how it was made).

Because the Amended Complaint fails to plead the predicate acts of wire or mail fraud against Ritz and Moe with the particularity Rule 9(b) requires, the RICO claims based on those alleged acts may be dismissed on this independent ground as well.[8]

### ii. Plaintiff Fails to Plausibly Allege that the Alleged Predicate Acts of Mail and Wire Fraud were done in Furtherance of the Alleged Scheme.

To state a civil RICO claim, a plaintiff must allege at least two predicate acts of racketeering. 18 U.S.C. § 1961(5). Where, as here, the alleged predicates purport to be "mail fraud" and "wire fraud" (Am. Compl. ¶ 329), controlling Eleventh Circuit precedent requires that the "use of the . . . wires" be *in furtherance* of the alleged scheme. *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009). A communication satisfies this important and independent requirement *only if* the communication is "incident to an essential part of the scheme" or "a step in the plot"— a purely temporal or tangential connection will not do. *United States v. Hasson*, 333 F.3d 1264, 1273 (11th Cir. 2003) (quoting *Schmuck v. United States*, 489 U.S. 705, 710–11 (1989)).

---

[8] Because Plaintiff has not pled two or more predicate acts, the "investment" and "control" RICO allegations also fail. But Plaintiff has also failed to plead with particularity that Ritz and Moe ever "invested" in Plaintiff or acquired "control" of Genius through the failed "board coup," and Plaintiff has in fact alleged facts undermining its claims in that regard. As noted, Plaintiff alleges that Genius acquired control and/ or invested in the PrimeSource subsidiary, rather than the other way around. Plaintiff also alleges that the so-called attempt to gain control through the so-called board coup failed.

The Supreme Court has drawn a clear line between communications that further or conceal a fraudulent scheme, and those that occur after the scheme has concluded. In *United States v. Maze*, 414 U.S. 395 (1974), the defendant used a stolen credit card to obtain goods and lodging from motels. *Id.* at 395-96. The Court held that the scheme ended the moment defendant checked out of the motels, as he had already obtained the intended benefits. *Id.* at 403-405. The subsequent mailings, in which motel owners sent invoices to the issuing bank, did not further the fraud; rather, they were routine billing communications that actually increased the likelihood of defendant's detection. *Id.* at 403. Because these post-transaction communications were outside the execution of the scheme itself, they failed the "in furtherance" requirement. *Id.* at 403-405.

By contrast, in *Schmuck*, the Court analyzed a scheme through which certain wires were vital to the scheme's success. Schmuck 489 U.S. at 710-712. There, the defendant sold cars to dealers after rolling back their odometers. *Id.* at 705. The dealers then mailed title applications to the state DMV to transfer ownership to retail buyers. *Id.* Because the dealers could not complete resale to their customers without those mailings, they were integral to consummating each fraudulent sale and maintaining dealer confidence, thereby allowing the scheme to continue. *Id.* The Court held that the mailings were "incident to an essential part of the scheme" because they directly enabled the fraud to succeed and endure over time. *Id.* at 711-712.

Here, Plaintiff's allegations on their face fail to meet this standard. By Genius's own telling, the supposed wire communications comprising the alleged fraud consist almost entirely of SEC filings and press releases issued days, weeks, or even months *after* the relevant acquisition agreements had been executed and closed. At that point —as in *Maze* —the alleged scheme had already "reached fruition" and Defendants had obtained whatever contractual benefits the transactions conferred. Once the acquisitions were complete, later public disclosures could not possibly induce the counterparties to enter the agreements or advance the alleged scheme's purported objectives. Such post-closing communications are routine corporate reporting, not acts that "extend the life of the fraud" or help conceal it; if anything, they invite public and regulatory scrutiny, thereby increasing the risk of detection.

The inherent and unfixable flaw in Plaintiff's theory is underscored by the timeline of events set forth in the Amended Complaint. Genius alleges that the Intellagents purchase agreement was executed on February 23, 2022 (Am. Compl. ¶¶ 70, 77–78), yet the alleged misrepresentations appear only in SEC filings dated March 7, 2022 and August 22, 2022—well after closing (¶¶ 78, 81). The SO Tech deal closed on September 22, 2022 (¶ 88), but the supposed misstatements are found in press releases and SEC disclosures dated September 27, 2022, January 17, 2023, and April 14, 2023—again, all post-closing (¶¶ 102–104). The Predictive Black Ltd. transaction closed on November 14, 2022 (¶ 120), yet Plaintiff points to an SEC filing dated April 14, 2023 as the fraudulent communication—months later (¶ 129). The PrimeSource Acquisition closed on May 17, 2022 (¶ 138), but the alleged

misrepresentations come from SEC filings on June 24, 2022 and September 13, 2022 (¶¶ 146, 149), both after the deal had been consummated.

In every instance, the alleged "scheme" related to LZG's supposed campaign to acquire companies through misrepresentations and then abuse them concluded upon the closing of each transaction—exactly like in *Maze*, where the fraud ended once the defendant checked out of the motel. None of these post-closing SEC filings or press releases plausibly furthered the alleged inducement; they simply announced and memorialized transactions that were already complete. Far from concealing the deals, such disclosures placed them in the public record. The only other alleged wire communication even arguably proximate to any transaction—a single email by Ritz and Moe to investors regarding marketing for FatBrain IT (Am. Compl. ¶ 48)—is not alleged to have been part of the supposed acquisition-inducement scheme at all. Plaintiff pleads no particularized facts under Rule 9(b) as to how, when, or by whom the wires were used to transmit the actual transaction documents to the sellers, or how any specific transmission was "incident to an essential part of the scheme" within the meaning of *Schmuck*. Instead, they rely on conclusory assertions that "misrepresentations" were made, without specifying the transaction, time, place, or contents of any such transmission. This is not enough.

In sum, Plaintiff's own allegations establish that the challenged wire and mail communications occurred only after the alleged scheme was completed, and thus cannot, as a matter of law, be "in furtherance" of that scheme. Under *Maze*, routine post-transaction communications, even if containing alleged misrepresentations,

cannot serve as predicate acts under the mail or wire fraud statutes. Without at least two predicate acts plausibly alleged to further the purported scheme, Plaintiff's RICO claim collapses at the threshold.  This is reason enough to dismiss with prejudice at this time.

### e.  Plaintiffs Fail to Allege a Pattern of Racketeering Activity.

"To successfully allege a pattern of racketeering activity, plaintiffs must charge that: (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a *continuing nature*." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1264 (11th Cir. 2004). Continuity—one of the core elements of a RICO "pattern"—is "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 1265 (internal quotations omitted).

Closed-ended continuity refers to a closed period of repeated conduct occurring over a "substantial period of time." *Id.* at 1266. While the Eleventh Circuit has acknowledged there is no bright-line minimum duration, it has emphasized that shorter timeframes are generally insufficient. For example, in *Jackson*, the court noted that "the great weight of authority suggests that nine months is a wholly insufficient interlude" to establish the necessary duration. *Id.* at 1266. Other courts in this Circuit have likewise held that alleged schemes of limited duration fail to establish closed-ended continuity. *See, e.g.*, *Aldridge v. Lily–Tulip, Inc. Salary Ret.*

*Plan Benefits Comm.*, 953 F.2d 587, 593 (11th Cir. 1992) (mail fraud scheme lasting six months "was accomplished in too short a period of time . . . to qualify as a pattern of racketeering activity"); *Hutchinson v. Wickes Cos., Inc.*, 726 F. Supp. 1315, 1320 (N.D. Ga. 1989) (questioning in dicta whether even two years qualifies as "substantial").

Here, the conduct by Defendants Moe and Ritz that Genius challenges, which begins with execution of the APA and continues up through the parties' subsequent disputes, spans, on the most generous reading, from January 2024 until approximately May 2025, when the parties began litigating the preliminary injunction that Genius says caused its $750 million injury.[9]  The bulk of the predicate acts they cite occurred within a period of less than sixteen months, and most within the first eight months after the APA was signed. This compressed timeframe is far short of the substantial duration required under *Jackson* and *Aldridge*.

Further, as the well-pleaded facts themselves establish, this was an inherently short-lived, transaction-specific dispute: the APA was executed in January 2024; the

_____

[9] Plaintiff attempts to salvage the closed-ended continuity requirement by pointing to LZG's prior acquisitions of other microcap companies and Moe and Ritz's role in those acquisitions. Yet, as discussed, Plaintiff was not a party to those transactions, alleges no specific facts (with or without the required particularity) about the underlying conduct in those deals, and pleads no connection between them and the injuries claimed here. The facts relating to the Genius transaction are also the opposite of those pleaded with respect to LZG's prior acquisitions. In those deals, LZG bought other companies; with Genius, they sold their assets instead. Genius stitching together unrelated prior deals is a transparent attempt to manufacture a single so-called "scheme" to transform this one-off failed deal into an actionable federal RICO case. This does not work. Disconnected events do not satisfy the continuity requirement.

alleged "encumbrance" discovered in March; a breakdown in relations by September; and alleged attempts at rescission and litigation by November of that same year. Like the nine-month period found "wholly insufficient" in *Jackson* and the six-month period rejected in *Aldridge*, Genius's allegations describe a finite series of events tied to one acquisition, not a long-term course of repeated criminal activity. As a matter of law, such a timeframe cannot support closed-ended continuity.

Open-ended continuity, on the other hand, can be shown where the alleged acts "were part of the defendants' regular way of doing business, or that the illegal acts threatened repetition in the future." *Jackson*, 372 F.3d at 1267 (internal quotations omitted). However, this theory (which Plaintiff appears to want to lever, by pointing to earlier, unrelated deals) applies only when the nature of the conduct itself projects *into the future*, with a threat of *continued* criminal activity. *Id*. Generalized allegations that misconduct could continue or might repeat are insufficient. *Id*. at 1268.

Though Plaintiff attempts, in a conclusory fashion, to characterize LZG's acquisition practices as part of LZG's purported regular way of doing business, there are no well-pleaded facts showing that there is any risk that these so-called illegal acts "[threaten] repetition in the future." *Jackson*, 372 F.3d at 1267. As noted, Plaintiff points to earlier, unrelated LZG transactions with other parties (Intellagents, SO Tech, Predictive Black) as supposed evidence of an ongoing "scheme." But those separate deals involved different counterparties, were concluded before the Genius/LZG transaction, and do not establish an actual present threat to

25

the Plaintiff. *See* fn 9. Genius also does not allege that LZG can or will buy other companies from its new vantage point as a hollowed-out shell following Genius's default (and in fact, it cannot). As *Jackson* makes clear, it is not enough to speculate that defendants "might" defraud someone else in the future—the complaint must show that the nature of the challenged conduct projects into the future as a distinct threat. *Jackson*, 372 F.3d at 1267-68.

Here, the business relationship between Genius, Ritz, and Moe has collapsed, the APA is the subject of rescission efforts and arbitration,[10] and there are no factual allegations of any ongoing dealings between the parties through which similar misconduct could recur. Absent a current business framework in which the alleged racketeering acts could reasonably be anticipated to recur, Plaintiff's theory of continuity is exactly the sort of generalized "could happen again" speculation that *Jackson* rejects.

Because Plaintiff fails to sufficiently plead continuity under either closed- or open-ended theories, it has not pleaded the independent requirement of a "pattern" of racketeering activity under § 1962.

---

[10] The existence of pending arbitration, in which Genius brings a breach of contract claim arising out of the APA, is another reason that Genius's flawed RICO claims cannot proceed. Genius is already seeking monetary relief arising out of the same transaction that underlies this lawsuit. *See, e.g., Prince Heaton Enterprises, Inc. v. Buffalo's Franchise Concepts, Inc.*, 117 F. Supp. 2d 1357 (N.D. Ga. 2000) (rejecting RICO claim and "declin[ing] Plaintiff's invitation to turn a contract dispute between sophisticated businessmen into a racketeering claim," after finding that "Plaintiff's allegations reveal the contractual essence of their dispute."

### f.  Plaintiff's Florida RICO Claims Fail for the Same Reasons as the Federal RICO Claim and Must be Dismissed.

Plaintiff's Florida RICO counts, brought under the Florida Civil Remedies for Criminal Practices Act, Fla. Stat. §§ 772.101–772.19, fail for the same reasons as its federal claims. Courts in the Eleventh Circuit have consistently held that the Florida RICO statute is patterned after, and interpreted in conformity with, the federal RICO statute. As such, when a federal RICO claim is insufficiently pled, the parallel Florida RICO claim necessarily fails as well. As the Eleventh Circuit has explained, interpretation of Florida's RICO statute is "informed by case law interpreting the federal RICO statute . . .  on which Chapter 772 is patterned." *Jones v. Childers*, 18 F.3d 899, 910 (11th Cir. 1994) (internal citation omitted). Following that directive, courts routinely assess the federal and state RICO claims together, and "Counts . . . shall stand or fall as a whole." *Jackson v. BellSouth Telecomm.*, 181 F. Supp. 2d 1345, 1356–57 (S.D. Fla. 2001), *aff'd*, 372 F.3d 1250, 1264 (11th Cir. 2004) ("[T]he analysis we apply to the plaintiffs' federal RICO claims is equally applicable to their state RICO claims.").

This approach is widely applied at the motion to dismiss stage. For example, in *Palm Beach Cnty. Env't. Coal v. Florida*, 651 F. Supp. 2d 1328, 1350 (S.D. Fla. 2009), quoting in part *Ferrell v. Durbin*, 311 F. App'x 253, 256 n.5 (11th Cir. 2009), the court held:

> The analysis of the Federal RICO claims is equally applicable to the Florida RICO claims . . .  Plaintiffs have plead the same facts and circumstances in both counts. Accordingly, it is unnecessary to evaluate the Florida RICO

count separately. Both RICO claims then fail against all
defendants against which they are alleged.

Here, Plaintiff's Florida RICO counts rest on precisely the same factual
allegations, word-for-word, as the federal RICO counts. Because Plaintiff's
allegations fail to state a claim under federal RICO for the reasons set forth above
(including the PSLRA bar, the lack of actionable predicate acts, and the absence of a
cognizable pattern of racketeering activity), Plaintiff's Florida RICO claims are
likewise incurably defective a matter of law.

### g. The Court Should Dismiss Plaintiff's Claims with Prejudice.

The damage that baseless RICO complaints cause to businesses in this district,
and the individuals who create them, cannot be underscored enough. In recognition
of this impact, and the reality of abuse, courts in this Circuit will dismiss defective
civil RICO claims with prejudice, even at the pleading stage and even on a plaintiff's
first attempt, where a plaintiff has failed to allege actionable predicate acts or a viable
pattern of racketeering activity. *See, e.g., Almanza v. United Airlines, Inc.*, 851 F.3d
1060, 1074-75 (11th Cir. 2017) (affirming district court's dismissal of RICO claim with
prejudice and denial for request for leave to amend because "proposed amended
complaint was indeed futile" for failure to plead plausible existence of enterprise);
*Drummond v. Zimmerman*, 454 F. Supp. 3d 1210, 1219-20 (S.D. Fla. 2020)
(dismissing with prejudice RICO counts against lawyer defendants where complaint
contained "no factual allegations to support the conclusion that the Lawyer
Defendants directed or controlled an enterprise and Plaintiffs d[id] not identify any

such facts in their opposition memorandum" and their alleged actions did "not establish control or direction of an enterprise.").[11]

Dismissal with prejudice is particularly appropriate here, where the alleged conduct is far outside the ambit of the RICO statute and Plaintiff's contentions are unsupportable under existing law. The First Amended Complaint has been presented for the improper purpose of pressuring and tarnishing the reputations of LZG former executives outside the scope of the pending arbitration, where the parties' real disputes are being litigated. No amount of repleading will transform Genius and LZG's ordinary and overlapping business disagreements into racketeering.[12]

## IV.   <u>Conclusion</u>

For the reasons set forth above, Plaintiff's Amended Complaint fails as a matter of law. The federal RICO claims are barred outright by the PSLRA, premised on conduct that is not and cannot be a predicate act under RICO, and devoid of any

---

[11] *See also Simmons v. Pritzker*, No. 22 CV 0123, 2022 WL 7100611, at *6 (N.D. Ill. Oct. 12, 2022) ("Finally, even assuming defendants committed mail and wire fraud, the fraud itself didn't proximately cause the alleged IDEA violations nor did it injure plaintiffs. . . . The absence of proximate cause cannot be fixed by amending the complaint, and because amending the RICO claims would be futile, those claims are dismissed with prejudice."); *Brisby v. Moynihan*, No. 3:14cv47-DPJ-FKB, 2014 WL 2940874, at *5 (N.D. Miss. June 30, 2014) (dismissing with prejudice plaintiff's complaint that had RICO claim as futile because the "Complaint fail[ed] to state a facially plausible claim under any of the potential causes of action identified by Defendants").

[12] *See also Goldberg for Jay Peak, Inc. v. Raymond James Fin., Inc.*, No. 16-21831-CIV-LENARD/GOODMAN, 2017 WL 7791564, at *10-11 (S.D. Fla. Mar. 27, 2017) (dismissing with prejudice RICO count because "the alleged fraud is sufficiently connected to the sale of securities to fall under the PSLRA bar."); *Wackenhut Corp. v. Serv. Emps. Int'l Union*, 593 F. Supp. 2d 1289, 1296 (S.D. Fla. 2009) (dismissing plaintiff's complaint with prejudice alleging RICO violation because complaint lacked properly pled predicate acts of extortion).

plausible allegations of a racketeering "pattern." The Florida RICO claims fall with their federal counterparts under binding Eleventh Circuit precedent. The Amended Complaint reflects nothing more than ordinary business disputes, corporate governance disagreements, and contractual issues already subject to arbitration—none of which belong in this Court under the guise of "racketeering." Because these deficiencies are legal, not factual, and cannot be cured by amendment, dismissal with prejudice is warranted. Defendants respectfully request that the Court dismiss the Amended Complaint in its entirety, enter judgment in their favor, and award Defendants their costs and fees in defense of this action.

Dated: October 15, 2025

Respectfully submitted,

*/s/ Charles Throckmorton*
FOLEY & LARDNER LLP
Charles Throckmorton (FBN 101203)
charles.throckmorton@foley.com
Samantha Fuhrman (FBN 1049284)
samantha.fuhrman@foley.com
2 South Biscayne Boulevard, Suite 1900
Miami, FL 33131
Telephone: (305)482-8400

Lauren Valiente (FBN 34775)
lauren.valiente@foley.com
Samantha Gerencir (FBN 1019553)
Samantha.gerencir@foley.com
100 N. Tampa St. Suite 2700
Tampa, FL 33602
Telephone: (813-225-5443)

R. Rene Carson (Admitted *pro hac vice*)
THE LAW OFFICES OF R. RENE CARSON
carsonrrene@gmail.com
459 Ave Sagrado Corazón

Las Violetas PH1
San Juan, Puerto Rico 00915
Telephone: (312)286-8989

*Counsel for Defendants Michael Moe &*
*Peter B. Ritz*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on October 15, 2025, the foregoing document was electronically filed through CM/ECF, thereby serving electronic notice to all counsel of record.

*/s/ Charles Throckmorton*