

# AWARD

International Chamber of Commerce | Chambre de Commerce Internationale (ICC)
Secretariat of ICC International Court of Arbitration | Secrétariat de la Cour Internationale d'Arbitrage

**iccwbo.org/arbitration**

**Paris**
33 avenue du Président Wilson
75116 Paris, France
+33 (0)1 49 53 28 28   arb@iccwbo.org

**New York**
in affiliation with Sicana, Inc.
140 East 45th Street, Suite 14C
New York, NY 10017, USA
+1 646 699 5704   ica9@iccwbo.org

**Singapore**
in affiliation with SICAS
28 Maxwell Road #02-01, Maxwell Chambers
Suites, Singapore 069120
+65 6983 5580   ica11@iccwbo.org

**Hong Kong**
Room 102, 1/F., West Wing, Justice Place,
11 Ice House Street, Central, Hong Kong
+852 3954 9504   ica8@iccwbo.org

**Sao Paulo**
in affiliation with SCIAB LTDA.
rua Surubim, 504, Brooklin Novo
CEP 04571-050, Sao Paulo, Brazil
+55 11 3040 8830   ica10@iccwbo.org

**Abu Dhabi**
ADGM Square, Level 20, Al Maqam Tower
Al Maryah Island, P.O. Box 111999
Abu Dhabi, United Arab Emirates
+971 56 333 2781   ica12@iccwbo.org

**ICC INTERNATIONAL COURT OF ARBITRATION**

**CASE No. 29043/PDP (EPP)**

GENIUS GROUP LIMITED

(Singapore)

**vs/**

LZG INTERNATIONAL, INC.

(U.S.A.)

This document is the original of the Final Award rendered in conformity with the Rules of Arbitration of the International Chamber of Commerce and issued as an electronic document pursuant to the parties' agreement.

**INTERNATIONAL CHAMBER OF COMMERCE
INTERNATIONAL COURT OF ARBITRATION**

**ICC Case No. 29043/PDP**

GENIUS GROUP LIMITED (Singapore), Claimant

vs.

LZG INTERNATIONAL, INC. (USA), Respondent

---

**FINAL AWARD**

---

**April 16, 2026**

Dana MacGrath
*Sole Arbitrator*

**TABLE OF CONTENTS**

I.  INTRODUCTION ....................................................................................................................1
II.  PARTIES AND COUNSEL .....................................................................................................2
   A.  Claimant (Genius Group Limited) ....................................................................................2
   B.  Respondent (LZG International, Inc.) ................................................................................2
III.  AGREEMENT TO ARBITRATE AND ARBITRAL TRIBUNAL ........................................3
   A.  Agreement to Arbitrate .....................................................................................................3
   B.  Arbitral Tribunal ..............................................................................................................4
IV.  GOVERNING LAW .................................................................................................................5
V.  PROCEDURAL HISTORY .....................................................................................................5
VI.  SUMMARY OF THE PARTIES' CLAIMS AND RELIEF SOUGHT ..................................23
   A.  Genius Claims against LZG .............................................................................................23
   B.  LZG Defenses to Genius Claims .....................................................................................24
   C.  LZG Counterclaims against Genius .................................................................................24
   D.  Genius Defenses to LZG Counterclaims .........................................................................25
VII.  SUMMARY OF THE RELEVANT FACTS .........................................................................25
   A.  Events Leading Up to the Signing of the APA ................................................................25
   B.  Signing of the APA and Key APA Provisions .................................................................28
   C.  Events after the Parties' Execution of the APA ...............................................................38
   D.  Events after the Closing of the APA ................................................................................40
VIII.  ANALYSIS OF THE PARTIES' CLAIMS AND DEFENSES .............................................51
   A.  The Parties Claims and Counterclaims ............................................................................51
     1)  Genius Claims against LZG ........................................................................................51
     2)  LZG Claims against Genius ........................................................................................52
   B.  Applicable Law ...............................................................................................................53
     1)  New York Law Applicable to Claims for Breach of Contract and Declaratory Relief ..............54
     2)  New York Law Applicable to Claims for Fraud ..........................................................57
   C.  Analysis of Facts Central to the Claims and Defenses of Both Parties ............................58
   D.  Analysis of Claims by Genius against LZG .....................................................................66
     1)  Declaratory Judgment that the APA is Terminated ......................................................71
     2)  Breach of Contract by LZG .........................................................................................75
     3)  Fraud by LZG ..............................................................................................................87
     4)  Remedies for LZG's Wrongful Conduct .....................................................................95
   E.  Analysis of LZG Counterclaims against Genius ..............................................................103
     1)  Breach of Contract by Genius ......................................................................................103
     2)  Fraud by Genius ..........................................................................................................107
IX.  COSTS .....................................................................................................................................108
   A.  Legal Standard for Costs in ICC Arbitration and the Parties' Positions ..........................108
   B.  Costs Sought by Genius ...................................................................................................110
   C.  Costs Sought by LZG .......................................................................................................113
X.  FINAL AWARD ......................................................................................................................115

**TABLE OF DEFINED TERMS**

- "**Asset Purchase Agreement**" or "**APA**" refers to the Asset Purchase Agreement dated January 23, 2024
- "**CMC**" refers to Case Management Conference
- "**FBPA**" refers to FatBrain PrimeSource Acquisition LLC
- "**Genius**" refers to Genius Group Limited
- "**Genius FARA**" refers to Genius' March 28, 2025 First Amended Request for Arbitration
- "**Genius SARA**" refers to Genius' July 11, 2025 Second Amended Request for Arbitration
- "**Genius Reply to Counterclaims**" refers to Genius' May 28, 2025 Reply to LZG's April 25, 2025 Counterclaims
- "**Genius Reply to Amended Counterclaims**" refers to Genius' September 12, 2025 Reply to LZG August 1, 2025 Amended Counterclaims
- "**Genius Pre-Hearing Mem.**" refers to Genius' October 30, 2025 Pre-Hearing Memorandum
- "**Genius Post Hearing Mem.**" refers to Genius' November 26, 2025 Post-Hearing Closing Memorandum
- "**Genius Post Hearing Reply Mem.**" refers to Claimant Genius' December 10, 2025 Reply Post-Closing Memorandum
- "**ICC Court**" refers to the International Court of Arbitration of the International Chamber of Commerce
- "**Joint Stipulation**" refers to the October 6, 2025 Joint Stipulation memorializing LZG's withdrawal of claims against the Additional Party (attached to Procedural Order No. 7)
- "**LZG**" refers to LZG International, Inc.
- "**LZG Answer and Counterclaims**" refers to the LZG's April 25, 2025 Answer and Counterclaims
- "**LZG Amended Answer and Counterclaims**" refers to LZG's August 1, 2025 Amended Answer and Counterclaims
- "**LZG Pre-Hearing Mem.**" refers to the LZG's October 30, 2025 Pre-Hearing Memorandum
- "**LZG Post Hearing Mem.**" refers to LZG's November 26, 2025 Post-Hearing Closing Memorandum
- "**LZG Post Hearing Reply Mem.**" refers to LZG's December 10, 2025 Reply Post-Closing Memorandum
- "**LZG Reply Proposed Findings**" refers to LZG's December 10, 2025 Statement of Proposed Findings
- "**PSG**" refers to PrimeSource Group[1]
- "**PS Analytical**" refers to Prime Source – Analytical Systems LLP
- "**Standstill / Debt Settlement Agreements**" refers collectively to Standstill Agreements and Debt Settlement Agreements dated January 10, 2024

---

[1] PSG is a group of five companies owned by FBPA, including: Prime Source LLP ("**PS**"), Prime Source – Analytical Systems LLP ("**PS Analytical**"), PS Innovation LLP ("**PS Innovation**"), Digitalism LLP "**Digitalism**"), and InFin-IT Solution LLP ("**InFin-IT**").

**FINAL AWARD**

This constitutes the Arbitral Tribunal's final award in ICC Case No. 29043/PDP resolving all the claims and defenses asserted in this arbitration ("**Final Award**").  While many terms are defined herein for convenience, reference should be made to the Table of Defined Terms as needed.

## I.    INTRODUCTION

1.    This dispute arises out of the Asset Purchase Agreement (the "**Asset Purchase Agreement**" or "**APA**"), dated January 23, 2024, between Genius Group Limited ("**Genius**") and LZG International, Inc. ("**LZG**") (collectively the "**Parties**"), pursuant to which Genius was to purchase from LZG a group of five privately-held companies and their assets.

2.    In this arbitration, Genius contends that LZG failed to deliver the assets "free of all encumbrances" as LZG expressly represented and warranted in the APA, having concealed pre-existing Debt Settlement and Standstill Agreements with third parties that rendered the assets encumbered.  Genius asserts a claim for declaratory relief that the APA is terminated,[2] a breach of contract claim,[3] and a fraud claim[4] against LZG.

3.    LZG contends that it did not breach the APA and asserts counterclaims for breach of contract[5] and fraud[6] against Genius.[7]

---

[2] Claimant's Second Amended Request for Arbitration ("**Genius SARA**") ¶¶ 86-92, Claimant's Post Hearing Memorandum ("**Genius Post Hearing Mem.**") at 35; Genius Post Hearing Reply Memorandum ("**Genius Post Hearing Reply Mem.**") at 33.
[3] Genius SARA ¶¶ 93-100, Genius Post Hearing Mem. at 36.
[4] Genius SARA ¶¶ 101-107, Genius Post Hearing Mem. at 47.
[5] LZG Answer to the Second Amended Request for Arbitration and Counterclaims ("**LZG Amended Answer and Counterclaims**") at 17-19; LZG Post Hearing Memorandum ("**LZG Post Hearing Mem.**") at 55; LZG Post Hearing Reply Memorandum ("**LZG Post Hearing Reply Mem.**") at 38.
[6] LZG Answer and Counterclaims at 19; LZG Post Hearing Mem. at 66.
[7] LZG initially had asserted a counterclaim against Genius for unjust enrichment but made no mention of that claim in the LZG Post Hearing Mem. or LZG Closing Reply and therefore this claim is deemed abandoned. *See* LZG Answer and Counterclaims at 19. Additionally, LZG initially had asserted a claim against Mr. Hamilton for breach of fiduciary duty that was subsequently withdrawn.

4.      Both sides seek to recover arbitration costs and expenses.[8]

## II.      PARTIES AND COUNSEL

### A.      Claimant (Genius Group Limited)

5.      Claimant Genius Group Limited (previously defined as "**Genius**") is a Singapore company with its principal place of business located in Singapore.

6.      Claimant is represented in this arbitration by the following attorneys and law firm:

> Eric Benzenberg
> Christopher Basile
> Joseph Rose
> Matthew Hettrich
> The Basile Law Firm P.C.
> 390 N. Broadway, Suite 140
> Jericho, NY 11753
> Tel.: (516) 455-1500
> eric@thebasilelawfirm.com
> chris@thebasilelawfirm.com
> joe@thebasilelawfirm.com
> matthew@thebasilelawfirm.com

### B.      Respondent (LZG International, Inc.)

7.      Respondent LZG International, Inc. (previously defined as "**LZG**") is a Florida corporation with its principal place of business located in New York, New York.

8.      LZG is represented in this arbitration by the following attorneys and law firms:

> Christopher Serbagi, Esq.
> The Serbagi Law Firm, P.C.
> 595 West End Ave, Apt. 15B
> New York, NY 10024
> Tel: 917-880-6187
> christopher@serbagilaw.com

> Tom Fini, Esq.
> Russell Jordan
> CATAFAGO FINI LLP
> One Grand Central Place
> 47th Floor
> New York, NY 10165
> Tel: 212-239-9669
> tom@catafagofini.com

---

[8] Genius SARA ¶ 115, Genius Post Hearing Mem. at 82; LZG Answer and Counterclaims at 19; LZG Motion for Attorneys' Fees ("**LZG Fee Motion**"); LZG Post Hearing Reply Memorandum ("**LZG Closing Reply**") at 35.

9.      At the beginning of this arbitration, Respondent LZG was represented by the law firm King & Spalding LLP, which withdrew as counsel by letter dated June 3, 2025.[9]

### III.     AGREEMENT TO ARBITRATE AND ARBITRAL TRIBUNAL

#### A.     Agreement to Arbitrate

10.     Section 18 of the Asset Purchase Agreement contains the Parties' arbitration agreement providing for arbitration under the Rules of Arbitration of the International Chamber of Commerce ("**ICC Rules**") and in accordance with the expedited procedures set out in Article 30 of the ICC Rules.  Section 18 of the APA reads as follows:

> "18. ARBITRATION
>
> 18.1 Any dispute arising out of or in connection with this contract, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration in New York City, New York, USA in accordance with the International Chamber of Commerce Arbitration Rules

---

[9] After King & Spalding LLP withdrew as counsel for LZG, Mr. John Parker of GenCounsel LLC served as interim counsel and appeared on behalf of Respondent LZG at the initial CMC on June 26, 2025, at which Mr. Parker informed the Arbitral Tribunal that LZG was in the process of engaging counsel for the arbitral proceedings. In July 2025, Mr. Serbagi of the Serbagi Law Firm P.C. appeared in the arbitration as counsel for LZG. Mr. Serbagi sought a three-week extension to file LZG's Amended Answer and Counterclaims.  As memorialized in Procedural Order No. 2, the Arbitral Tribunal granted LZG's requested three-week extension until August 1, 2025, to file its Amended Answer and Counterclaims. In late July, counsel for Genius raised questions as to Mr. Serbagi's authority to represent LZG in this arbitration based on an ancillary judicial derivative lawsuit against the LZG Board of Directors in Florida state court. On Friday, August 1, 2025, the Arbitral Tribunal requested that counsel for Claimant and Respondent, respectively, provide the Arbitral Tribunal and the ICC Secretariat with a power of attorney or equivalent documentation.

On the evening of Sunday, August 3, 2025, Mr. Serbagi submitted a letter advising the Arbitral Tribunal and ICC Secretariat that he and his firm were withdrawing "temporarily" as counsel of record for Respondent in this arbitration, in light of a July 25, 2025, judicial order by a Florida state court.  Upon receiving notice of Mr. Serbagi's withdrawal, the Arbitral Tribunal postponed a virtual CMC scheduled for the following day, August 4, 2025, until later in August. On August 6, 2025, Mr. Benzenberg circulated by email to all Parties, the Arbitral Tribunal and the ICC Secretariat a copy of a power of attorney designating The Basile Law Firm as legal representatives of Genius. On September 2, 2025, Mr. Tom Fini of Catafago Fini LLP appeared in the arbitration as co-counsel for Respondent LZG, alongside Mr. Serbagi of The Serbagi Law Firm P.C. On September 8, 2025, Mr. Fini circulated by email to all Parties, the Arbitral Tribunal and the ICC Secretariat, a notarized copy of a power of attorney from a member of the LZG Board of Directors designating both Mr. Fini of Catafago Fini LLP and Mr. Serbagi of The Serbagi Law Firm P.C. as legal representatives of LZG in the arbitration.

3

("ICC Rules") for the time being in force, which rules are deemed to be incorporated by reference in this Section.

18.2 The Parties agreed [sic] that any arbitration commenced pursuant to this Section shall be conducted in accordance with the Expedited Procedure set out in Article 30 of the ICC Rules.

18.3 The Tribunal shall consist of one arbitrator.

18.4 The language of the arbitration shall be English.

18.5 This Section shall survive the termination of this Agreement."

11.     In accordance with Section 18 of the APA, this arbitration is being conducted pursuant to the ICC Rules and in accordance with the expedited procedures set out in Article 30 of the ICC Rules.

## B.     Arbitral Tribunal

12.     In a joint letter to the Secretariat of the International Court of Arbitration of the ICC ("**ICC Secretariat**") dated March 31, 2025, Claimant and Respondent jointly nominated Ms. Dana MacGrath as sole arbitrator pursuant to the Parties' agreed procedure. In its April 30, 2025, letter, the ICC Secretariat confirmed that no objections were received from either party on the appointment of the sole arbitrator.

13.     Pursuant to Article 13(2) of the Rules, on June 5, 2025 the Secretary General of the ICC Court confirmed Ms. Dana MacGrath as sole arbitrator,[10]  whose name and contact details are as follows:

> Dana MacGrath
> Arbitrator
> MacGrath Arbitration
> dana@macgratharbitration.com

---

[10] The sole arbitrator is referred to as the Arbitral Tribunal in this Final Award.

## IV.  GOVERNING LAW

14.  Section 19 of the Asset Purchase Agreement provides that the APA shall be governed by New York law.

15.  Section 19.14 of the APA states as follows:

> "19.14 Governing Law.
>
> This Agreement and the relationship between the Parties shall be governed by, and interpreted in accordance with, the Laws of the State of New York and and [sic] jurisdiction for any dispute shall be the federal courts located in the Southern District of New York."

## V.  PROCEDURAL HISTORY

16.  Genius commenced this arbitration by filing a Request for Arbitration dated October 30, 2024 that was notified by the ICC Secretariat on November 15, 2024 to Respondents (1) LZG International, Inc. (U.S.A.), (2) Michael Thomas Moe (U.S.A.), and Peter Ritz.[11] *See* ICC Secretariat letter dated December 10, 2024 (cover letter retransmitting the Request for Arbitration and its attachments and correspondence to date by Federal Express to Respondents and copying counsel for Genius on December 10, 2024 and requesting an email address for LZG International) [HB_005357].[12]

17.  Genius filed a First Amended Request for Arbitration ("**Genius FARA**") on March 28, 2025.

---

[11] Genius withdrew any claims in the arbitration against Messrs. Moe and Ritz. Therefore, LZG is the only Respondent in the arbitration.

[12] In the period following the commencement of arbitration, both Parties sought interim relief in aid of arbitration in New York federal court. The Hon. Mary Kay Vyskoch granted the Parties' separate motions seeking a preliminary injunction restricting stock transfer of both Genius and LZG pending arbitration to maintain the status quo pending the resolution of the arbitration and issued a stay of the New York federal action. *See Genius v. LZG International et al.*, Case 1:24-cv-08464-MKV, Opinion and Order [Dkt No. 99] (S.D.N.Y March 13, 2025). On March 17, 2025, Genius appealed this decision to the United States Court of Appeal for the Second Circuit. *Genius Group Ltd. v. LZG Int'l, Inc. et al*, Case No. 25-630 (2d Cir.). On May 7, 2025, the Second Circuit stayed the injunction against Genius pending resolution of the appeal but maintained the preliminary injunction in effect as to LZG.

18.     LZG filed an Answer and Counterclaims ("**LZG Answer and Counterclaims**") dated April 25, 2025.

19.     On May 21, 2025, Mr. Hamilton (an individual originally named as an Additional Party) filed an Opposition to Joinder as an Additional Party in the arbitration ("**Opposition to Joinder**").

20.     On May 28, 2025, Genius filed a Reply to LZG's Counterclaims ("**Genius Reply**").

21.     On June 5, 2025, the ICC Court Secretary General confirmed the appointment of Dana MacGrath as the sole arbitrator.

22.     An initial Case Management Conference ("**CMC**") was held virtually on June 26, 2025.  Participants in the CMC included (1) Mr. Eric Benzenberg with the Basile Law Firm serving as counsel for Claimant Genius, (2) Mr. Roger Hamilton, Chief Executive Officer and client representative of Genius, (3) Mr. John Parker with GenCounsel LLC serving as interim counsel for Respondent LZG, (4) Mr. Peter Ritz, Board of Directors member and client representative of LZG, and (5) Ms. Dana MacGrath, Sole Arbitrator.

23.     The main points discussed at the initial CMC were memorialized in Procedural Order No. 1, dated July 10, 2025, together with a timetable of the main deadlines in this arbitration. At the initial CMC, counsel for Genius raised the issue of dispositive motions. The Arbitral Tribunal noted that dispositive motions are not common in expedited proceedings. The procedural timetable set out in Procedural Order No. 1 did not envisage dispositive motions.

24.     At the initial CMC of June 26, 2025, it was also noted that any claims asserted by Claimant Genius in this arbitration against individuals (or entities) other than Respondent LZG had been withdrawn and the only claims that Genius was asserting in this arbitration were against LZG.  *See* Procedural Order No. 1 ¶ 6.

25. On July 11, 2025, Genius filed Claimant's Second Amended Request for Arbitration ("**Genius SARA**"), with accompanying exhibits, and a redline comparison against its previous pleading. Claimant based its filing of the Genius SARA on the premise that further factual details in the pleadings would assist efficient fact development in this expedited arbitration. After careful consideration, the Arbitral Tribunal decided to admit the Genius SARA into the record. *See* Procedural Order No. 2 ¶ 4-5. The Arbitral Tribunal concluded that the additional factual details contained in the Genius SARA would allow LZG to provide a more detailed amended Answer and the Parties to more efficiently handle fact development in this arbitration. Procedural Order No. 2 ¶ 5. LZG was granted until Friday, August 1, 2025, to submit an amended Answer in response to the Genius SARA of July 11, 2025, affording LZG its requested three (3) weeks to prepare its amended pleading. Procedural Order No. 2 ¶ 7.

26. Another virtual CMC was scheduled for July 21, 2025, at 8:30 am Eastern Time. All parties and counsel of record were given notice of the July 21, 2025 CMC, including Mr. Eric Benzenberg with the Basile Law Firm serving as counsel for Genius, Mr. Roger Hamilton, Chief Executive Officer and client representative of Genius, Mr. John Parker with GenCounsel LLC serving as interim counsel for LZG, and Mr. Peter Ritz, Board of Directors member and client representative of LZG. Additionally, Mr. Christopher Serbagi, an attorney who the Arbitral Tribunal was advised that LZG soon may retain as counsel to represent LZG in the arbitration, was given notice of the CMC scheduled for July 21, 2025. *See* Procedural Order No. 2 ¶ 2.

27. However, on July 21, 2025, no counsel or client representative appeared for LZG at the virtual CMC. Therefore, the Arbitral Tribunal promptly adjourned the conference and rescheduled it for Thursday, July 24, 2025, at 8:30 am Eastern time with notice to all Parties. Procedural Order No. 2 ¶ 3.

28.     A virtual CMC took place on July 24, 2025, attended by Mr. Benzenberg of The Basile Law Firm as counsel for Claimant Genius and the Additional Party, and attended by Mr. Serbagi of The Serbagi Law Firm as counsel for Respondent LZG. *See* Procedural Order. No. 4 ¶ 4. At this CMC, counsel for Genius raised questions as to the authority of Mr. Serbagi to act as counsel for LZG based on what was described as a Florida state court derivative action against the LZG Board of Directors.

29.     Given that counsel had referred to various ancillary judicial proceedings, the Arbitral Tribunal requested that counsel identify the court proceedings that counsel believed were relevant to this arbitration. *See* Procedural Order No. 3 ¶ 2.

30.     On July 25, 2025, Claimant submitted a letter identifying the following court proceedings as relevant to this arbitration:

a.     **New York federal court proceedings**: On November 7, 2024, Genius commenced a CPLR Section 7502(c) special proceeding in the United States District Court for the Southern District of New York seeking an injunction maintaining the status quo in aid of the current arbitration. *See Genius Group Ltd. v. LZG Int'l, Inc. et al*, Case 1:24-cv-08464-MKV (S.D.N.Y.). On February 11, 2025, the District Court awarded a preliminary injunction in favor of Genius and against LZG. The federal court judge subsequently vacated this first injunction, and on March 13, 2025, issued an opinion and order in which it granted a preliminary injunction in favor of both Genius and LZG to maintain the status quo pending arbitration, and stayed the judicial case pending the ICC arbitration. On March 17, 2025, Genius appealed this decision to the United States Court of Appeal for the Second Circuit. *Genius Group Ltd. v. LZG Int'l, Inc. et al*, Case No. 25-630 (2d Cir.). On May 7, 2025, the Second Circuit stayed the injunction against Genius pending resolution of the appeal but maintained the preliminary injunction in effect as to LZG.

b.     **Florida state court derivative lawsuit against LZG Board Members**: A group of LZG shareholders filed a derivative action on October 14, 2024, alleging that board members Michael Moe and Peter Ritz had breached their fiduciary duties. *Shawn Carey, et al v. Michael Moe, et al*, Case 2024-019773-CA-01 (Miami-Dade County). On May 9, 2025, the shareholders sought removal of the LZG Board of Directors under Florida law. After oral argument on July 21, 2025, the Florida court ruled from the bench, ordering the removal of Mr. Moe and Mr. Ritz from the LZG Board of Directors. Thereafter it issued a written order memorializing its ruling dated July 25, 2025.

31.     No further information regarding these judicial proceedings was supplied by the Parties to the Tribunal, and the Arbitral Tribunal has no reason to believe anything further regarding these judicial cases impacts this arbitration.

32.     On Friday, August 1, 2025, the Arbitral Tribunal requested by email that counsel for Genius and LZG, respectively, provide a Power of Attorney.  This request was memorialized in Procedural Order No. 3 ¶ 2.

33.     Also on Friday, August 1, 2025, LZG filed its Answer and Counterclaims ("**LZG Amended Answer and Counterclaims**") in this arbitration together with a redline comparison to LZG's earlier pleading.

34.     In anticipation of an upcoming virtual CMC scheduled for August 4, 2025, on Friday, August 1, 2025, Genius again asked for a ruling by the Arbitral Tribunal on "joinder" as soon as possible.  *See* Procedural Order No. 4 ¶ 6.  Neither Respondent's second counsel of record nor third counsel of record had filed any submissions regarding the issue of "joinder" of Mr. Hamilton – an issue that Genius had raised repeatedly at the virtual CMCs in June and July 2025.

35.     Based on the submissions before the Arbitral Tribunal, on Saturday, August 2, 2025, the Tribunal issued a Decision on Joinder ("**Decision on Joinder**") regarding the joinder of Mr. Hamilton as Additional Party in advance of the upcoming Monday, August 4, 2025 CMC.

36.     Also on Saturday, August 2, 2025, Mr. Serbagi filed a letter on behalf of LZG seeking leave to file a dispositive motion.

37.     The next day, on Sunday evening, August 3, 2025, Mr. Serbagi withdrew LZG's request for leave to file a dispositive motion.  Mr. Serbagi also informed the Arbitral Tribunal and opposing counsel by email that he was temporarily withdrawing as counsel of record for Respondent due to a judicial order by a Florida state court dated July 25, 2025, memorializing a

ruling made from the bench earlier that week that removed Mr. Ritz and others from the LZG Board of Directors.[13]

38.     In response to Mr. Serbagi withdrawing temporarily as counsel of record for LZG on the evening of Sunday, August 3, 2025, the Arbitral Tribunal advised the Parties and counsel that same night by email that the virtual CMC scheduled for Monday, August 4, 2025 at 3 pm EDT was cancelled and would be rescheduled.  The Arbitral Tribunal memorialized these developments in Procedural Order No. 3, dated August 4, 2025.

39.     On August 24, 2025, counsel for Genius submitted a letter requesting, *inter alia*, that the Arbitral Tribunal stay the arbitration pending a New York court adjudication regarding a motion for disqualification of Mr. Serbagi as counsel for Respondent LZG.  On August 25, 2025, Mr. Serbagi submitted a letter on behalf of LZG opposing the request for a stay of the arbitration and indicating that LZG was in the process of retaining new counsel. Procedural Order No. 5 ¶ 4.

40.     The Arbitral Tribunal held a virtual CMC on August 25, 2025.  Participants in the CMC included (1) Mr. Eric Benzenberg with the Basile Law Firm serving as counsel for Genius and the Additional Party (Roger Hamilton), (2) Mr. Christopher Serbagi with The Serbagi Law Firm serving as counsel for LZG, (4) Ms. Dana MacGrath, Sole Arbitrator, and (5) Ms. Jessica Rado, Tribunal Administrative Secretary.[14]

---

[13] At the CMC on July 24, 2025, Counsel for Genius had questioned whether Mr. Serbagi was properly authorized to act as counsel for LZG if the individual director(s) of LZG who had instructed Mr. Serbagi to act as counsel for LZG in this arbitration had been removed from the LZG Board by a Florida court. In *Shawn Carey, et al v. Michael Moe, et al.*, Case No. 2024-019773-CA-01 (Miami-Dade County), a group of LZG shareholders had filed a derivative action on October 14, 2024, alleging that LZG board members Michael Moe and Peter Ritz had breached their fiduciary duties and that the Florida court should remove them from the LZG Board of Directors.  After oral argument on July 21, 2025, the Florida court ruled from the bench ordering the removal of Mr. Moe and Mr. Ritz from the LZG Board of Directors. This decision was memorialized in an order dated July 25, 2025.

[14] Ms. Jessica Rado was appointed as Arbitral Tribunal Administrative Secretary in late August 2025.  On August 20, 2025, the ICC Secretariat informed the Parties by letter of the proposed appointment of Ms. Rado as Arbitral Tribunal Administrative Secretary and acknowledged having received Ms. Rado's

41.     At the virtual CMC on August 25, 2025, Mr. Benzenberg confirmed that the request on behalf of Genius to stay the arbitration was based solely on the issue of a counsel disqualification motion pending before a New York court. Mr. Serbagi stated that LZG was in the process of engaging new counsel within the next few days. In light of the Parties' submissions in their letters and at the CMC on this issue, the Arbitral Tribunal denied the request by Genius to stay the arbitration. *See* Procedural Order No. 5 ¶ 5, dated August 25, 2025.

42.     Mr. Benzenberg requested a two-week extension for Genius and Mr. Hamilton, named as an Additional Party, to submit a reply to LZG's amended Counterclaims in light of the recent procedural developments and the upcoming Labor Day holiday weekend.  Counsel for LZG did not oppose the extension.  The Arbitral Tribunal granted Genius an extension to file its reply from August 29, 2025 to September 12, 2025.  *See* Procedural Order No. 5 ¶ 3.

43.     Additionally, Mr. Serbagi requested that the Arbitral Tribunal allow dispositive motions at the CMC on August 25, 2025.  The Arbitral Tribunal noted that dispositive motions are not common in expedited proceedings and had not been permitted at an earlier CMC when requested by counsel for Claimant that Mr. Serbagi had not attended.  *See* Procedural Order No. 5 ¶ 7; Procedural Order No. 1 ¶ 9.  In light of recent procedural developments, and the joint request by counsel for both sides for an opportunity to seek leave to file dispositive motions that potentially may narrow or resolve entirely the disputed issues in the case, the Arbitral Tribunal granted both sides the right to submit letters of not more than five pages seeking leave to file dispositive motions and set deadlines for such letters, as memorialized in Procedural Order No. 5.

---

curriculum vitae and statement of independence and impartiality, inviting the Parties to submit any objections by August 25, 2025.  There were no objections.

44. On August 29, 2025, the ICC Secretariat confirmed by letter the appointment of Ms. Jessica Rado as Arbitral Tribunal Administrative Secretary and the absence of any objections by the Parties to her appointment.

45. On September 12, 2025, Genius timely submitted a Reply to the Counterclaims asserted in LZG's Answer and Counterclaims ("**Genius Reply to Amended Counterclaims**"), with accompanying exhibits.

46. In accordance with the amended procedural timetable set out in Procedural Order No. 5, Genius submitted a letter seeking leave to file a dispositive motion on September 26, 2025. LZG filed a letter response on October 6, 2025. Genius filed a reply letter on October 9, 2025. The Arbitral Tribunal analyzed the Parties' submissions with respect to Genius' application for leave to file a dispositive motion and ultimately denied Genius' request, as set forth in Procedural Order No. 8, dated October 10, 2025.

47. The Tribunal held another virtual CMC on September 29, 2025. Participants in the CMC included (1) Mr. Eric Benzenberg with the Basile Law Firm acting as counsel for Genius, (2) Mr. Christopher Serbagi with The Serbagi Law Firm acting as counsel for LZG, (3) Mr. Tom Fini with Catafago Fini LLP acting as counsel for LZG, (4) Ms. Dana MacGrath, Sole Arbitrator, and (5) Ms. Jessica Rado, Arbitral Tribunal Administrative Secretary. The virtual CMC was scheduled for 10:00 am Eastern on Monday, September 29, 2025 following the Arbitral Tribunal's receipt of LZG's letter of Friday, September 26, 2025 requesting an extension of the deadline to file witness statements and an unopposed request for a conference to discuss scheduling matters. Genius also submitted a letter dated September 26, 2025, setting out its position on the requested extension of the deadline to file witness statements. *See* Procedural Order No. 5 ¶¶ 1-3.

48.   At the virtual CMC on September 29, 2025, the Arbitral Tribunal first noted that LZG had requested, *inter alia*, a settlement conference in its September 26, 2025 letter.   The Arbitral Tribunal clarified that it could not hold a settlement conference and that any settlement discussions between the Parties could only take place outside the purview of the Arbitral Tribunal. *See* Procedural Order No. 5 ¶ 4.

49.   Also at the virtual conference on September 29, 2025, counsel for both sides reiterated their positions regarding the disputed extension of the deadline for witness statements. Having heard from both sides, the Arbitral Tribunal set an extended deadline of Thursday, October 9, 2025, for the submission of witness statements.   The Arbitral Tribunal also clarified that any documents referenced in the witness statements should be included as exhibits numbered sequentially for each witness.  *See* Procedural Order No. 5 ¶ 5.

50.   Additionally, at the virtual CMC on September 29, 2025, the Parties discussed the issue of using documents at the evidentiary hearing that had not been produced in this arbitration previously.   It was agreed that any such additional documents to be used by a Party at the evidentiary hearing would be exchanged by Wednesday, October 22, 2025, and that the electronic Hearing Bundle would be compiled shortly thereafter so that the pre-hearing written submissions due on October 30, 2025, could reference documents as contained in the Hearing Bundle.  *See* Procedural Order No. 5 ¶ 7.  Also, to accommodate the Parties request for a two-day evidentiary hearing (as opposed to a one-day hearing on November 13, 2025 as originally scheduled), the Arbitral Tribunal proposed and the Parties agreed to start the evidentiary hearing on Wednesday, November 12, 2025 and continue on Thursday, November 13, 2025.

51.   On October 8, 2025, the Arbitral Tribunal issued Procedural Order No. 7 addressing a September 26, 2025 letter application submitted by LZG seeking "leave to file a motion to

request jurisdiction over Mr. Hamilton for claims against him … as set forth in Respondent's counterclaims." LZG Sept. 26, 2025 Letter at 1. Thereafter, counsel submitted a joint stipulation dated October 6, 2025 ("**Joint Stipulation**") (a copy of which is attached to Procedural Order No. 7).

52. In the Joint Stipulation, the parties agreed as follows:

(a) "LZG will drop any attempt to assert claims against Roger Hamilton ("Hamilton") personally in the above-captioned ICC Arbitration."

(b) "If LZG asserts any claims against Hamilton in another forum, Hamilton will not argue that such claims should have been brought in the pending ICC Arbitration."

53. Upon receipt of the Joint Stipulation, on the afternoon of October 6, 2025, the Arbitral Tribunal invited counsel for all Parties to confirm that: (a) by submitting this Joint Stipulation dated October 6, 2025, the Parties are jointly memorializing that LZG has withdrawn any claims in this arbitration against Additional Party Roger Hamilton; and (b) for the purposes of this arbitration, the issue of jurisdiction over Mr. Hamilton is moot based on the Joint Stipulation; as a result, there will be no further correspondence or legal and factual argument relating to jurisdiction over Mr. Hamilton or claims against Mr. Hamilton; and (c) in light of the October 6, 2025 Joint Stipulation regarding withdrawal of claims against Additional Party Roger Hamilton, Genius requests that the arbitration caption be amended to no longer refer to Mr. Hamilton as an additional party given that LZG has withdrawn any claims against Mr. Hamilton in this arbitration.

54. Counsel for all Parties confirmed the accuracy of the Arbitral Tribunal's summary of the Joint Stipulation by email and upon receipt of confirmation, the Arbitral Tribunal replied by email on October 6, 2025, reiterating the Arbitral Tribunal's understanding that any claims by LZG against Mr. Hamilton in this ICC arbitration have been dropped.

14

55.     Accordingly, in Procedural Order No. 7, the Arbitral Tribunal formally acknowledged and confirmed that (a) any claims by LZG against Mr. Hamilton in this arbitration have been withdrawn; and (b) the issue of jurisdiction over Mr. Hamilton was now moot and LZG's application for leave to file a dispositive motion regarding jurisdiction over Mr. Hamilton was moot and deemed withdrawn. *See* Procedural Order No. 7 ¶ 6. Finally, the Arbitral Tribunal acknowledged and confirmed that the Additional Party would no longer appear in the caption going forward. *Id*.

56.     On October 21, 2025, the Arbitral Tribunal held a virtual CMC in advance of the filing by the Parties of their respective pre-hearing memoranda and supporting materials. *See* Procedural Order No. 9 ¶¶ 1-3.  Participants in the CMC included (1) Mr. Eric Benzenberg with the Basile Law Firm as counsel for Genius, (2) Mr. Christopher Serbagi with The Serbagi Law Firm serving as co-counsel for LZG, (3) Mr. Tom Fini with Catafago Fini LLP serving as co-counsel for LZG, (4) Ms. Dana MacGrath, Sole Arbitrator, and (5) Ms. Jessica Rado, Tribunal Administrative Secretary.  *See* Procedural Order No. 9 ¶ 2.

57.     The virtual CMC had been scheduled following the Arbitral Tribunal's suggestion to discuss logistical matters in anticipation of the filing of pre-hearing memoranda and the virtual evidentiary hearing. *See* Procedural Order No. 9 ¶ 3.  The mechanics of the pre-hearing submissions were discussed and agreed.  In addition, it was discussed and agreed at the CMC that the previously agreed deadline for post-hearing submissions was too close to the end of the evidentiary hearing in light of the evidentiary hearing having been extended to two days and the need for a final transcript to be available for reference in the post-hearing submissions.  The Parties and Arbitral Tribunal agreed to extend the deadline for post-hearing written submissions from November 20, 2025 to November 26, 2025.  *See* Procedural Order No. 9 ¶ 7.

58.     Additionally, the Arbitral Tribunal explained that the Parties will have an opportunity to raise objections, if any, to the admissibility of evidence submitted by the opposing party in advance of the evidentiary hearing.  The Arbitral Tribunal clarified that the Federal Rules of Evidence do not apply in this arbitration and provided a template format for counsel to use to the extent either side wished to raise evidentiary objections.  *See* Procedural Order No. 9 ¶ 8.  The Arbitral Tribunal and Parties agreed to November 4, 2025, as the deadline for submitting evidentiary objections to the Arbitral Tribunal. *Id.*  Ultimately neither side raised any evidentiary objections by the agreed deadline of November 4, 2025.

59.     Furthermore, it was agreed that counsel for the Parties would confer on the order of witnesses and length of cross examination and redirect examination anticipated for each witness at the evidentiary hearing, taking into account the fact that Genius had submitted one witness statement and LZG had submitted four witness statements, and that the chess clock method would not apply. Counsel for the Parties were instructed to consider the time zone for each witness and prepare a hearing schedule that aimed to ensure that no witness would testify later than 11:00 pm in his or her local time.  Both sides having witnesses in distant time zones, it was agreed that the virtual evidentiary hearing would start at 8:00 am Eastern time on November 12, 2025, and at 7:00 am Eastern time on November 13, 2025, to accommodate the witnesses in later time zones. *See* Procedural Order No. 10 ¶ 8.

60.     On October 30, 2025, Genius submitted its pre-hearing memorandum ("**Genius Pre-Hearing Mem.**"), together with copies of factual exhibits and legal authorities cited therein.

61.     On October 30, 2025, Respondent submitted its pre-hearing memorandum ("**LZG Pre-Hearing Mem**."), together with copies of factual exhibits and legal authorities cited therein.

62.     The Pre-Hearing virtual CMC took place on November 7, 2025.  Participants in the CMC included (1) Mr. Eric Benzenberg and Mr. Matthew Hettrich with the Basile Law Firm as counsel for Genius, (2) Mr. Christopher Serbagi with The Serbagi Law Firm as counsel for LZG, (3) Mr. Tom Fini with Catafago Fini LLP as counsel for LZG, (4) Ms. Dana MacGrath, Sole Arbitrator, and (5) Ms. Jessica Rado, Arbitral Tribunal Administrative Secretary.  The Pre-Hearing CMC focused on the hearing schedule and logistical issues ahead of the two-day virtual evidentiary hearing scheduled for November 12-13, 2025.  *See* Procedural Order No. 10 ¶¶ 2-3.

63.     At the Pre-Hearing CMC on November 7, 2025, Genius took issue with certain of LZG's affirmative defenses and legal theories/arguments in LZG's October 30, 2025 Pre-Hearing Memorandum that Genius contended were never raised in LZG's Answer and Counterclaims or otherwise in this arbitration until LZG's October 30, 2025 pre-hearing memorandum, as Genius had asserted in its letter of November 6, 2025 ("**Genius Nov. 6, 2025 Letter**").  Genius contended that LZG's belated presentation of defenses violated Article 5 of the ICC Rules of Arbitration and prejudiced Genius, as it did not have an opportunity to address what Genius characterized as newly raised defenses/arguments. Genius asked the Arbitral Tribunal to strike from LZG's Pre-Hearing Memorandum what Genius characterized as newly raised legal theories and arguments and to prohibit LZG from attempting to continue to advance such theories (whether during cross-examination or LZG's Post Hearing Memorandum).  *See* Procedural Order No. 10 ¶¶ 4-5 (citing Genius Nov. 6, 2025 Letter at 3).  Counsel for LZG advised it would submit a letter response by Monday, November 10, 2025, identifying where in its Amended Answer LZG had previously asserted the defenses and arguments, and explaining why LZG believed the Arbitral Tribunal should not strike LZG's defenses and arguments at issue.  Without addressing the merits of whether or not the Arbitral Tribunal would strike the additional LZG defenses and arguments at issue, the

17

Arbitral Tribunal stated that the Parties would have a full opportunity to address all claims, defenses and arguments that ultimately remain in the case in their post-hearing memoranda.

64.     Additionally, during the Pre-Hearing CMC on November 7, 2025, the Arbitral Tribunal proposed that the Parties file both a post-hearing memorandum and post-hearing reply memorandum to ensure a full opportunity to be heard on all claims, defenses and arguments.  Both Parties agreed to the addition of a second round of post-hearing briefing, and collectively agreed on December 10, 2025, as the deadline for submitting post-hearing reply memoranda. *See* Procedural Order No. 10 ¶ 6.

65.     Finally, the logistics for the virtual evidentiary hearing, Hearing Bundles, witness sequence and deadlines for post-hearing submissions were discussed at the Pre-Hearing CMC on November 7, 2025.  *See* Procedural Order No. 10 ¶¶ 8-11.  It was agreed that any impeachment documents available in the public domain that counsel planned to use for the evidentiary hearing were to be exchanged by 12 noon ET, Monday November 10.  *See* Procedural Order No. 10 ¶ 11.

66.     Four volumes of exhibits were submitted for use at the evidentiary hearing and post-hearing submissions.[15]

67.     As agreed at the Pre-Hearing CMC, LZG submitted a letter on November 10, 2025, identifying where in its Amended Answer LZG had previously asserted the defenses and arguments, and explaining why LZG believed the Tribunal should not strike LZG's defenses and arguments at issue.

---

[15] The electronic Hearing Bundle Volume I, prepared by Genius, was submitted on October 30, 2025. It contained documents the Parties wished to use during the virtual hearing. The electronic Hearing Bundle Volume II, prepared by Genius, was submitted on November 10, 2025. It contained impeachment documents submitted by Genius. The electronic Hearing Bundle Volume III, prepared by Genius, was submitted on November 14, 2025. It contained additional documents for the Virtual Evidentiary Hearing, including, *inter alia,* prior written submissions in the arbitration (e.g., pleadings, pre-hearing submissions, written witness testimony). The electronic Hearing Bundle Volume IV, prepared by LZG, was submitted on November 28, 2025. It contained additional documents relied upon by Mr. McKnight in his expert report.

68.     Ultimately, having carefully considered the arguments in the Parties' respective letters, the Arbitral Tribunal issued Procedural Order No. 11, concluding that the Arbitral Tribunal would not strike any portions of LZG's Pre-Hearing Memorandum and would not foreclose examination of witnesses at the evidentiary hearing on the defenses and arguments at issue in those letter submissions.

69.     On November 10, 2025, counsel for LZG brought to the attention of the Arbitral Tribunal that Genius had requested LZG to produce documents referred to in LZG's expert report that had not already been produced (more than 150 documents).  Counsel for LZG responded that all documents made available to its expert that were not produced by LZG in the arbitration had been available in the due diligence data room pre-dating the APA to which counsel for both Parties had access and to which LZG had given its expert access.  Counsel for Genius initially asked to postpone the testimony of LZG's expert until counsel for Genius had a chance to review the more than 150 documents at issue alleged to be available in the due diligence data room.  Counsel for LZG opposed this request.  After conferring, counsel for the Parties agreed that LZG's expert would be examined as scheduled at the virtual evidentiary hearing (the schedule for which was memorialized in Procedural Order No. 10, dated November 7, 2025) and Genius would have the right to recall LZG's expert for additional examination the following week, if needed.

70.     The virtual Evidentiary Hearing took place on November 12 and November 13, 2025, pursuant to the schedule agreed by the Parties and memorialized in Procedural Order No. 10.  On November 12, 2025, two fact witnesses (Mr. Birmanov and Mr. Moe) and one expert witness (Mr. McKnight) testified on behalf of LZG. On November 13, 2025, one fact witness (Mr. Hamilton) testified on behalf of Genius, and one fact witness (Mr. Ritz) testified on behalf of LZG. Ultimately counsel for Genius chose not to recall LZG's expert for additional examination.

71.     Shortly after the virtual two-day evidentiary hearing, on November 19, 2025, Mr. Serbagi on behalf of LZG requested that the Arbitral Tribunal and counsel convene for closing oral arguments to take place after the two rounds of written post-hearing submissions scheduled for November 26, 2025 (the day before U.S.A. Thanksgiving 2025) and December 10, 2025 (two weeks thereafter), respectively.

72.     On November 19, 2025, counsel for Genius opposed LZG's request on the basis that this request for closing oral argument was never mentioned previously and would frustrate the expedited nature of this proceeding.  On November 20, 2025, the Arbitral Tribunal informed counsel by email that the Parties would have an opportunity to address all the claims, defenses and arguments in their two rounds of comprehensive post-hearing written closing and reply submissions, and therefore the Arbitral Tribunal did not anticipate a need for any additional closing oral argument.  If the Arbitral Tribunal were to have specific questions for counsel after reviewing the Parties' two rounds of written closing submissions, or were to need anything further from the Parties, the Arbitral Tribunal would notify counsel.

73.     On November 26, 2025, Genius submitted its post-hearing written submission ("**Genius Post Hearing Mem**."), together with Schedule 1, titled "Analysis of LZG's Written Witness Statements."

74.     On November 26, 2025, LZG submitted its post-hearing closing memorandum ("**LZG Post Hearing Mem**."), together with an affirmation of Mr. John New, and a motion for attorneys' fees ("**LZG Fee Motion**").

75.     On November 28, 2025 (the day after U.S.A. Thanksgiving 2025), counsel for LZG submitted a letter ("**LZG Nov. 28, 2025 Letter**") alleging that Genius or its counsel removed one of the attachments to an electronically produced email.

20

76.     In a responsive email on November 28, 2025, counsel for Genius pointed out that LZG's arguments regarding the alleged omission of an attachment to this email were discussed at length in LZG's Post Hearing Memorandum, and that Genius planned on responding to that discussion in Genius' Post Hearing Reply Memorandum due on December 10, 2025.

77.     On November 28, 2025, the Arbitral Tribunal provided Genius with an opportunity to respond to LZG's arguments about the email at issue by letter on or before Wednesday, December 3, 2025 after the USA Thanksgiving weekend, should Genius choose to do so, or Genius could choose to respond in its Post Hearing Reply Memorandum.

78.     On Tuesday, December 2, 2025, counsel for Genius submitted a response letter ("**Genius Dec. 2, 2025 Letter**"), asserting that there were no redactions, edits or omissions to the body of the email at issue, that the omission of the attachment in question was inadvertent, that LZG did not ask Mr. Hamilton about this issue during the cross examination at the virtual evidentiary hearing, and that LZG had waived any objections to the evidence produced by not raising this alleged evidence tampering issue timely by November 4, 2025 in accordance with the procedural timetable (November 4, 2025 deadline for objections to evidence).

79.     The Arbitral Tribunal held a virtual CMC on December 4, 2025, at which counsel for the Parties further addressed the email produced by Genius missing one of two attachments. The Arbitral Tribunal reiterated that counsel could further address their arguments regarding this email in their post-hearing reply submissions.

80.     After the virtual CMC, on December 4, 2025, counsel for Genius submitted a Declaration by Mr. Benzenberg ("**Benzenberg Declaration**") further addressing the issues raised in the LZG Nov. 28, 2025 letter, and attaching the document allegedly omitted by Genius as an email attachment when produced earlier in the arbitration. Respondent LZG subsequently filed a

21

letter on December 5, 2025 ("**LZG Dec. 5, 2025 Letter**") responding to the Benzenberg Declaration.[16]

81.    On December 10, 2025, Claimant submitted its post-hearing reply memorandum ("**Genius Post Hearing Reply Mem.**").

82.    On December 10, 2025, Respondent submitted its post-hearing reply memorandum ("**LZG Post Hearing Reply Mem**."), together with a statement of proposed findings and conclusions ("**LZG Reply Proposed Findings Mem**.").

83.    The Parties' requests for fees were addressed in their post-hearing submissions and accompanying materials.

84.    By email dated December 30, 2025, the ICC Secretariat advised that on 4 December 2025, the ICC Court "extended the time limit for rendering the final award until 30 January 2026 (Article 31(2))".

85.    By email dated January 30, 2026, the ICC Secretariat advised that on January 8, 2026, the ICC Court "extended the time limit for rendering the final award until 27 February 2026 (Article 31(2))."

86.    By email dated February 20, 2026, the Arbitral Tribunal declared the proceedings closed with respect to the matters to be decided in this Final Award in accordance with Article 27(a) of the ICC Rules and stated that the Arbitral Tribunal expected to submit the draft award to the ICC Court for approval within the next few days.  *See* Email from Sole Arbitrator to counsel and ICC Secretariat dated February 20, 2026.

---

[16] Having heard from the Parties in their letters and post-hearing submissions as well as the testimony during the two-day evidentiary hearing, the Arbitral Tribunal hereby concludes that the production by Genius of the email omitting on of the attachments was inadvertent. The complete copy of the email and all attachments, as to which there are no objections to authenticity, is in the record and referenced to the extent needed for the purposes of this Final Award.

87.     By email dated February 27, 2026, the ICC Secretariat advised that on February 5, 2026, the ICC Court "extended the time limit for rendering the final award until 31 March 2026 (Article 31(2))."

88.     On March 16, 2026, the ICC Court fixed the ICC Costs of Arbitration for this case at US$ 217,000.00.

89.     By email and letter dated March 24, 2026, the ICC Secretariat advised that on March 5, 2026, the ICC Court "extended the time limit for rendering the final award until 30 April 2026 (Article 31(2))."

90.     By email and letter dated April 7, 2026, the ICC Secretariat confirmed that both Parties agreed to electronic notification of the Final Award.

## VI.     SUMMARY OF THE PARTIES' CLAIMS AND RELIEF SOUGHT

### A.     Genius Claims against LZG

91.     Claimant Genius asserts three claims for relief:

a.     **Declaratory Judgment that the APA is Terminated**. Genius alleges that LZG failed to satisfy all of the conditions precedent to the closing of the APA, and therefore pursuant to the terms of the APA, Genius is entitled to a declaratory judgment that the APA is terminated. *See, e.g.,* Genius SARA ¶¶ 86-92; Genius Post Hearing Mem. at 35.

b.     **Breach of Contract**: Genius asserts a breach of contract claim against LZG based on LZG's alleged failure to satisfy various conditions precedent in the APA due to its alleged false representations and warranties in the APA. *See* Genius SARA ¶¶ 93-100; Genius Post Hearing Mem. at 36.

23

c. **Fraud**: Genius alleges that LZG knowingly deceived Genius into purchasing assets as to which LZG allegedly never had title or otherwise owned free and clear of encumbrances. *See* Genius SARA at ¶¶ 101-107; Genius Post Hearing Mem. at 47.

**B. LZG Defenses to Genius Claims**

92. LZG asserts the following affirmative defenses:

a. Genius allegedly breached the APA, thereby barring any relief to Genius.

b. Genius' claims allegedly are precluded by the doctrine of election of remedies and equitable estoppel.

c. Genius allegedly cannot establish LZG's conduct caused its harm.

d. The fraud claim asserted by Genius allegedly is frivolous.

e. Genius allegedly fails to meet any of the elements of rescission.

**C. LZG Counterclaims against Genius**

93. LZG asserts the following counterclaims:

a. **Breach of Contract:** LZG alleges that Genius breached the APA based on Genius' declaration of LZG's breach of contract, refusal to perform further under the APA (including allegedly failing to make further payments, to transfer Genius shares, and to appoint LZG Directors to the Genius Board), and commencing arbitration against LZG. *See* LZG Amended Answer and Counterclaims at 17-18; LZG Post Hearing Mem. at 55.

b. **Fraud:** LZG alleges that Genius knowingly made false representations of fact as to Genius having sufficient funds at the time of closing. *See* LZG Amended Answer and Counterclaims at 19; LZG Post Hearing Mem. at 66.

94. LZG originally had asserted a claim for unjust enrichment as an alternative to its breach of contract counterclaim (LZG Amended Answer and Counterclaims at 19) but thereafter

did not argue or otherwise address a claim for unjust enrichment in its pre-hearing and post-hearing submissions. As a result, the unjust enrichment counterclaim is deemed abandoned.

### D.       Genius Defenses to LZG Counterclaims

95.       Genius opposes LZG's breach of contract claim on the grounds that, *inter alia*, Genius allegedly had no duty to perform, including to make payments pursuant to the APA, because LZG allegedly failed to satisfy conditions precedent to closing so the transaction never closed or the "closing" had no effect.  *See* Genius Reply to Counterclaims at 22-24; Genius Post Hearing Mem. at 73-78.

96.       In response to LZG's claim of fraud, Genius denies it knowingly made any material misrepresentations about the state of its business and availability of sufficient funds at the time of closing, alleges that it was known and agreed by the Parties that post-closing Genius planned to raise additional funds through an ATM[17] and in any event Genius' conduct allegedly did not cause LZG any damages.  *See* Genius Reply to Counterclaims at 25; Genius Post Hearing Mem. at 78-82.

## VII.    <u>SUMMARY OF THE RELEVANT FACTS</u>

### A.       Events Leading Up to the Signing of the APA

97.       Genius and LZG began discussions in the Fall of 2023 about a prospective transaction whereby Genius would acquire from LZG control over the "PrimeSource Group" ("**PSG**"), a group of five Kazakhstani technology companies owned by FatBrain PrimeSource

---

[17] An "at the market" or "ATM" offering allows a company to issue and sell stock on an as-needed basis through a contractual arrangement with an underwriter or bank. Genius had prior approval for an ATM with underwriter H.C. Wainwright & Co. ("**HCW**") but could not obtain SEC approval until it filed its 2023 annual statement and form F-3. LZG would not have qualified for an ATM as it is only available to S-3/F-3 filers (stock trades on a national exchange such as the NYSE) among other requirements.  *See* Genius Post-Hearing Mem. at 1 n.1; Hamilton Stmt., ¶ 77, 82, 92 ("LZG was aware of the high level of importance of Genius' ATM.").

Acquisition Company LLC ("**FBPA**").  *See* HB_000001 (email dated October 17, 2023 introducing Roger Hamilton and Peter Ritz); Genius Pre-Hearing Mem. at 2; Hamilton Stat., ¶ 3; Ritz Stat., ¶ 25. FBPA is sometimes referred to as "FatBrain" or "FB" in documents and testimony in this arbitration.

98.     Shortly thereafter, the Parties executed a non-disclosure agreement in early November 2023, and created data rooms, where each side populated material documents, files and objects concerning their businesses.  Genius Pre-Hearing Mem. at 2 (citing Hamilton Stat., ¶¶ 5-9; Ritz Stat., ¶ 39; HB_000002-000007 (NDA Agreement signed by the Parties).

99.     The LZG data room included Promissory Notes respectively held by Messrs. Chsherbinin and Nazarov contemplating that the debt obligations owed were due on or before December 31, 2023.  Hamilton Stmt., ¶ 19.

### 1.     APA Drafting History

100.    On November 28, 2023, Genius circulated an initial draft of the Asset Purchase Agreement (previously defined as the "**APA**") that would be the main agreement memorializing the proposed transaction. Genius Pre-Hearing Mem. at 3; Hamilton Stat., ¶ 12; HB_000390, 000391-000421 (initial draft of the APA); Ritz Stat., ¶ 73.

101.    The initial draft and ultimately final version of the APA provided for two components of consideration from Genius: Genius would convey 73 million freely tradable Genius shares to LZG and commit to provide after closing up to USD $15 million in cash.  *See* APA §§ 3.1, 7.6 [HB_000688, HB_000693]. Consideration by LZG was the conveyance of the assets as defined in the APA and listed in Exhibit 1 to the APA free of encumbrances. HB_000688.

102.    The first draft of the APA of November 28, 2023 included several defined terms, including "Encumbrances" and provided that "[t]he Assets shall be sold free from all

Encumbrances." HB_000398. While the Parties made several edits to the draft APA, this language was contained in each subsequent version, all the way through Version 6 of the APA circulated by LZG on January 6, 2024. *See* Genius Pre-Hearing Mem. at 5; LZG Pre-Hearing Mem. at 8; HB_000566 (January 6, 2024 draft APA § 2); HB_000688 (final and signed draft of the APA § 2).

103.    Genius specifically included this language, along with defined terms for "Encumbrances" and "Liabilities," with the purpose of making it clear that while Genius was amenable to acquiring certain debts of LZG, it was not willing to acquire the assets subject to legal rights, claims, interests, restrictions or the like held by third parties that could interfere or otherwise disrupt Genius' acquisition of assets. Hamilton Stmt., ¶ 14.

104.    Both a Genius Legal Risk Memo and Financial Risk Memo identified the Promissory Notes issued to Messrs. Chsherbinin and Nazarov and noted "8.9M [was] outstanding" and that the "loan nee[ed] to be fully repaid" by "Dec. 31, 2023." Hamilton Stmt., ¶ 24.

105.    On January 5, 2024, Mr. Ritz sent an email to Mr. Chsherbinin, copying Mr. Hamilton, that did not mention any default on the Promissory Notes." Hamilton Stmt., ¶ 31.

106.    There were in person meetings in New York on January 13-14, 2024, between the leaders of Genius and LZG/FatBrain including Messrs. Hamilton, Ritz, Moe (an LZG director) and Chsherbinin. Hamilton Stmt., ¶ 37.   There was no mention by Messrs. Ritz, Moe or Chsherbinin to Mr. Hamilton at these meetings of any default on the Promissory Notes due on December 31, 2023, or entry into any January 2024 standstill or settlement agreements relating to the underlying debts to Messrs. Chsherbinin and Nazarov associated with the Promissory Notes. Hamilton Stmt., ¶ 37.

107.     After several draft versions of the agreement were exchanged between the Parties, on January 22, 2024, LZG circulated another draft of the APA which stated, *inter alia*, that

27

"Assets[18] shall be sold [to Genius] free from all Encumbrances," HB_000622.  This draft also added a provision that, subject to various conditions precedent, including one that LZG's warranties set forth in Section 8 of the APA are "true and correct" and that "[a]ll assets being purchased are free and clear of all liens and liabilities," Genius was to purchase the Assets on the Closing Date.  HB_000624 at 5.1(c) and (f) (January 22, 2024 draft APA condition precedent language that LZG's warranties are "true and correct," and that "[a]ll assets being purchased are free and clear of all liens and liabilities").

108.    On January 22, 2024, the Genius Board of Directors approved entry into the transaction with LZG. Hamilton Stat., ¶ 41; HB_000650-000651 (Email from Mr. Hamilton forwarding board votes to Genius' counsel, Ms. Kahn).

### B.    Signing of the APA and Key APA Provisions

109.    On January 23, 2024, Mr. Hamilton executed the final version of Asset Purchase Agreement on behalf of Genius. Hamilton Stat., ¶ 44; HB_000681-000714 (executed copy of the APA). Mr. Ritz executed the final APA on behalf of LZG that same day.  HB_000711 (signature page of the executed APA).  Pursuant to NYSE requirements (*e.g.*, NYSE Supplemental Listing Applications), on February 7, 2024, the Parties re-executed the Asset Purchase Agreement, the material terms of which remained unchanged.  *See* Hamilton Stat., ¶ 44 n.4; HB_000715-000749. As discussed further below, the January 2024 signing of the APA was not the "closing" which took place in late March 2024.

110.    The fully executed Asset Purchase Agreement was included in the Hearing Bundle as HB_000681-000714.  The key provisions of the APA are discussed below.

---

[18] As discussed later, Exhibit 1 to the final APA listed the assets being sold by LZG to Genius pursuant to the APA transaction. *See* HB_000712 (APA, Exhibit 1).

111.     The main provisions of the APA that are relevant for purposes of this arbitration are (a) the assets being sold by LZG to Genius pursuant to the APA; (b) the representations and warranties made by LZG regarding the assets LZG was selling to Genius; (c) the conditions precedent to closing the transaction, including express representations and warranties regarding the absence of encumbrances on the assets sold by LZG to Genius pursuant to the APA; (d) the payment obligations of Genius as the purchaser of the assets from LZG; and (e) the provisions on books and records.

112.     Turning first to the assets being sold by LZG to Genius pursuant to the APA. Section 2.1 of the APA (titled "Purchase of Assets") states as follows:

> "2.1 Upon the satisfaction of the condition relating to the Offering, as defined in the Recitals, the Seller agrees to sell, and the Purchaser agrees to purchase the assets of LZG (the "Assets") for the Purchase Price. The Assets shall be sold free from all Encumbrances and together with all rights and privileges attached to them at the Execution Date or subsequently becoming attached to them. ***The list of the assets constitutes the Exhibit 1 to this Agreement***."

> HB_000688 (emphasis added).

113.     The term "Assets" is defined in the Definitions section of the APA as "all of the property, rights and assets of the Company which are to be conveyed to GG [Genius]." APA § 1(d); HB_000684 and Exhibit 1 to the APA at HB_000712.

114.     Exhibit 1 to the APA lists the assets being conveyed by LZG to Genius pursuant to the APA. The text of Exhibit 1 to the APA (HB_000712) is reproduced below in full:

[Asset Purchase Agreement] Exhibit 1

List of the Assets

100% of the membership interests of FB Primesource Acquisition, LLC

Assets of FB Primesource Acquisition, LLC:

> 100% stock ownership of five companies organized under Kazakhstan law and operating in Kazakhstan:

29

1) Prime Source LLP, founded 11/26/2007;

2) Digitalism LLP, founded 03/14/2008;

3) InFin-IT-Solution LLP, founded 11/06/2008;

4) Prime Source Innovation LLP, founded 06/18/2020;

5) Prime Source-Analytical Systems LLP, founded 02/17/2006

IP property and certain related business assets of LZG, which shall have been contributed before closing to FB Primesource Acquisition, LLC, consisting of:

1) Software and IP related to Outcomes Engine Risk Frameworks, including the Agatha and Ness AML tools, plus US Patent Application No. 63/466,232, entitled "Method and System for Gradient Intelligent Machine Learning";

2) Software and IP related to Angelina Foreign Exchange & Trade IQ Peer Intelligence;

3) Software and IP related to RansomProof SaaS;

4) Software and IP related to Ginger F2F Yield Optimization framework and

5) Software and IP related to CovidRisk.Live for Digital Health SaaS.

Liabilities of FB Primesource Acquisition, LLC, not to exceed fifteen million dollars ($15,000,000):

Ordinary trade obligations incurred in the ordinary course of business obligations incurred by LZG in connection various business acquisitions and assumed prior to closing by Primesource, commitment to fund LZG's expenses and costs in winding and liquidating LZG after closing.

115.   Turning next to the representations and warranties made about the Assets in the APA, Section 8 contains a number of warranties by LZG to Genius.

116.   The warranty most central to this dispute is the one providing that there are no "Encumbrances" on the Assets being sold by LZG to Genius.  There are several parts of the APA that speak to LZG's warranties that the assets are being transferred to Genius free of encumbrances. First, as mentioned above, Section 2.1 provides that "The Assets shall be sold free from all Encumbrances and together with all rights and privileges attached to them at the Execution Date or subsequently becoming attached to them." APA § 2.1.

30

117.    The APA also contains representations regarding LZG having no liabilities or indebtedness that could or would impact the APA transaction.  Specifically, APA Section 8.5 titled "No Liabilities; Indebtedness" includes the following language in subparagraphs (a) and (b):

> "(a) Absence of Liabilities. Except as listed on Schedule 8.5 hereto, neither LZG nor any of its subsidiaries or affiliates has any Liability of any nature, other than: (i) liabilities identified as such in the "liabilities" column of the Balance Sheets for the fiscal years for 2021 and 2022; (ii) liabilities incurred subsequent to the date of the Balance Sheet in the ordinary course of business consistent with past practices of LZG and listed on Schedule 8.5 hereto; (iii) obligations that (A) exist under Contracts, (B) are expressly set forth in and identifiable by reference to the text of such Contracts and (C) are not required to be identified as liabilities in a balance sheet prepared in accordance with GAAP; or  liabilities under this Agreement or any other Transaction Document;

> (b) Indebtedness. LZG is not in default with respect to any Indebtedness and no payment with respect to any Indebtedness is past due. LZG has not received any notice of default, alleged failure to perform or any offset or counterclaim with respect to any Indebtedness. Neither the execution, delivery or performance of any Transaction Document will, or would reasonably be expected to, cause or result in a default, breach or acceleration, automatic or otherwise, of any condition, covenant or another term of any Indebtedness."

> HB_000695-000696.

118.    The term "Liabilities" is capitalized in Section 8.5(a) and is defined in the APA as follows:

> "(w)    "Liabilities" means with respect to any person any direct or indirect liability, indebtedness, obligation, expense, deficiency, guaranty or endorsement of or by such person of any type, known or unknown, and whether accrued, absolute, contingent, unmatured, matured, otherwise due or to become due."

> HB_000686.

119.    The parties made other representations and warranties relevant to this arbitration in the APA. Section 7 of the APA lists additional obligations to be performed upon closing, including, in relevant part:

31

"7.3 At Closing, the Seller shall deliver to the Purchaser the following documents:

(a)    a bill of sale transferring the Assets to the Purchaser.

(b)    any necessary assignments, certificates, or instruments of transfer for the Assets.

(c)    any required consents or approvals for the transfer of the Assets.

(d)    any other document that may be reasonably required by the Purchaser pursuant to Closing under [sic].

\*\*\*

7.3 [sic] At Closing the Purchaser shall issue the Consideration Shares of GG to Seller.

\*\*\*

7.4 The obligations of each of the Parties in this Section are interdependent on each other. Closing shall not occur unless all of the obligations specified in this Section are complied with and are fully effective.

\*\*\*

7.7 As soon as reasonably practicable after April 1, 2024, but in no event later than six months from Closing, GG shall cause a resale registration statement to be filed and use its reasonable efforts to have it become effective to register the Consideration Shares under the Securities Act of 1933."

HB_000692-000693.

120.    Section 7.6 of the APA details Genius' post-closing payment obligations:

"7.6.1    Post-Closing, the Purchaser shall make a capital contribution to FB Primesource Acquisition, LLC, in the amount of US$2,500,000, which may be used to pay certain acquisition indebtedness incurred in connection with the purchase by LZG of the PrimeSource Group.

7.6.2    As soon as practicable, the Purchaser shall make capital contribution to FB Primesource Acquisition, LLC in the amount of US$12,500,000, which may be used to pay certain obligations of FB Primesource Acquisition, LLC or LZG incurred in connection with LZG's purchase of the Assets, or for general working capital purposes."

HB_000693.

121.    Section 7.8 further details the required post-closing actions:

"7.8 Within one month of closing, both parties will take the following post-closing actions:

7.8.1    Change the Board of Directors with non-executive and executive representation from both the buyer and seller on the Board, including the existing Board of the Seller.

7.8.2    Enter a Management Agreement with Peter Ritz, CEO of LZG, to join GG's Executive Team.

7.8.3    Communicate a joint message on the merger to Investors, Clients and the Market

7.8.4    Execute an integration plan for LZG's assets and operations to be integrated with GG."

HB_000693.

122.    The APA also contained a broad "general warranty" in Section 8.18.  The key language of this warranty reads as follows:

"8.18: General Warranty. None of the representations or warranties contained herein by Seller or the Shareholders, nor any exhibit, schedule, statement, or certificate furnished to or to be furnished by Seller or the Shareholders to Buyer pursuant to the terms hereof or in connection with the transactions contemplated hereby, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained or incorporated herein or therein not misleading."

HB_000701.

123.    Turning now to the conditions precedent for the closing pursuant to the APA, the closing required that conditions precedent set forth in Section 5 of the APA be satisfied prior to the closing.

124.    The Purchaser[19] Conditions Precedent to Closing in APA Section 5.1 included:

"Section 5.1: Purchaser Conditions Precedent to Closing. The obligations of the Purchaser to purchase the Assets on the Closing Date are subject to the satisfaction,

---

[19] While Section 5 has subheadings of "5.1 Purchaser Conditions Precedent" and "5.2 Seller Conditions Precedent" the sub-bullets beneath the heading Purchaser Conditions Precedent impose conditions on both

33

or waiver in writing by the Purchaser at or prior to the Closing, of the following conditions:

a) Compliance with obligations. The ***Purchaser and the Seller shall have performed and complied in all respects with all agreements, obligations, and conditions contained in the Agreement that are required to be performed or complied with on or before Closing*** and shall have obtained all approvals, consents, including all ***consents from third parties, including but not limited to, any investors in and lenders to the Company, and qualifications necessary to complete the sale and purchase of the Assets***.

b) No Proceedings. No administrative, investigatory, judicial, quasi-judicial, or arbitration proceedings shall have been brought by any Person seeking to enjoin or seek Damages from any party in connection with the sale and purchase of the Assets, and no order, injunction, or other action shall have been issued, pending or threatened, which involves a challenge or seeks to or which prohibits, prevents, restrains, restricts, delays, makes illegal or otherwise interferes with the consummation of any of the transactions contemplated under the Agreement and the Transaction Documents;

c) Accuracy of Warranties. Delivery to Purchaser of a certificate, dated as of the Closing Date, executed by the Seller, certifying that the warranties set out in Section 8 are true and correct.

d) Delivery to Purchaser by LZG of consolidated financial statements of the five Kazakhstan subsidiaries of FB Primesource Acquisition, LLC (the "Primesource Group") audited by a PCAOB registered firm in full compliance with IFRS and LZG management financial statements with respect to the Assets not held by FB Primesource Acquisition, LLC or the Primesource Group.

e) Consents and Waivers. The Seller will have obtained all necessary consents, waivers, and no-objections in writing from any Person as may be required under any applicable Law or contract or otherwise for the execution, delivery, and performance of the Transaction Documents.

f) All assets being purchased are free and clear of all liens and liabilities and that there is no pending or threatened litigation or regulatory action or subpoena, legal process, proceeding or the like."

HB_000689-HB_000690 (emphasis added).

---

Purchaser [Genius] and Seller [LZG]. *See, e.g.,* the first sub-bullet undersection 5.1(a) Compliance with obligations. The Purchaser and the Seller shall have performed and complied in all respects with all agreements, obligations, and conditions contained in the Agreement that are required to be performed or complied with on or before Closing …." APA § 5.1(a).

34

125.   The Seller Conditions Precedent to Closing in Section 5.1 of the APA included:

> "Section 5.2: Seller Conditions Precedent to Closing. The obligations of the Seller to sell the Assets on the Closing Date subject to the satisfaction, or waiver at or prior to the Closing, of the following conditions
>
> a) Compliance with obligations. The Purchaser shall have performed and complied in all respects with all agreements, obligations, and conditions contained in the Agreement that are required to be performed or complied with on or before Closing and shall have obtained all approvals, consents, and qualifications necessary to complete the transfer of the Assets.
>
> b) Consents and Waivers. The Purchaser will have obtained all necessary consents, waivers, and no-objections in writing from any Person as may be required under any applicable Law or contract or otherwise for the execution, delivery, and performance of the Transaction Documents."

HB_000689-HB_000690.

126.   The APA had a provision requiring LZG to maintain the books and records of the assets of the companies being acquired by Genius.  Section 8.16 of the APA, titled "Books and Records" states as follows:

> "All books, records and accounts of the Parent and its Subsidiaries with respect to the Acquired Business are made and kept in reasonable detail and accurately and fairly reflect in all material respects the transactions and dispositions of its assets. The records, systems, controls, data and information of the Parent and its Subsidiaries with respect to the Acquired Business are recorded, stored, maintained and operated under the exclusive ownership and direct control of the Seller and its accountants. Each of the Seller and each of its Affiliates maintains a system of internal accounting controls sufficient to provide reasonable assurances that, with respect to the Acquired Business: transactions are executed in accordance with management's general or specific authorization; transactions are recorded as necessary to permit preparation of financial statements in conformity with IFRS and to maintain accountability for assets; access to assets is permitted only in accordance with management's general or specific authorization and the recorded accounting for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

HB_000700.

127.   The APA contained a Limitation of Liability provision in Section 13, which includes, *inter alia*, the following language:

35

"13.2 The aggregate liability of each party for all Substantiated Claims shall not exceed the amount of the Purchase Price actually received by the Seller under this Agreement. For the purposes of assessing whether the limit has been reached, the liability of the Seller shall be deemed to include the amount of all costs, expenses and other liabilities (together with any VAT thereon) payable by it in connection with the settlement or determination of any Claim."

"13.3 Notwithstanding anything else in this Agreement, the Seller shall have no liability for any liabilities until the entire US$15,000,000 of funding has been made available to Seller for the purpose of satisfying liabilities."

"13.10: Nothing in this Section 13 applies to exclude or limit the liability of either party to the extent that a Claim arises or is delayed as a result of dishonesty, fraud, willful misconduct or willful concealment by such party, its agents or advisers."

HB_000704-000706.

128.    The APA also contained a provision on termination in Section 14 that gave each of the Parties the right to terminate the APA if the conditions precedent had not been satisfied or waived on or before Closing. Specifically, Section 14.1 reads as follows:

"14.1: Each of the Parties shall take all steps necessary to fulfill the Conditions Precedent promptly. Subject to Section 14.2, if the Conditions Precedent are not satisfied, or waived on or before the Closing, the non-defaulting Party may (without limiting their right to claim damages or exercise any other rights and remedies they may have under this Agreement):

a) terminate this Agreement with immediate effect;

b) proceed to Closing as far as practicable."

HB_000706.

129.    Section 14.2 of the APA provides that termination of the agreement is without prejudice to any rights and obligations under the APA accrued or incurred before the termination. Specifically, Section 14.2 states as follows:

"Any termination of this Agreement shall be without prejudice to any rights and obligations of the Parties accrued or incurred prior to the date of such termination, which shall survive the termination of this Agreement."

HB_000706.

36

130.    The APA contains a "no waiver" provision.  Specifically, APA Section 19 states as follows:

> "19.7 Waiver. No waiver of any breach of any provision of this Agreement shall constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver shall be effective unless made in writing and signed by an authorized representative of the waiving Party."

> HB_000710.

131.    Section 13.8 of the APA also contains a provision that prevents duplicative recovery for multiple claims predicated on the same conduct:

> "13.8 If the same fact, matter, event or circumstance gives rise to more than one Claim, neither party shall be entitled to recover more than once in respect of such fact, matter, event or circumstance."

> HB_000706.

132.    Section 12.1 of the APA includes a provision on indemnification and damages that provides for indemnification of "arbitral costs" and expenses ("including without limitation, reasonable attorney's fees and expenses") and includes, *inter alia*, "reasonable fees and expenses of legal counsel … and other expenses of litigation or of any Claim."

133.    Section 12.1 of the APA reads as follows:

> "12. INDEMNIFICATION AND DAMAGES

> 12.1 In consideration of the purchase of the Assets by the Purchaser from the Seller hereunder, each Party ("Indemnifying Party") agrees to indemnify, defend and hold harmless, the other Party, its Affiliates and each of their respective partners, officers, employees, shareholders, partners, agents, as the case may be from and against, any and all, damages, Losses, Liabilities, obligations, fines, penalties, levies, action, investigations, inquisitions, notices, suits, judgments, claims of any kind including third party claims, interest, governmental and statutory action, costs, litigation and arbitral costs, taxes or expenses (including without limitation, reasonable attorney's fees and expenses) (collectively referred to as "Loss") suffered or incurred, directly or indirectly by any Indemnified Party as a result of:

> a) any misrepresentation or inaccuracy in any Warranty made by such Indemnifying Party, or any failure by such Indemnifying Party to perform or comply with any

37

agreement, obligation, liability, warranty, term, covenant or undertaking contained in this Agreement.

b) any fraud committed by the Indemnifying Party, at any time."

HB_000704.

134.   Section 12.3 of the APA provides that the rights arising under Section 12.1 are independent of and in addition to the Parties' other rights and remedies:

12.3 The indemnification rights of the Indemnified Parties under this Agreement are independent of, and in addition to, such other rights and remedies as Indemnified Parties may have at Law or in equity or otherwise, including the right to seek specific performance or other injunctive relief, none of which rights or remedies shall be affected or diminished thereby."

HB_000704.

135.   The APA further defines "Damages" as follows:

1. Definitions

(n) "Damages" means: (a) any and all monetary (or where the context so requires, monetary equivalent of) damages, fines, fees, penalties, Losses, and out-of-pocket expenses (including without limitation any liability imposed under any award, writ, order, judgment, decree or direction passed or made by any Person); (b) subject to applicable Law, any punitive, or other exemplary or extra contractual damages payable or paid in respect of any contract; and (c) amounts paid in settlement, interest, court costs, costs of investigation, *reasonable fees and expenses of legal counsel, accountants, and other experts, and other expenses of litigation or of any Claim*, default, or assessment.

HB_000684-85 (emphasis added).

136.   Sections 12.1 and 12.3 of the APA provide a contractual right to recover, *inter alia*, reasonable legal costs, fees and expenses incurred in this arbitration as well as reasonable court costs and legal fees related thereto. *See infra* Section IX of this Final Award on Costs.

### C.   Events after the Parties' Execution of the APA

137.   Following the signing of the APA, the Parties prepared for the "Closing" as envisioned in Section 7 of the APA, which took place on March 13, 2024.  Some of the events

between the APA signing and the closing are disputed – in particular what information LZG shared or did not share with Genius – and when – about encumbrances on the assets LZG was selling to Genius before the closing.[20]  In short, LZG contends it shared certain information about its indebtedness to third parties with Genius either before the January 2024 signing of the APA or before the March 13, 2024 APA closing; Genius contends that it was not informed of undisclosed encumbrances on the assets that Genius was purchasing from LZG pursuant to the APA before the signing or the closing of the APA.  *See* LZG Pre-Hearing Mem. at 8; Genius Pre-Hearing Mem. at 5-7; LZG Post-Hearing Mem. at 9; Genius Post-Hearing Mem. at 19.

138.    The APA closing took place on March 13, 2024.  It was memorialized by a Transaction Closing Document,[21] a Bill of Sale,[22] an Assignment and Assumption Agreement,[23] and Stock Powers signed by LZG for each of the underlying subsidiaries.[24] HB_003781-95.

139.    On March 14, 2024, Mr. Hamilton circulated to LZG and others the fully executed closing documents: Transaction Closing Document, a Bill of Sale, Assignment and Assumption Agreement, and Stock Powers signed by LZG for each of the underlying PSG subsidiaries. HB_003781-95 (email from Mr. Hamilton to LZG attaching fully executed documents). The Bill of Sale included the same representation as the APA that Genius was acquiring the assets from LZG "free and clear of all Encumbrances".  Hamilton Stmt., ¶¶ 50-51.

---

[20] Given that these facts are disputed, they are discussed in the section of the Final Award that addresses the Tribunal's findings of fact (Section VIII(c), *infra*).
[21] HB_003794-HB_003795
[22] HB_003788-HB_003792
[23] HB_003788-HB_003792
[24] HB_003784-HB_003787

**D.      Events after the Closing of the APA**

140.    Later on March 14, 2024, Mr. Hamilton had a telephone discussion with Mr. Chsherbinin (Prime Source co-founder) and subsequently sent an email to Mr. Chsherbinin recapping some documents and information that Genius was expecting to receive from LZG that had been discussed during the call. *See* Hamilton Stat., ¶ 55; HB_000785 (email from Mr. Hamilton summarizing what Mr. Chsherbinin had told Mr. Hamilton; Hearing Tr. at 117:10-118:14 (Hamilton).

141.    During the March 14, 2024 phone call, Mr. Hamilton learned about the existence of two previously undisclosed agreements entered into on January 10, 2024 between FB PrimeSource Acquisition and Prime Source executives and original owners, Messrs. Chsherbinin, and Nazarov. *See* Nazarov Standstill Agreement [HB_002243] and Chsherbinin Standstill Agreement [HB_002246]; s*ee also* Genius Pre-Hearing Mem. at 7; Hamilton Stmt., ¶ 56.

142.    These undisclosed agreements addressed outstanding amounts owed to the original Prime Source owners for LZG's interest in the Prime Source entities and set two installment payments of such amounts, with deadlines of January 31, 2024 and March 31, 2024. Pursuant to these agreements, if there was default with respect to payment obligations, Messrs. Chsherbinin and Nazarov had the contractual right to repossess their ownership interest in the Prime Source entities.  Mr. Hamilton also learned on that phone call that the previously undisclosed agreement(s) imposed financial obligations that exceeded the $15 million capped liability amount to which Genius agreed in the APA.  *See* Hamilton Stat., ¶ 56; HB_000786-000787 (email from Mr. Hamilton to Mr. Chsherbinin).

143.    LZG contends that in the March 14, 2024 email, Mr. Hamilton had acknowledged a continuing debt owed by FBPA to the PrimeSource founders, as well as the risk that ownership

40

of the PSG subsidiaries would revert back to the co-founders in the event of default on the debt. *See* HB_000786-87 (March 14, 2024 email from Mr. Hamilton to Mr. Chsherbinin) ("As promised, I'm summarizing the elements of the new agreement / amendment to your acquisition agreement with FatBrain AI, and how we ensure the Prime Source acquisition can be completed smoothly and successfully given the completion of the merger of Genius Group and FatBrain AI this week"), HB_002241-002243 (Nazarov Standstill Agreement) and HB_002244-002246 (Chsherbinin Standstill Agreement). Genius contends that these encumbrances conflict with LZG's express representations and warranties in the APA that the assets being sold pursuant to the APA were free of encumbrances. Genius Pre-Hearing Mem. at 5; Genius Post-Hearing Mem. at 14-15; APA § 2.1; Hearing Tr. at 60:23-61:3 (Hamilton) ("I believe we got that written confirmation in the asset purchase agreement. Because that's actually promised in the asset purchase agreement under the reps and warranties that there was no encumbrance and there was no default.")

144. Genius contends that Mr. Hamilton did not have knowledge of these previously undisclosed encumbrances until after the March 13, 2024 APA closing and did not receive copies of the standstill agreements with the Prime Source co-founders until March 29, 2024. *See* Hamilton Stat., ¶ 58; HB_008323; Hearing Tr. 132:7-10 (Hamilton); HB_000786-787 (cited above, the email from Mr. Hamilton summarizing the telephone conversation he had with Mr. Chsherbinin in which Mr. Chsherbinin told Mr. Hamilton about the previously undisclosed standstill agreements).

145. On March 17, 2024, Mr. Chsherbinin sent Mr. Hamilton an email demanding higher and faster payments. *See* HB 000790 ("As you know, in January we reached an agreement on debt restructuring, which has been going on for almost 1.5 years. Taking into account all the previous

history, the conditions are simple: by the end of March, Victor and I either receive full payment or return all the shares of Prime Source Group.").

146. On March 28, 2024, Mr. Chsherbinin sent Mr. Hamilton an email attaching i) calculations of sums and penalties, ii) draft letter from Mr. Ritz informing FatBrain that FB Primesource Acquisition LLC (FBPA) was unable to fulfill payment by March 31, 2024, and asking for an additional installment, and iii) proposed supplemental agreements to the Chsherbinin and Nazarov Standstill Agreements. Hamilton Stat., ¶¶ 70-72; HB_000808-000823.

147. Later that same day (March 28, 2024), Mr. Ritz emailed Mr. Hamilton copies of the Standstill / Settlement Agreements at issue.  *See* Standstill Agreements and Debt Settlement Agreements [HB_000824-000858]. Genius contends that this was the first time Mr. Hamilton learned about these agreements.  Hamilton Stat., ¶ 73; Genius Pre-Hearing Mem. at 8-9.  In sum, Genius maintains that these undisclosed encumbrances on the assets subject to the APA were only disclosed at the end of March – months after the January 2024 signing of the APA and also after the Closing of the APA in mid-March 2024.  *See* Genius Post Hearing Mem. at 14-15.

148. On March 29, 2024, following a call with Mr. Ritz and Mr. Moe, Mr. Hamilton sent Messrs. Ritz and Moe an email describing Genius' position on the newly discovered Standstill / Settlement Agreements, and reiterating that Genius was willing to proceed with the APA transaction so long as Genius would acquire the Assets unencumbered (as the warranties in the APA required) and Genius would pay the LZG liabilities as soon as was practicable in accordance with the language of the APA.  *See* Hamilton Stat., ¶ 81; HB_000859-000860, Genius Pre-Hearing Mem. at 10.  The LZG liabilities referred to in the APA are not the undisclosed encumbrances on the assets at issue in this arbitration.  Genius anticipated there were LZG liabilities based on discussions with Mr. Ritz of LZG during the APA negotiations.  Hearing Tr. 174:18-22 (Hamilton)

(it was Mr. Hamilton's understanding there were LZG liabilities but not encumbrances associated with the Prime Source entities). The LZG liabilities as understood by Genius were separate and unrelated to the undisclosed promissory notes and standstill / settlement agreements between each of the Prime Source co-founders, respectively, and Mr. Ritz, that constituted undisclosed encumbrances. *See* Hamilton Stmt., ¶¶ 76-81; Hearing Tr. 61:7-9) (Hamilton) ("we knew there was a liability to be paid, but that's something different from an encumbrance").

149.   On March 29, 2024, Mr. Hamilton convened an emergency meeting of the Genius Board of Directors to inform them of the recent discovery of the encumbrances on the assets LZG had sold to Genius pursuant to the APA. Hamilton Stat., ¶ 82.  At the Board meeting, Mr. Hamilton conveyed the assurances he had received from Messrs. Ritz and Moe about the resolution of the standstill issues.  The Genius Board unanimously voted that "[Mr. Hamilton] would continue to pursue both a renegotiation of the debt directly with Prime Source while also pursuing routes to raise financing prior to the ATM."[25]  *See* Minutes of the Genius Board Meeting [HB_000861-62]; Genius Pre-Hearing Mem. at 11.

150.   That same day, March 29, 2024, Mr. Hamilton emailed Mr. Chsherbinin a proposal to amend the terms of the Standstill Agreements. *See* Hamilton Stat., ¶ 83; HB_000863-000865. Mr. Chsherbinin immediately rejected Genius' proposal. Genius Pre-Hearing Mem. at 11.

151.   On March 30, 2024, Mr. Hamilton emailed Mr. Ritz a proposed amendment to the Asset Purchase Agreement, which stated that if Messrs. Chsherbinin and Nazarov repossessed the Assets pursuant to the Standstill Agreements, the APA "shall be reversed and cancelled." Hamilton Stat., ¶ 84; HB_000866-000870.

---

[25] As mentioned previously, an "at the market" or "ATM" offering allows a company to issue and sell stock on an as-needed basis through a contractual arrangement with an underwriter or bank.

152.    On April 4, 2024, Mr. Chsherbinin sent Mr. Hamilton signed amended Standstill Agreements, which provided more time to pay the outstanding debts to Messrs. Chsherbinin and Nazarov pursuant to a revised payment schedule. Hamilton Stat., ¶ 87; HB_000881-000894; Genius Pre-Hearing Mem. at 11.

153.    In an effort to help LZG meet its payment obligations to the Prime Source co-founders, on April 4, 2024, Genius wired $750,000 to LZG. Hamilton Stat., ¶ 89; HB_000895-000899; Genius Pre-Hearing Mem. at 11.

154.    A few weeks later, on April 30, 2024, Genius made a second payment of $750,000 to LZG to enable compliance with payment obligations under the amended Standstill Agreements with Messrs. Chsherbinin and Nazarov. *See* Email exchanges between LZG and Genius with proof of payment HB_000941; Hamilton Stat., ¶ 97; Genius Pre-Hearing Mem. at 13.

155.    Genius needed audited financials from LZG and Prime Source to fulfil its SEC reporting requirements.  However, Genius had not yet received any audited financials for each of the Prime Source entities.  Apparently, a liquidity crunch rendered LZG unable to pay amounts due and owing for the Prime Source LLP audit, and Prime Source asked Mr. Hamilton if Genius would provide the funds needed to pay for the audit.  *See* HB_000909-000913 (titled "Intercompany Loan #1" dated April 12, 2024 between Genius and Prime Source LLP"); Genius Pre-Hearing Mem. at 12.

156.    On May 3, 2024, Mr. Hamilton sought approval from Genius Board of Directors to provide LZG an additional $20,000 to pay amounts outstanding to the auditor so that the auditor would finalize the audited financials for the Prime Source audit. Hamilton Stat., ¶ 99; HB_000942-000943, Genius Pre-Hearing Mem. at 13.

157.    With respect to the other financial obligations to Messrs. Chsherbinin and Mr. Nazarov (the undisclosed encumbrances), on May 28, 2024, Genius wired $1,000,000 to LZG to enable compliance with payment obligations arising under the amended Standstill Agreements with Messrs. Chsherbinin and Nazarov. Hamilton Stat., ¶ 102; HB_001187-001192.  This one million dollar wire was not toward the $15 million amount to pay LZG liabilities pursuant to the APA, but rather to help LZG pay the newly revealed encumbrances on the assets purportedly sold to Genius pursuant to the APA – LZG's payment obligations arising under the amended Standstill Agreements with Messrs. Chsherbinin and Nazarov.

158.    Mr. Hamilton testified at the hearing, "my understanding was 100 percent that we were buying an asset that was owned by LZG International, which where there was no default and where there was no encumbrance." Hearing Tr. 61:18-25 (Hamilton).  Mr. Hamilton further testified that the $15 million payment to LZG provided for in the APA "was not being paid by [Genius] to Prime Source." Rather, it was being paid to LZG International pursuant to the APA for LZG liabilities.  Hearing Tr. 61:18-25 (Hamilton).

159.    In May and June 2024, Mr. Hamilton received complaints from LZG shareholders alleging various matters, including that LZG had entered into the APA without LZG shareholder approval.  Hamilton Stat., ¶ 104; HB_001193-001196. Mr. Hamilton requested clarifications from Mr. Ritz, but Mr. Ritz did not produce any documentation to confirm that the necessary LZG Board approval had been obtained for LZG to proceed with the APA, notwithstanding the requirement in Section 8.2(a) of the APA that LZG as seller "has all requisite power and authority to enter into this Agreement and other Transaction Document to which it is a party and to consummate the Transaction."  Genius Pre-Hearing Mem. at 14; Hamilton Stmt., ¶¶ 104-105.

160.    APA Section 7.8.1 provided that LZG officers would be hold roles on the Genius Board of Directors, including one as non-executive chairman.  HB_000693.[26]

161.    Following the closing, Mr. Moe (LZG Director) was appointed as non-executive Chairman of the Genius Board of Directors in April 2024.  Also, as of June 3, 2024, Mr. Ritz (LZG Director) was appointed as Chief Revenue Officer, a key role in the Genius executive team. Genius Pre-Hearing Mem. at 11 n.3; *see* HB_000914-000920.

162.    On June 20, 2024, another amendment was made to the Standstill / Settlement Agreements with the Prime Source co-founders, further extending the payment schedule to the Prime Source co-founders.  Hamilton Stat., ¶ 106.

163.    On June 25, 2024, Genius wired $2,000,000 to LZG to assist in LZG's compliance with the further amended Standstill / Settlement Agreements with Messrs. Chsherbinin and Nazarov.  *See* Hamilton Stat., ¶ 107; HB_001199-001203.

164.    Meanwhile no audited financials had been provided to Genius.

165.    Between August 14 and August 20, 2024, Mr. Reese, the auditor for LZG (whose payment was sourced from Genius in the absence of liquidity on the part of LZG) contacted Prime Source and was told by a member of the accounts team that Prime Source had less than $100,000 in available cash. Genius Pre-Hearing Mem. at 15; *See* email to Mr. Reese on August 20, 2024, copying among others Mr. Hamilton [HB_001214].  Mr. Hamilton had been previously told by Mr. Ritz and Mr. Chsherbinin that Prime Source had revenues of $50 million, profit of over $5 million and a healthy cash position in the millions. Hamilton Stat., ¶ 115; HB_001214. Genius Pre-Hearing Mem. at 15.

---

[26] Section 7.8 of the APA states: "7.8 Within one month of closing, both parties will take the following post-closing actions: 7.8.1 Change the Board of Directors with non-executive and executive representation from both the buyer and seller on the Board, including the existing Board of the Seller.  7.8.2 Enter a Management Agreement with Peter Ritz, CEO of LZG, to join GG's Executive Team."

166.     During an August 22, 2024 telephone call, following discovery of the significant discrepancies between the representations by Messrs. Ritz and Chsherbinin regarding the financial health of Prime Source and what the auditor had uncovered, Mr. Hamilton informed Messrs. Moe and Ritz that Mr. Hamilton was going to start an internal investigation as to both of them.  *See* Hamilton Stat., ¶ 117; HB_003026-003081 (Audio Exh. 4 at 00:01:40).

167.     On August 26, 2024, AXS Law Group, PLLC, counsel for shareholders of LZG, notified Genius and Messrs. Hamilton, Ritz and Moe that the law firm planned to file a shareholders derivative action for violation of the federal securities laws, and attached a draft of the complaint.  Ritz Stat., ¶ 122; HB_001227-001252.

168.     On August 29, 2024, Genius held a Board meeting to which the full executive team was invited.  Hamilton Stat., ¶ 125.  Mr. Ritz and Mr. Moe were both present.  During the meeting, the Genius Board made the decision that Genius would proceed with the remaining payments apparently necessary to complete the transaction, to demand a release of the powers of attorney given by Messrs. Moe and Ritz to the sellers (co-founders) of Prime Source allowing the co-founders to take back the Prime Source asset in order to protect the asset Genius had acquired, and to enter a management contract with Mr. Chsherbinin.  The Genius Board asked Mr. Ritz to resolve these matters with Mr. Chsherbinin, with whom Mr. Ritz had a longtime working relationship.  *See* Minutes of the Genius Board Meeting dated August 29, 2024 HB_001253-001257; Hamilton Stat., ¶ 125.[27]

169.     Between September 1, 2024 and September 23, 2024 Mr. Ritz, now an officer and Board member of Genius, continued negotiations with the Prime Source co-founders in an attempt to find a new debt payment schedule for LZG to pay its outstanding debts in a way that was

---

[27] On September 10, 2024, the SEC notified Genius that the SEC had approved its $150 million ATM. Hamilton Stat., ¶ 128.

agreeable to all – with no success. *See, e.g.*, HB_001285-001291 (Prime Source email to Messrs. Ritz and Hamilton attaching proposed Supplemental Agreement to the January 2024 Standstill Agreement); HB_001293-001295 (email exchange leading to a September 20, 2024 email from Mr. Hamilton explaining that the proposed new terms were not acceptable to Genius).

170.    In his Friday, September 20, 2024 email (HB_001299), Mr. Hamilton stated as follows:

> "Peter / Eugene - These agreements are missing the critical risk issues the GNS board have asked for (management contract / POA) and that we agreed would be resolved in 1st week Oct in NYC. Can we pls include this either in the agreements or in an addendum? Also there is a 14 day max delinquency that hasn't been discussed which is in there and needs to either be removed or discussed for the same reasons. Peter can you pls resolve these items with Eugene & team?"

HB_001299.

171.    That same Friday, Mr. Chsherbinin responded by email to Mr. Hamilton as follows:

> "We have included in the final versions of the agreement the best terms for FB and Genius that we can accept. Sellers and management of PSG have not violated any of the agreements reached with FB, while FB has not fulfilled 3 obligations for the next payments. Therefore, there is no possibility or prerequisites for the cancellation of POA. A meeting in October will be possible only if an agreement is reached on the current outstanding obligations on the part of the Buyer. Please let us know if you agree to them or not in order to plan further steps."

HB_001299.

172.    On Monday, September 23, 2024, Mr. Hamilton responded:

> "Hi Eugene, Peter,
>
> We discussed on our last call the importance of these items as agreed at the GNS board meet and we did agree we'd proceed with the amended payment plan on the basis we would meet to give the necessary comfort so the remainder of the payments could be made with some degree of security - at least to the level as per the GNS LZGI agreement.
>
> Peter could you please connect with Eugene to resolve ASAP?

48

In the meantime we'll postpone meeting in NYC until we have a suitable path forward.

Thanks,
Roger"

HB_001299; *See also* Hamilton Stat., ¶ 127-136.

173.   Discord between the Parties escalated quickly from there. On Tuesday, September 24, 2024, Genius terminated the employment of Mr. Ritz with Genius Group in the role of Chief Revenue Officer effective immediately, "due to serious concerns regarding [his] professional conduct and performance."  HB_001305-001306 (Genius September 24, 2024 letter to Mr. Ritz); Hamilton Stat. ¶ 140.

174.   Also on Tuesday, September 24, 2024, Mr. Moe, Chairman of the Genius Board of Directors (and still a director on the Board of LZG at the time), together with another Genius Board member, Mr. Richard, informed Mr. Hamilton by telephone that on Sunday, September 22, 2024 the Genius Board had met and decided to terminate Mr. Hamilton as CEO of Genius.  Audio Exh. 6 at 00:00:03 [HB_003198-003209]; Hamilton Stat., ¶ 137.

175.   On September 25, 2024, Mr. Hamilton called for a meeting of the Genius Board of Directors to address what he considered to have been an improper meeting of September 22, 2024 at which he was allegedly terminated as CEO.  *See* Genius Pre-Hearing Mem. at 17; Hamilton Stat., ¶ 141.  The following day, on September 26, 2024, another meeting of the Genius Board was held at which Board members agreed to refrain from any voting while it gathered more information.  *See* Audio Exh. 8 [HB_003466-003561] (audio transcription).

176.   A few days later, there was another Genius Board meeting, at which the Board voted to reinstate Mr. Hamilton as the CEO of Genius.  At this same meeting, Mr. Moe (LZG Director) resigned as Chairman of the Board of Directors of Genius.  *See* Hamilton Stat., ¶ 143;

Audio Exh. 9 [HB_003601-003712] (audio transcription).[28]

177.    Shortly thereafter, the Genius Board directors (including Mr. Moe of LZG) who had participated in the controversial Sunday, September 22, 2024 Genius Board meeting, resigned from the Genius Board of Directors.[29]   *See* Hamilton Stat., ¶ 145; HB_001307-001308 (Genius Board of Directors October 10, 2024 resolution accepting their resignations).

178.    Between October and November 2024, the Parties' representatives discussed various ways to address the serious fracture of their business relationship, including rescission of the APA and other alternative options – but no resolution was reached.  Hamilton Stat., ¶¶ 146, 151; HB_001309-001311 (October 27, 2024 proposal by Mr. Ritz to Mr. Hamilton "that the Parties proceed with a rescission of the Agreement, which is contemplated in Section 14.1(a) of the Agreement."); HB_001312-001313 (November 12, 2024 proposal by Mr. Ritz to Mr. Hamilton of rescission of the APA).

179.    As mentioned above, Genius commenced arbitration by Request for Arbitration dated October 20, 2024, which was notified to the Parties by the ICC Secretariat on or before November 15, 2024 and again on December 10, 2024. *See* December 10, 2024 letter from ICC Secretariat to Parties, copying counsel for Genius.

---

[28] On or about October 4, 2024, LZG Shareholders commenced two separate actions against LZG, Mr. Ritz, Mr. Moe, Genius and Mr. Hamilton alleging that the defendants had defrauded LZG shareholders. Hamilton Stat., ¶ 144; *Carey et al. v. Moe et al.*, Case No. 1:24-cv-07551 (S.D.N.Y.); *Shawn Carey, et al. v. Michael Moe, et al.*, No. 2024-019773-CA-01 (11th Judicial Circuit, Miami-Dade County) (the "**LZG Shareholder Derivative Action**").

[29] On October 9, 2024 Mr. Moe and three other LZG board members were forced to resign from the Genius Board of Directors. *See* HB_003890-HB_003894 (email exchanges among Mr. Hamilton, Mr. Moe. Mr. Ritz, and others, dated October 9, 2024, attaching a Letter of Demand for Mr. Moe's resignation from Genius Board). *See also* U.S. Securities and Exchange Commission, Form 6-K for the month of October 2024, available at https://www.sec.gov/Archives/edgar/data/1847806/000149315224041094/form6-k.htm (last accessed on February 17, 2026).

## VIII.   ANALYSIS OF THE PARTIES' CLAIMS AND DEFENSES

180.    In this section, the Parties' respective claims and defenses are analyzed within the context of applicable law and the factual record in the arbitration.  Section A sets out the Parties respective claims.  Section B sets out the law applicable to the Parties' respective claims.  Section C addresses the factual disputes that are central to the Parties' claims and defenses and sets out the Arbitral Tribunal's main factual findings.  Sections D and E set out the Arbitral Tribunal's analysis and conclusions with respect to the Parties' respective claims and defenses in light of the evidentiary record, the Arbitral Tribunal's factual findings and applicable law.

### A.    The Parties Claims and Counterclaims

181.    Set out below is a summary of the claims and counterclaims asserted by the Parties.

#### 1)  Genius Claims against LZG

182.    Genius asserts three claims for relief: (1) declaratory judgment on the APA's termination right; (2) breach of contract; and (3) fraud.  *See* Genius Post Hearing Mem. at 3.

183.    With respect to Genius' claim for declaratory judgment that the APA is terminated, Genius contends that LZG failed to satisfy all of its conditions precedent to Closing under the APA, that Genius did not waive LZG's complete satisfaction of its conditions precedent, and that therefore pursuant to APA Section 14.1, Genius is entitled to, *inter alia*, termination of the APA with immediate effect. Accordingly, Genius seeks a declaratory judgment that the APA is terminated. *See id*.

184.     With respect to Genius' claim for breach of contract, Genius contends that the APA expressly contemplated the sale and purchase of certain assets from LZG, with LZG agreeing to deliver all assets being sold (including Prime Source) "free from all Encumbrances."  Genius Post Hearing Mem. at 4.  Genius asserts that it performed its contractual obligations and LZG breached

51

its contractual obligations because, unbeknownst to Genius, LZG falsely represented in the APA that LZG was selling the assets free from all encumbrances when in fact LZG had "secretly" granted encumbrances on the Assets before entering into the APA. *See id.* Genius also contends that LZG breached numerous other provisions of the APA (discussed later in this Final Award), but the most fundamental breach was falsely representing that LZG was selling the assets free from encumbrances.

185.    Finally, Genius asserts a claim for fraud based on LZG having induced Genius to buy an asset that LZG never owned - and was likely to be repossessed by its original legal owners – by knowingly and intentionally withholding information about the January 10, 2024Standstill/Settlement Agreements (the secret encumbrances) and thereafter making numerous material misrepresentations to Genius on which Genius allegedly reasonably relied in entering into the APA which were expressly memorialized in the APA, and, ultimately, suffered considerable harm due to LZG's alleged intentional misconduct. *See* Genius Post Hearing Mem. at 43-44.

### 2) LZG Claims against Genius

186.    LZG contends that it did not breach the APA and asserts counterclaims for (a) breach of contract against Genius for allegedly failing to perform obligations under the APA and (b) for fraud.

187.    With respect to LZG's breach of contract claim against Genius, LZG alleges that Genius breached the APA based on Genius' declaration of LZG's breach of contract, refusal to perform further under the APA (including, *inter alia*, making further payments pursuant to the APA and transferring Genius shares), and commencing arbitration against LZG. *See* LZG Amended Answer and Counterclaims at 17; LZG Post Hearing Mem. at 55.

188. With respect to LZG's fraud claim against Genius, LZG alleges that Genius knowingly made false representations of fact of having sufficient funds at the time of closing. *See* LZG Answer and Counterclaims at 19; LZG Post Hearing Mem. at 66.

### B. Applicable Law

189. It is undisputed that the Parties entered into the APA pursuant to which LZG agreed to sell various assets to Genius based on the terms of the APA. Both of the Parties are asserting claims of breach of contract and fraud against each other in connection with that transaction. The APA provides that New York law governs the APA. *See* APA § 19. The Parties do not dispute that New York law applies to the APA pursuant to Section 19.14 and confirmed that common understanding at the initial CMC. *See* Procedural Order No. 1 ¶ 3. The general principles of New York law applicable to claims of breach of contract and claims of fraud are set out below.

190. The Arbitral Tribunal notes that the Parties did not directly discuss the applicable standard of proof for their respective claims. Each side presented its case on the principle that the party seeking relief has the burden to establish its case. Generally, a party asserting a claim for breach of contract carries the burden of proving its claim by a preponderance of the evidence. The burden of proof for civil fraud is higher – often phrased as clear and convincing evidence. *See, e.g., Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 128, 508 N.Y.S.2d 17, 21 (2d Dep't 1986) (appellate court reviewing the trial court's determination as to whether intent to defraud had been established by "clear and convincing" evidence). The burden of proving a defense is on the party which asserts it. *See Rosenthal v. City of NY*, 283 A.D.2d 156, 160 (1st Dep't 2001). In analyzing the claims in this arbitration, the Arbitral Tribunal has applied these standards to the evidence. As explained in this Final Award, there was substantial and convincing documentary and testimonial evidence supporting the Arbitral Tribunal's findings and conclusions herein.

**1) New York Law Applicable to Claims for Breach of Contract and Declaratory Relief**

191.     The elements of a cause of action for breach of contract under New York law are "the existence of a contract, the [claimant's] performance thereunder, the [respondent's] breach thereof, and resulting damages."  *Harris v. Seward Park Hous. Corp.*, 79 A.D.3d 425, 426 (1st Dep't 2010) (cited in Genius Pre-Hearing Mem. at 22).  In other words, a breach of contract exists if the evidence establishes the existence of a contract, the party's performance under the contract, the other party's breach of its contractual obligations, and damages resulting from the breach.  *See* LZG Pre-Hearing Mem. at 47-48 (citing *Harris v. Seward Park Housing Corp.*, 79 A.D.3d 425, 426 (1st Dept. 2010); *Morris v. 702 East Fifth Street HDFC*, 46 A.D.3d 478, 479 (1st Dept. 2007)).  These elements for a breach of contract claim are not disputed between the Parties.

192.     Where the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole.  The words and phrases used by the parties must, as in all cases involving contract interpretation, be given their plain meaning.  *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244 (2014) (collecting cases); *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990) ("when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms").

193.     In interpreting a contract, the focus is on what the parties intended as evidenced by what they wrote in their agreement.  *Rodolitz v. Neptune Paper Prods.*, 22 N.Y.2d 383, 387 (1968).  "When two parties have made a contract and have expressed it in a writing," extrinsic evidence "of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing."  *Unisys Corp. v. Hercules, Inc.*, 224 A.D.2d 365, 368-69 (1st Dep't 1996) (quoting 3 Corbin, Contracts § 573 (1960)).

54

194.   Where an agreement contains an "entire agreement" or merger clause, New York law provides that the language of the contract represents the entire understanding between the parties.  The purpose of a merger clause is to apply the parol evidence rule to bar the introduction of extrinsic evidence to alter, vary or contradict the terms of the writing.  A merger clause evinces the parties' intent that the agreement is to be considered a completely integrated writing, which means that extrinsic proof cannot be used to add to or vary its terms.  *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990).  Extrinsic and parol evidence are not admissible to create an ambiguity in a written agreement that is clear and unambiguous on its face.  *Id.*

195.   Waiver is the intentional relinquishment of a right, made with both knowledge of its existence and the intent to relinquish that right.  *See City of NY v. State*, 40 N.Y.2d 659, 669 (1976). A waiver "should not be lightly presumed."  *Gilbert Frank Corp. v. Federal Ins. Co*., 70 N.Y.2d 966, 968 (1988). Furthermore, the burden of proving a defense of waiver is on the party which asserts it.  *See Rosenthal v. City of NY*, 283 A.D.2d 156, 160 (1st Dep't 2001).

196.   Contractual clauses that require waivers to be in writing are valid and enforceable under New York law.  *See, e.g., Jefpaul Garage Corp. v. Presbyterian Hosp. in City of NY*, 61 N.Y.2d 442, 446 (1984); *Awards.com v. Kinko, Inc*., 42 A.D.3d 178 (1st Dep't 2007).

197.   Implicit in every contract is a covenant of good faith and fair dealing. *25 Bay Terrace Assoc., L.P. v. Public Serv. Mut. Ins. Co*., 144 A.D.3d 665, 667 (2d Dep't 2016); *see also P.S. Fin., LLC v. Eureka Woodworks, Inc.*, 214 A.D.3d 1, 30 (2d Dep't 2023). The implied covenant of good faith and fair dealing is a pledge that neither party shall do anything which will destroy or injure the right of the other party to receive the fruit of the contract.  *P.S. Fin., LLC*, 214 A.D.3d at 30; *see also 25 Bay Terrace Assoc., L.P*., 144 A.D.3d at 667.

198. However, no obligation may be implied that would be inconsistent with other terms of the contractual relationship. *See 1357 Tarrytown Rd. Auto, LLC v. Granite Props.*, LLC, 142 A.D.3d 976, 977 (2d Dep't 2016).

199. As pointed out by LZG in its Pre-Hearing Memorandum, contracts should be interpreted to not produce a commercially absurd result. *See* LZG Pre-Hearing Mem. at 12 (citing a dissenting opinion in *E-Z Eating 41 Corp. v. H.E. Newport L.L.C.*, 84 A.D.3d 401, 409 (1st Dep't 2011), which cites *Elsky v Hearst Corp.*, 232 A.D.2d 310, 311, 648 N.Y.S.2d 592 (NY 1996)).

200. Rescission is an equitable remedy that is "to be invoked only when there is lacking a complete and adequate remedy at law and where the status quo may be substantially restored." *Alper v. Seavey*, 9 A.D.3d 263, 264 (1st Dep't 2004) ("Generally, rescission is available where a party lacks a 'complete and adequate remedy at law and where the status quo may be substantially restored.'") (citation omitted). Rescission may be granted where one party's breach is so substantial and fundamental that it defeats the purpose of the contract. *Sabby Healthcare Master Fund Ltd. v. Microbot Medical Inc.*, 2018 NY Slip Op 32429(U), ** 2 (N.Y. Sup. Ct. 2018).[30]

201. Under New York law, a condition precedent is "an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690 (1995). Most conditions precedent describe acts or events which must occur before a party is obliged to perform a promise made pursuant to an existing contract. *Id*. Generally, conditions precedent are strictly enforced. *Id*.

---

[30] It should be noted that the Parties both submit that Section 14.1(a) of the APA expressly contemplates and provides for rescission as a remedy. *See* Genius Post-Hearing Mem. at 68-69; HB_001310-14 (LZG letters dated October 27 and November 12, 2024).

202.    Monetary damages are a standard remedy for breach of contract.  As a matter of New York law, "damages for breach of contract should put the [claimant] in the same economic position [claimant] would have occupied had the breaching party performed under the contract." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003).

203.    Equity-based defenses generally are not applicable against damages at law for breach of contract.  *See, e.g., Greco v. Christoffersen*, 70 A.D.3d 769, 771 (2d Dep't 2010); *Manshion Joho Center Co., Ltd. v. Manshion Joho Center, Inc.*, 24 A.D.3d 189, 190 (1st Dep't 2005); *Reeps v. BMW of North America, LLC*, 94 A.D.3d 475, 476 (1st Dep't 2012) (equitable defense of laches is unavailable in an action at law); *Republic Ins. Co. v. Real Dev. Co.*, 161 A.D.2d 189, 190 (1st Dep't 1990).  Additionally, one seeking equity must act equitably; equity cannot be invoked to aid one who is deemed to have unclean hands.  *See, e.g., Wolfenstein v. Fashion Originators Guild*, 244 A.D. 656, (1st Dep't 1935); *Shernoff v. Schimel*, 112 N.Y.S.2d 333, 348 (Kings Sup. Ct. 1952) ("Equity will not open its doors to one who seeks to enforce alleged rights arising from a contract which he himself has breached or violated.").

### 2)  New York Law Applicable to Claims for Fraud

204.    Turning now to the law applicable to claims of fraud, it is undisputed that the elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages." *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009) (cited in Genius Pre-Hearing Mem. at 24); *Cent. Ins. Agency, Inc. v. Estate of Korman*, 237 A.D.3d 1036, 1037 (2d Dep't 2025) (cited in LZG Pre-Hearing Mem. at 44).  Fraud must be pleaded with specificity and bare allegations of fraud in a pleading without any allegation of the details constituting the wrong are not sufficient.  *Kline v. Taukepoint Realty Corp.*, 302 A.D.2d 433, 433-34 (2d Dep't 2003).

205.     A party's reliance upon a misrepresentation made by the opposing party must be reasonable.  *See River Glen Assoc. v. Merrill Lynch Credit Corp.*, 295 A.D.2d 274, 275 (1st Dep't 2002).  A party asserting fraud must exercise ordinary diligence and may not claim to have reasonably relied on a respondent's representations where the injured party had means available by the exercise of ordinary intelligence to know the truth of the representation.  *Curran, Cooney, Penney v Young & Koomans*, 183 A.D.2d 742, 743, 583 N.Y.S.2d 478 (2d Dep't 1992).

206.     Furthermore, the party asserting a claim for fraud must show both that opposing party's misrepresentation induced it to engage in the transaction in question and that the misrepresentations directly caused the loss about which party complains.  *See Laub v. Faessel*, 297 A.D.2d 28, 31 (1st Dep't 2002). Where material misrepresentations have induced a party to enter a contract to its detriment, a cause of action in fraud may be maintained, and such claim is not a duplicative breach of contract claim.  *White v. Guarente*, 43 N.Y.2d 356 (N.Y. 1977); *Minico Ins. Agency, LLC v. B&M Cleanup Servs.*, 165 A.D.3d 776, 777-78 (2d Dep't 2018).  Fraudulent intent, by its very nature, is rarely susceptible to direct proof and must be established by inference from the circumstances surrounding the allegedly fraudulent act.  *See Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 128 (2d Dep't 1986).

C.     **Analysis of Facts Central to the Claims and Defenses of Both Parties**

207.     All of the claims asserted by Genius turn on whether LZG withheld material information before the signing of the APA and made false representations and warranties to Genius in the APA that the assets LZG was selling to Genius were free of encumbrances.  The assets that LZG purported to sell Genius were specifically set forth in Exhibit 1 to the APA.

208.     Therefore, before analyzing each individual claim, the Arbitral Tribunal first addresses the key factual disputes that are at the heart of Genius' claims against LZG and that are

also relevant to LZG's defenses and counterclaims against Genius.

209. It should be noted that the Parties do not argue that the terms of the APA are ambiguous or dispute the meaning of the provisions of the APA. The only point raised regarding the language of the executed APA is that the word "assets" was usually capitalized in the APA as it is a defined term, but LZG has pointed out that the word "assets" was not capitalized in one instance. In the view of the Arbitral Tribunal, this typographical error does not render the meaning of the term "assets" or "Assets" ambiguous, because assets is a defined term in the APA and additionally Exhibit 1 to the APA specifically lists the assets that LZG was purporting to sell to Genius pursuant to the APA.

210. Genius contends that it believed LZG's representations and warranties in the APA signed on January 23, 2024 that the assets LZG was selling to Genius – which included the assets listed in Exhibit 1 to the APA – were free of encumbrances. LZG claims that Genius knew or had reason to believe that the assets LZG was selling pursuant to the APA – in particular relating to Prime Source – were encumbered by financial obligations owed to third parties.

211. LZG states that there were encumbrances evidenced through Promissory Notes dated May 31, 2022 for $12 million – each Promissory Note for $6 million, respectively, between FBPA (signed for by Peter Ritz as FBPA Chief Executive Officer) and Messrs. Viktor Nazarov and Yevgeniy Chsherbinin, co-founders of Prime Source (HB_001798-001809) and related Security Agreements dated as of June 17, 2022 between "Prime Source – Analytical Systems Liability Partnership" and Messrs. Nazarov and Chsherbinin (CEO of Prime Source – Analytical Systems Lability Partnership) (HB_001812-HB_001832) . *See* LZG Reply-Findings Mem. ¶¶ 25-27).[31]

---

[31] Most of the proposed factual findings advanced by LZG that diverge significantly from the facts which Genius present are set forth in "Respondent's Proposed Findings of Fact and Conclusions of Law" that LZG

212.     Pursuant to a Press Release in the record dated June 28, 2022 titled "FatBrain Acquires Prime Source, Accelerating AI Solutions…" it was announced that "FatBrain AI (LZG International Inc.:OTC: LZGI) … has acquired Prime Source, the largest independent IT software developer in Kazakhstan and fifth largest in Centra Asia." (HB_001796-97).  Based on this Press Release, it appeared that LZG owned the Prime Source entities – assets Genius acquired from LZG pursuant to the APA as listed in Exhibit 1 thereto.

213.     What is disputed is when Mr. Hamilton learned of encumbrances (Standstill/Settlement Agreements) on LZG's acquisition of the Prime Source entities that pre-dated the execution of the APA and also encumbrances on the assets that post-dated the APA and/or its closing (the record indicated that multiple supplemental agreements were executed when the debtor under the original promissory notes and security agreements failed to pay).

214.     As described by LZG, "The Notes and related Security Agreements disclosed that the final bullet payment to the PrimeSource founders of approximately $8 million was due on December 31, 2023 … and that the PrimeSource founders could repossess the shares in the event of default without judicial process. HB_000318-000327 and HB_000378-000387." LZG Proposed Findings ¶ 26. LZG further asserts:

> "There were also power of attorney provisions embedded in those agreements. HB_001816-001817; HB_001826-001827. The powers of attorney contained in the original Security Agreements were extremely broad, irrevocable, and granted the Prime Source founders almost unlimited rights to act in the event of default."
>
> LZG Reply Proposed Findings ¶ 27.

---

submitted together with LZG's Post-Hearing Reply Memorandum on December 10, 2025, similar to what is common for a summary judgment filing in U.S. courts. Genius did not object to this additional filing by LZG. In any event, LZG's proposed findings of fact appear to be duplicative of assertions made by LZG witnesses (*e.g.*, Mr. Ritz and Mr. Birmanov) and contained in documents previously submitted by LZG in this arbitration.

215.    LZG asserts that according to Mr. Ritz, the "need for a standstill agreement was specifically discussed during late November/early December 2023 in-person meetings in London between Eugene [Chsherbinin], Peter Ritz and Roger Hamilton, and that the revised payment dates of January 31, 2024 and March 31, 2024 were proposed based on Genius's anticipated ability to fund the payments." Ritz Stmt., ¶¶ 50-51; HB_008348-008349. Both Messrs. Ritz and Birmanov testified that Prime Source original co-owner Mr. Chsherbinin and Mr. Hamilton discussed, prior to the APA signing, that there were payment obligations due and owing to the Prime Source founders due before the end of 2023 and then extended to January 31, 2024.

216.    Specifically, in his affirmation Mr. Birmanov states:

> "Eugene traveled to London and met with Roger Hamilton and Ritz at the end of November 2023. When Eugene returned, he informed me that he, Hamilton and Ritz had a discussion on future plans, conditions and payments due on 31 December 2023. These discussions were the basis for us to prepare PoA's, Debt Settlement Agreements and Standstill Agreements, without which Eugene refused to continue the dialogue. I helped prepare these documents. The dates that we used in the draft agreements came from the discussions at the meeting in London where Hamilton confirmed to Peter and Eugene the availability of funds."

Birmanov Stmt., ¶ 5.

217.    By contrast, Genius contends that it was not informed of these "standstill" or "settlement" agreements by email or otherwise in November/early December 2023, nor during the in-person meetings on January 13 and 14, 2024, where the leaders of Genius and FatBrain— including Mr. Ritz, Mr. Michael Moe (an LZG Director) and Chsherbinin—held a meeting in New York (the "**New York Meeting**"). *See* HB_000594-000595; 000596-000609.  According to Mr. Hamilton, the existence of any January 2024 standstill or settlement agreements was not disclosed at the New York Meeting.  *See* Genius Pre-Hearing Mem. at 5-6; Hamilton Stmt., ¶¶ 34-35, 46. Genius contends that in this arbitration, LZG has blurred the distinction between liabilities and encumbrances that were known and believed to be satisfied before the APA closing in mid-March

61

2024 and the undisclosed encumbrances that extended beyond the March 14, 2024 closing. Hamilton Stmt., ¶¶ 24-26, 28-29; Hearing Tr. 118:15-20 (Hamilton) ("The LZG International debt that we had to pay had not been extinguished because it was part of the 15 million we [Genius] were paying."); Hearing Tr. 29:7-10 (Hamilton) (with respect to the early negotiations, "Mr. Ritz said he would be interested in selling Prime Source if Genius could also be covering some of the liabilities that he had within LZG International."); Hearing Tr. at 31:1-3 (Hamilton) ("the request from Mr. Ritz was that we buy the assets together with a $15 million payment for liabilities."); *see also* Genius Pre-Hearing Mem. at 5-7; Genius Post Hearing Mem. at 19.

218.    Genius contends that Mr. Hamilton expected LZG and its subsidiaries to pay their outstanding obligations with respect to Prime Source entities due December 31, 2023 before the APA closing on January 23, 2024, and that Genius was not aware of new encumbrances entered into in early January 2024 on the LZG assets being sold to Genius.  For example, Mr. Hamilton testified that he was not specifically aware of the fact that January 2024 Standstill Agreements and Settlement Agreements (together, the "**Standstill / Settlement Agreements**") had been entered into on January 10, 2024, with Messrs. Nazarov and Chsherbinin. *See* Hamiton Stmt. ¶¶ 34-35; Hearing Tr. at 71:20-72:12 (Hamilton); *see also* HB_002241-002246 (the January 2024 Standstill / Settlement Agreements).

219.    When asked at the evidentiary hearing to comment on the contents of paragraph 5 of the Birmanov Affirmation, Mr. Hamilton testified as follows:

> "I'll just read the next part. The part here saying 'Eugene returned, informed me that he, Hamilton and Ritz had a discussion on future plans, conditions, and payments due on December 31, 2023,' that is not accurate, 'cause we did not have that discussion."

> Hearing Tr. 71:20-25 (Hamilton).

220. Mr. Hamilton further testified with respect to the rest of paragraph 5 of the Birmanov Affirmation:

> "…then it says, 'These discussions were the basis for us to prepare PoA's debt settlement agreements and standstill agreements without which Eugene refused to continue the dialogue.' Well, if that occurred at that point, that was information we were not aware of at all. And Eugene never at any point said he was going to refuse dialogue in any of the conversations we had. In fact, he met with us in New York in – I think, three days after he had signed the standstill agreement on the 10th [of January 2024] and never mentioned anything about those standstill agreements or about refusing dialogue at that point. So that's not accurate."

Hearing Tr. 71:25-72:12 (Hamilton).

221. Mr. Hamilton further testified that "we [Genius] were never provided this information [about the standstill agreements] in the due diligence, even though it was very material." Hearing Tr. 73:20-21 (Hamilton). LZG withheld all information about the Standstill/Settlement Agreements in the due diligence phase and at the New York Meetings.

222. Genius contends that it only started to learn about undisclosed encumbrances such as promissory notes and standstill/settlement agreements between LZG and Prime Source co-founders with payment deadlines in late March 2024 -- after the APA closing -- when Mr. Hamilton requested documents from LZG in connection with, *inter alia*, preparing the Genius annual report. *See* Genius Post Hearing Mem. at 19; Hamilton Stmt., ¶¶ 55-59; *see also* HB_000785-HB_000787 (email exchanges from Mr. Hamilton to Mr. Chsherbinin and others, dated March 14, 2024, discussing Prime Source financials).

223. Based on a review of the voluminous record (four separate hearing bundles) of documentary and testimonial evidence, the Arbitral Tribunal concludes that there were undisclosed encumbrances on the assets Genius acquired from LZG that were entered into in early 2024 (the January 2024 Standstill / Settlement Agreements) as to which Genius (including Mr. Hamilton) did not have knowledge until after the closing of the APA transaction.

224.     The Arbitral Tribunal notes that the record includes copies of the previously undisclosed Standstill/Settlement Agreements with the Prime Source co-founders described above, together with subsequent supplemental agreements extending the payment deadline in light of the default by FPBA (LZG's subsidiary) on its payment obligations to the Prime Source original owners.  *See* HB_002241 and 002246 (original Standstill Agreements with Mr. Nazarov and Mr. Chsherbinin, dated January 10, 2024), HB_002411-002416 (Supplemental Agreements No. 1, dated April 3, 2024), HB_002418-HB_002421 (Supplemental Agreements No. 2, dated June 20, 2024), HB_004154-HB_004159 (Supplemental Agreements No. 3, dated September 16, 2024) However, in the Arbitral Tribunal's view, the documentary and testimonial record establishes that Genius and its executives had no knowledge of the January 10, 2024 encumbrances (Standstill/Settlement Agreements) with 2024 payment deadlines to the Prime Source co-founders at the time the APA was signed on January 23, 2024 or at the time of the APA closing on March 13, 2024.

225.     The Prime Source assets were the "crown jewel" of LZG.  Hearing Tr. at 44:6-8 (Ritz) ("Prime Source was the crown jewel of LZG"); Hearing Tr. at 106:13-15 (Ritz); Hearing Tr. 111:1-4 (Ritz) ("The crown jewel, sir, was FB Primesource Acquisition, which owned the Prime Source Group, sir.").  Mr. Moe testified that he interpreted the APA transaction as Genius doing an asset purchase of LZGI and FatBrain (Prime Source entities).  Hearing Tr. at 84:24-85:8 (Moe).  *See also* LZG Pre-Hearing Mem. at 25.

226.     Additionally, in the Arbitral Tribunal's view, the documentary and testimonial evidence in the record establishes that before closing, Genius did not have any knowledge of encumbrances inconsistent with the LZG express representations in the APA that the assets were being transferred free and clear of encumbrances.  In fact, Mr. Ritz of LZG testified at the hearing

that the first time he disclosed the January 2024 standstill/settlement agreements with the Prime Source co-founders was "at the end of March [2024]."  Hearing Tr. 69:4-12 (Ritz).  Mr. Ritz further confirmed that without the standstill agreements, they would have been in immediate default of the Prime Source debt at the moment LZG signed the APA.  Hearing Tr. 127:16-20 (Ritz).

227.    The record includes transcriptions of recorded telephone calls between Mr. Hamilton and representative of LZG and/or Prime Source during the period after the APA closing of discussions about the previously undisclosed encumbrances on the assets sold to Genius (the January 2024 Standstill / Settlement Agreements with the Prime Source co-founders).  It is undisputed that Mr. Hamilton recorded these conversations.  While LZG suggests that recording the phone calls was improper,[32] both LZG and Genius cite the contents of various transcriptions of these telephone calls and do not question the accuracy of the transcriptions in the record.

228.    The post-APA closing telephone recordings, together with the other documentary and testimonial evidence in the record, reveal a carefully orchestrated deception by LZG about undisclosed encumbrances on assets that LZG was determined to sell to Genius while staving off any action by the Prime Source co-founders to whom LZG entities were indebted to reclaim their company.  Based on the documentary and testimonial evidence in the record, the Arbitral Tribunal finds that LZG knew its representations were false when made and were included in the APA to induce Genius to rely on the misrepresentations and enter into the APA transaction.

229.    Mr. Ritz testified in his affirmation and at the hearing about the undisclosed payments due to the Prime Source co-founders by December 31, 2023 and the Standstill /

---

[32] LZG's counsel also highlights the fact that at some point counsel for Genius allegedly improperly recorded a meet and confer telephonic conversations with counsel for LZG unbeknownst to LZG's lawyers at the time.  However, counsel for Genius expressly informed counsel for LZG during the complained of October 9th telephone conversation that it was being recorded.  *See* Genius Post-Hearing Reply Mem. at 28.

Settlement Agreements entered into in January 2024 and subsequently amended to extend further the payment deadline to the Prime Source co-founders.

230.   It is not disputed that LZG officers (in particular Mr. Ritz, who testified at the hearing) knew on January 10, 2024 about the undisclosed encumbrances (signed by Mr. Ritz) on the assets LZG as Seller purportedly sold to Genius as Buyer pursuant to the APA signed on January 23, 2024 that included representations and warranties that the assets were being sold free of encumbrances. The documentary and testimonial evidence in the record lead the Arbitral Tribunal to conclude that Mr. Ritz and LZG withheld all information about the January 10, 2024 Standstill/Settlement Agreements from Genius and Mr. Hamilton before the January 23, 2024 execution of the APA and continued to withhold any information about the January 10, 2024 Standstill/Settlement Agreements until after the March 13, 2024 closing had taken place.

231.   Once the truth about the encumbrances on the assets purportedly sold by LZG to Genius pursuant to the APA was revealed after the March 13, 2024 closing, it became clear that the representations and warranties by LZG in the APA regarding the absence of encumbrances on the assets being transferred and other factual matters represented by LZG in the APA were false and inconsistent with the information disclosed.   The legal consequences of these misrepresentations and false warranties are discussed in the analysis of the Parties' claims below.

**D.      Analysis of Claims by Genius against LZG**

232.   As discussed above, Genius asserts three claims against LZG all predicated on essentially the same conduct, namely LZG's withholding of information about the secret encumbrances on the assets to be conveyed to Genius pursuant to the APA and LZG's false representations and warranties in the APA relating to LZG's conveyance of the assets pursuant to the APA listed in Exhibit 1 thereto free and clear of all encumbrances.

233. Before discussing the specific claims by Genius, we address a late-stage defensive argument asserted by LZG in its pre-hearing and post hearing memoranda (but not in its pleadings). LZG contends as a defense to all claims by Genius that the APA contemplated merely a sale of LZG's "membership interests" in FBPA, and that LZG's "membership interests" were the only "Asset" that LZG was selling "free from all Encumbrances." *See* LZG Post Hearing Mem. at 4-6 (contending that LZG could only make representations as to what it owned, being membership interests in FBPA). LZG asserts that its representation as to "no encumbrances" referred only to "LZG's ability to transfer the rights it owned in its subsidiary corporation FBPA LLC, and not to what the subsidiary FBPA LLC owned." LZG Pre-Hearing Mem. at 4. LZG contends that LZG itself did not own the underlying assets held by FBPA LLC. *See* LZG Post Hearing Mem. at 4, 6-9 (the APA's definition of "Assets" is confined to the "property, rights, and assets" of LZG and, thus, LZG's representations are limited to the same).

234. LZG claims that where APA Section 2.1 states the "Assets shall be sold free from all Encumbrances and together with all rights and privileges attached to them," both the definition of "Company" and the "Assets" focus exclusively on LZG, which allegedly means the membership interests of LZG in FBPA LLC is the only thing as to which "the encumbrance language can possibly apply," LZG Pre-Hearing Mem. at 6, as opposed to the list of assets in Exhibit 1 to the APA enumerating the assets being conveyed.

235. LZG contends that "under settled New York law," a conveyance of "all rights and interests" of the seller transfers only what the seller itself owns and is not a warranty that the property of subsidiaries is free of third-party liens. LZG Pre-Hearing Mem. at 6. LZG relies on a case from New York Surrogates Court, *In re Mason Family Trust*, 2017 N.Y.L.J LEXIS 763 (N.Y. Surr. Ct. 2017), involving a decedent transferring interest in an LLC that owned real property that

67

was encumbered by a mortgage, finding the representation that transfer of the LLC interest was "free and clear" of encumbrances did not warrant that the underlying property was free of encumbrances, as the property remained subject to the mortgage.  LZG also points to New York federal bankruptcy case, *Stillwater Liquidating LLC v. Net Five at Palm Pointe, LLC* (*In re Stillwater Asset Backed Offshore Fund Ltd.*), 559 B.R. 563, 594 (S.D.N.Y. Bkr. 2016), for the proposition that holding a membership interest in a limited liability company is property (just as a share of stock is property), but that the owner of the membership interest has no ownership right in the property that is owned by the limited liability company.  LZG also relies on the hearing testimony of Mr. Ritz (testifying that the only asset (singular) being sold by LZG was FBPA, notwithstanding the fact that the APA and Exhibit 1 to the APA both provide that LZG was selling assets (plural). *See* Ritz. Tr. 57-58:1-11; *see also* LZG Pre-Hearing Mem. at 5, 14.[33]

236.    Genius contends that LZG's argument that it had a limited ability to transfer rights of its subsidiary FBPA a red herring, and also that LZG's reliance on New York law in support of LZG's argument is misplaced because FBPA is a Delaware limited liability company. Therefore, any transfer of rights with respect to an interest in FPBA is governed by the Delaware Limited Liability Company Act.  *See* Genius Post Hearing Reply Mem. at 7-8; HB_00042 (Promissory Note from FPBA to Mr. Chsherbinin, defining FBPA as a Delaware liability company); NY LLC

---

[33] LZG contends that the language of the Bill of Sale reinforces LZG's position. *See* LZG Post Hearing Mem. at 10, citing the Bill of Sale: "Effective as of the Closing, and subject to the terms and conditions set forth in the [Asset] Purchase Agreement and this Agreement: (a) the Seller hereby sells, conveys, transfers, assigns and delivers … free and clear of all Encumbrances, all of the Seller's right, title and interest in, to and under the Assets (as set forth on Exhibit A hereto), and the Purchaser accepts the Assignment; and (b) the Purchaser hereby assumes and agrees to assume and discharge the Liabilities as set forth on Exhibit A hereto." HB 002528, § 2 (Bill of Sale, dated March 13, 2024). Exhibit A to the Bill of Sale is a list of the same assets listed in Exhibit 1 to the APA, so the Bill of Sale does not support LZG's proposed interpretation of the APA that LZG was only conveying its membership interests of LZG in FBPA LLC.

§ 801(a) ("the laws of the jurisdiction under which a foreign limited liability company is formed govern its organization and internal affairs and the liability of its members and managers.").

237.   Genius argues that the APA contemplates that LZG would sell each of the Assets set forth in Exhibit 1 to the APA, including "100% stock ownership" of the Prime Source entities, namely the "five companies organized under Kazakhstan law and operating in Kazakhstan" (HB_000747) to Genius free from encumbrances. APA Section 2.1 [HB_000688]. Genius contends that the Stock Powers for the five Prime Source entities (HB_000774-000778) unambiguously state that "LZG – the sole signatory – is executing [each] Stock Power pursuant to the Asset Purchase Agreement," that LZG is the "seller" and that LZG is "sell[ing], assign[ing], and transfer[ring]" to Genius "all of the Seller's ownership and interests" in Prime Source LLP, Prime Source-Analytical Systems LLP, InFin-It-Solution LLC, Prime Source Innovation LLP and Digitalism LLP.  *See* Genius Post Hearing Reply Mem. at 2.  None of the Stock Powers state that LZG is signing on behalf of FBPA.  Moreover, there is no reference to FBPA in the Stock Powers, *see* HB_000774-000778 (Stock Powers). LZG has produced no documentation effectuating LZG's transfer of FPBA to Genius.  *See* Genius Post Hearing Reply Mem. at 3.

238.   In the Arbitral Tribunal's view, regardless of whether New York law or Delaware law governs the meaning of "beneficial ownership," LZG transferred – or purported to transfer – more than a "beneficial ownership" in the FBPA shares pursuant to the APA.  *See* Exhibit 1 to the APA listing assets that LZG purportedly conveyed to Genius [HB_000712]; Exhibit A to the Bill of Sale [HB_002533]. While both the New York and Delaware law cited by the Parties stands for the proposition that a corporation can only sell what it owns, pursuant to the APA transaction LZG as Seller was purporting to transfer ownership of all the assets in Exhibit 1 to the APA unencumbered, as demonstrated by the plain language of the APA.

239. It is difficult to comprehend how the Parties to this arbitration would spend months negotiating the APA, sign the APA in late January 2024 and then have a "Closing" in mid-March 2024 if the transaction documents merely conveyed a beneficial ownership of LZG with nominal value[34] to Genius in return for more than seven million Genius shares and significant monetary consideration and a commitment of funding LZG liabilities up to $15 million, as opposed to a transaction that conveyed the specific list of assets set out in Exhibit 1 to the APA free of encumbrances as represented and warranted in Section 2.1 of the APA. Contracts should be interpreted to not produce a commercially absurd result, citing *E-Z Eating 41 Corp. v. H.E. Newport L.L.C.*, 84 A.D.3d 401, 409 (1st Dep't 2011) (cited in LZG Pre-Hearing Memorandum at 12). Even LZG's expert, Mr. McKnight, wrote in his report and affirmed at the hearing his understanding that LZG was selling the Prime Source companies to Genius. *See* Hearing Tr. at 180:1-24 (McKnight) ("Under the terms of the APA, GNS agreed to purchase the assets of LZG, including its ownership interest in Prime, for consideration consisting of 73,873,784 shares of GNS, and the assumption of $15 million in LZG's liabilities.") (Prime Source entities collectively included "five of them.").

240. In any event, even if one were to accept LZG's argument that it conveyed only its "beneficial ownership" in its FPBA shares, then LZG's representations and warranties in the APA regarding the Prime Source assets had no foundation. The existence of the Standstill / Settlement Agreements between LZG and the co-founders of Prime Source with respect to Prime Source assets that subsequently came to light after the signing and closing of the APA evidences that LZG did not possess the "requisite power to enter into the [Asset Purchase] Agreement and other

---

[34] *See* LZG Expert Report of Mr. McKnight dated October 9, 2025 at 5, 42 (HB_008406, 008443 (showing LZG's market valued at $0.001 per share on December 19, 2023 and total market cap of $166,956.00); *see generally* McKnight Expert Report (HB_008400-008454).

Transaction Document[s] … and to consummate the Transaction," as LZG represented in APA Section 8.2(a) [HB_000694].[35]  In other words, LZG's argument that the APA was only to convey LZG's "beneficial ownership" in FBPA leads to the conclusion that either the APA transaction conveyed nothing of value to Genius or LZG did not possess the authority as represented to convey the assets on Exhibit 1 of the APA.

241.     Based on the documentary and testimonial evidence in the record, the Arbitral Tribunal concludes that LZG did not purport to convey merely a "beneficial interest" in FBPA pursuant to the APA and instead purported to sell Genius the assets listed on Exhibit 1 of the APA (and purported to have had the power to do so, although that was later revealed to be untrue).

### 1)  Declaratory Judgment that the APA is Terminated

242.     As an initial matter, in addition to claims for breach of contract and fraud, Genius seeks a declaratory judgment that the APA is terminated based on the conduct of LZG and certain provisions of the APA, including in particular APA Section 14.1, that provide a termination right due to LZG's failure to satisfy conditions precedent to closing.

243.     A party is entitled to a declaratory judgment pursuant to N.Y. CPLR § 3001, having the effect of a final judgment as to the rights and other legal relations of the parties, whether or not further relief is or could be claimed by a party.  *See* Genius Post Hearing Mem. at 35.  The general purpose of a declaratory judgment is to stabilize an uncertain or disputed justiciable dispute as to present or prospective obligations.  *James v. Alderton Dock Yards*, 256 N.Y. 298, 305 (1931).  In

---

[35] *See* APA Section 8.2(b) ("This Agreement has been, and, upon execution and delivery by the Seller, each other Transaction Document to which Seller is a party will be, duly executed and delivered by LZG and constitute, or upon execution and delivery will constitute (in each case, assuming the due execution and delivery of each other party hereto or thereto), the legal, valid and binding obligation of the Seller.") [HB_000694].

other words, a declaratory judgment provides clarity as to the parties' obligations under a contract or termination of obligations thereunder.

244.    Here, Genius contends that it is entitled to a declaratory judgment pursuant to APA Section 14.1 that the APA has been terminated "with immediate effect" due to LZG having "failed to satisfy its Conditions Precedent to Closing."  Genius Post Hearing Mem. at 35.

245.    As discussed above, APA Section 14.1. provides: "Each of the Parties shall take all steps necessary to fulfill the Conditions Precedent promptly.  Subject to Section 14.2, if the Conditions Precedent are not satisfied, or waived on or before the Closing, the non-defaulting Party may (without limiting their right to claim damages or exercise any other rights and remedies they may have under this Agreement): a) terminate this Agreement with immediate effect; b) proceed to Closing as far as practicable."  HB_000706 (Executed APA).

246.    Genius claims a declaratory judgment pursuant to Section 14.1 of the APA is warranted because LZG failed to satisfy its obligations to be able to complete the sale and purchase "of the Assets free from all Encumbrances" as required by APA Section 2.1 [HB_000688] and APA Section 5.1(a) [HB_000689], and LZG's obligation to deliver to Genius a certificate that "the warranties set forth in [APA] Section 8 are true and correct" as required by APA Section 5.1(c) [HB_000690].  *See* Genius Post Hearing Mem. at 35.

247.    More specifically, Genius alleges that LZG did not satisfy the conditions precedent in APA Section 5.1(c) requiring that LZG's warranties (set forth in Section 8) were true and correct, and APA Section 5.1(f) requiring that the "assets [are] being purchased free and clear of all liens and liabilities..."  Genius Pre-Hearing Mem. at 21. Genius maintains that neither of these Conditions Precedent were (or could be) satisfied, because "LZG did not possess the Assets free from all Encumbrances and, thus, could not convey them in the manner it was obligated to."

Genius Pre-Hearing Mem. at 21.

248.    LZG represented in the APA that it was not in default with respect to any indebtedness, *see* APA Section 8.5(b) [HB_000695-000696] and that none of the representations or warranties contained in the APA by LZG or the Shareholders, "nor any exhibit, schedule, statement, or certificate furnished to or to be furnished by [LZG] or the Shareholders to [Genius]" pursuant to the terms of the APA and in connection with the transaction "contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained or incorporated herein or therein not misleading."  APA Section 8.18 (General Warranty) [HB_000701].  The evidence in the record has established that LZG's representations and warranties were untrue.  The APA warranty by LZG that the assets were being conveyed free of any Encumbrances was false because it was subsequently revealed that the assets on Exhibit 1 of the APA being transferred were actually still encumbered by obligations under Standstill / Settlement Agreements and supplements thereto between the Prime Source co-founders and Mr. Ritz that required the debtor to make certain payments which it failed to pay, resulting in the Prime Source co-founders right to reclaim their assets.

249.    Genius contends its request for a declaration that the APA is terminated pursuant to Section 14(a) is proper and will quiet the relationship (and dispute) between the Parties.  Genius Post Hearing Mem. at 36 (citing APA § 14.1, which allows termination of the APA "with immediate effect" if LZG failed to satisfy the conditions precedent) [HB_000706].

250.    The Termination provision in Section 14.1 of the APA[36] provides a contractual right for a declaration that the APA is terminated because LZG failed to satisfy the Conditions Precedent and Genius did not waive them.

---

[36] HB_000706 ("…if the Conditions Precedent are not satisfied, or waived on or before the Closing, the non-defaulting Party may (without limiting their right to claim damages or exercise any other rights and

251.     The Tribunal concludes that Genius has established its right for a declaration that the APA is terminated with immediate effect pursuant to Section 14.1 of the APA because LZG failed to satisfy the APA conditions precedent.  Therefore, the Tribunal declares that the APA is terminated with immediate effect as of the date of this Final Award.

252.     Additionally, the agreement between the Parties provides that termination of the APA is without prejudice to any rights or obligations of the Parties pursuant to Section 14.2 of the APA, which states: "14.2.  Any termination of this Agreement shall be without prejudice to any rights and obligations of the Parties accrued or incurred prior to the date of such termination, which shall survive the termination of this Agreement." APA § 14.2 [HB_000706].

253.     Section 14.2 of the APA permits a party to assert claims for the other party's failure to perform its rights and obligations accrued or incurred prior to the date of termination. Therefore, the Parties can assert claims and counterclaims in this arbitration predicated on a failure to have performed rights and obligations of the Parties accrued or incurred prior to termination.

254.     Therefore, in addition to the declaration that the APA is terminated with immediate effect, the Tribunal addresses the other claims asserted by Genius relating to "rights and obligations of the Parties" under the APA in the context if its claims for breach of contract and fraud.

---

remedies they may have under this Agreement): a) terminate this Agreement with immediate effect…"). APA § 14.1.

### 2)   Breach of Contract by LZG

255.    Genius claims that LZG is in breach of the APA for failure to deliver the Assets free of all encumbrances. *See* Genius Pre-Hearing Mem. at 23, Genius Post Hearing Mem. at 38, Genius Post Hearing Reply at 1.

256.    As mentioned above, the elements of claim for breach of contract are the existence of a contract, the claimant's performance thereunder, the respondent's breach thereof, and resulting damages.  *Harris v. Seward Park Hous. Corp.*, 79 A.D.3d 425, 426 (1st Dep't 2010).

257.    There is no dispute as to the first element – the existence of the APA. *See* Genius SARA ¶ 93 [HB_008120]; LZG Amended Answer § 5 paragraph 1 [HB_008133].  As to the remaining elements of the claim, the Arbitral Tribunal finds that Genius has established each of these elements by the preponderance of the evidence.

258.    As to the second element, the Arbitral Tribunal finds that Genius performed its obligations under the APA up until sometime after was revealed to Genius that there were undisclosed encumbrances on the assets being sold by LZG to Genius pursuant to the APA. Section 5.2 of the APA enumerates Genius' obligations that must be satisfied before the closing could occur. [HB_000690].   This section required Genius to perform and comply with all "agreements, obligations and conditions" set forth therein and obtain "all approvals, consents, and qualifications necessary to complete the transfer of the Assets." *Id*.  It also required Genius to obtain "all necessary consents, waivers and no-objections in writing from any Person as may be required." APA § 5.2 [HB_000690]. The record supports a finding that Genius performed these obligations and LZG does not allege that Genius breached Section 5.2 of the APA.

259.    Genius also performed its pre-closing duties under Section 6.2 of the APA. This contractual provision required Genius to promptly notify LZG in writing of any, *inter alia*, event

75

that could have a Material Adverse Effect (there was none). This provision also required Genius to provide LZG with access to Genius' books and records and other relevant documents to effectuate the APA transactions. LZG does not dispute that Genius fulfilled this obligation.  APA Section 6.2 also required that Genius take no act that would cause "any of the warranties set forth in Section 8 or 9 to be untrue," and to "make all required pre-transaction disclosures to the SEC as may be required" and "fulfill all other obligations required by the SEC."  APA §§ 6.2(a)-(d) [HB_000691-692].

260.    LZG argues that Genius did not comply with APA Section 9.2(d), which reads as follows:

> Funding.  At Closing, the Purchaser will possess funding, or is the recipient of, binding, irrevocable and unconditional funding commitments, which will allow it to meet its obligations to make the payments due under this Agreement.

> HB_000702.

261.    However, the evidence in the record demonstrates that Genius complied with this pre-closing obligation as well.  As was well known to LZG, Genius had planned an ATM months before the Parties engaged in negotiations and due diligence in connection with the APA. *See* HB_001337-001340.  In February 2023, Genius signed an engagement letter with HCW for funding through an ATM. "The 2023 ATM contemplated a F-3 Registration Statement, which would cover the issuing of a shelf together with an ATM off the back of filing the Company's 20-F annual report by May 15, 2023."  Genius Post Hearing Mem. at 37; HB_001337-001340.

262.    Genius and HCW had an agreement in place for the 2023 ATM by May 2023. However, the auditors missed the deadline to provide audited financials for Genius' annual report on Form 20-F and therefore Genius had to wait an additional 12 months to seek funding via an ATM.  Genius Post-Hearing Mem. at 32; HB_001337-001340.  Nonetheless, Genius anticipated being able to timely file the necessary documentation for the ATM the following year, which

76

would provide ample funding for Genius business activities.  At the evidentiary hearing, Mr. Hamilton testified that the ATM would have provided sufficient financing to cover the LZG liabilities Genius had agreed to pay under the APA.  *See* Hearing Tr. at 185:6-22 (Hamilton). In short, Genius satisfied all of its pre-closing obligations under the APA.

263.   Furthermore, Genius complied with its contractual obligations with respect to the closing.  The APA closing took place on March 13, 2024, memorialized by, *inter alia*, a Transaction Closing Document,[37] a Bill of Sale,[38] an Assignment and Assumption Agreement,[39] and Stock Powers signed by LZG for each of the underlying LZG subsidiaries.[40]  HB_003781-795.

264.   On March 14, 2024, Mr. Hamilton circulated to LZG and others the fully executed closing documents: Transaction Closing Document, a Bill of Sale, Assignment and Assumption Agreement, and Stock Powers signed by LZG for the underlying Prime Source subsidiaries. HB_003781-95 (Email from Mr. Hamilton to LZG attaching fully executed documents).

265.   As envisaged in Section 7.8 of the APA, LZG Directors were appointed to the Genius Board and in senior management positions.  Mr. Moe was appointed non-executive chairman in April 2024, and Mr. Ritz was made Chief Revenue Officer as of June 3, 2024.  *See* HB_000914-000920.   This is further evidence of Genius complying with its contractual obligations.

266.   In fact, once Mr. Hamilton started to learn about the undisclosed encumbrances on the assets sold pursuant to the APA and other concerning aspects of the LZG transaction (for example, the absence of a required LZG audit of the assets sold due to failure to pay the auditor), Genius tried to provide funds to assist LZG in paying debts owed to creditors (namely the Prime

---

[37] HB_003794-HB_003795.
[38] HB_003788-HB_003792.
[39] HB_003788-HB_003792.
[40] HB_003784-HB_003787.

Source Group original owners) and providing funds to pay the auditor for the audit needed for Genius SEC filings to incorporate accurate information regarding the acquired assets pursuant to the APA. This was in addition to Genius having performed its contractual obligations under the APA. These expenditures were not requirements or obligations of Genius under the APA, but rather efforts by Genius to try to salvage the transaction by providing financial support to its counterparty LZG. The Arbitral Tribunal views these efforts by Genius to financially support LZG following the APA closing as a demonstration of good faith efforts to preserve the APA transaction and value of the company and assets in question. Implicit in every contract is a covenant of good faith and fair dealing. *See 25 Bay Terrace Assoc., L.P. v. Public Serv. Mut. Ins. Co.*, 144 A.D.3d 665, 667 (2d Dep't 2016); *see also P.S. Fin., LLC v. Eureka Woodworks, Inc.*, 214 A.D.3d 1, 30 (2d Dep't 2023). The additional voluntary financial support provided by Genius to LZG after LZG's revelation of the misrepresentations and false warranties in the APA are illustrative of good faith and fair dealing by Genius attempting to preserve the transaction before it became clear to Genius that the transaction could not be salvaged. *See P.S. Fin., LLC*, 214 A.D.3d at 30; *25 Bay Terrace Assoc., L.P.*, 144 A.D.3d at 667.

267. Ultimately, even with the additional financial support from Genius, it became apparent that the encumbrances on the LZG assets were not going to be removed by LZG. Efforts by the Parties to find a way to resolve LZG's failure to have complied with the APA were unsuccessful. Thereafter Genius commenced arbitration to enforce its rights.

268. In the Arbitral Tribunal's view, the misrepresentations and false warranties made by LZG in the APA constitute a breach of contract. While there are many aspects of the APA that in retrospect LZG failed to satisfy, we focus on the central breaches – the representations and warranties made by LZG that it was selling the assets (set out in Exhibit 1 to the APA) "free of

78

encumbrances." APA § 2.1 [HB_000688] (stating that the "list of assets constitutes Exhibit 1 to this Agreement").  On the day the Parties executed the APA, Mr. Ritz emailed Mr. Hamilton the combined balance sheet for FB Primesource Acquisition LLC, comprising all five Prime Source companies plus assets and liabilities covered by the transaction, scheduled in Exhibit 1 List of Assets…" HB_000652.  Mr. Ritz's understanding that Prime Source was among the assets being sold to Genius is further affirmed by the Bill of Sale, which Mr. Ritz drafted, stating that LZG is selling "the Assets (as set forth on Exhibit A hereto)" to Genius "free and clear of all Encumbrances," § 2 [HB_000779-000784]. "Exhibit A" to the Bill of Sale is identical to Exhibit 1 to the APA, and includes, *inter alia*, the Prime Source entities.  *See* HB_003793; HB_000712. Pursuant to the APA and Bill of Sale, LZG (and not FBPA) executed Stock Powers concerning the ownership interest in Prime Source.  *See* HB_000774-000778.  No stock power was executed by LZG for FBPA.  *See* Genius Post-Hearing Mem. at 43.  LZG does not contend that one was ever executed for FBPA. Mr. Ritz did not recall executing a stock power for FBPA at the evidentiary hearing.  *See* Hearing Tr. 82:13-20 (Ritz).

269.    LZG's representations and warranties that the assets were free of encumbrances were false because it was later disclosed that the assets that LZG purported to transfer to Genius were in fact encumbered by unpaid promissory notes and then Standstill / Settlement Agreements and amendments thereto with the co-founders of Prime Source.  LZG never made the outstanding payments to the Prime Source co-founders required under the undisclosed agreements and therefore the assets remained encumbered.  In short, LZG never possessed clear legal title to Prime Source.  *See* HB_000825-858 (Standstill / Settlement Agreements).  The Standstill / Settlement Agreements demonstrate that the Prime Source co-founders retained encumbrances on Prime Source.

270. Sections 5 and 6 enumerated Conditions Precedent to Closing and Pre-Closing Actions applicable to LZG. *See* APA, §§ 5.1(a)-(f), 6.1(a)-(f), 6.2 [HB_000689-000691]. Most relevant is the Conditions Precedent to closing that LZG's warranties set forth in Sections 8 are "true and correct," APA § 5.1(c), *see also* § 6.2(c), and as discussed above, LZG breached those provisions by failing to deliver the Prime Source entities free from encumbrances.

271. Section 6.2(a) of the APA specifically required LZG to promptly advise Genius in writing of encumbrances that "has had or may reasonably be expected to have a Material Adverse Effect" on the APA transaction. This provision required prompt disclosure in writing of the Standstill / Settlement Agreements at the time they were entered but LZG failed to comply with this obligation, constituting a contractual breach. *See* Hearing Tr. at 69:11-12 (Ritz) (admitting the Standstill / Settlement Agreements were not disclosed until the end of March 2024 after entry of the APA and the APA closing memorialized with various stock powers and Bill of Sale).

272. Additionally, LZG was contractually required to be able to deliver audited financial statements for each of the Prime Source entities, *see* APA § 5.1(d), which LZG was not able to do without Genius funding the audit. Hamilton Stmt., ¶ 91. Also, LZG was contractually required under APA Section 6.2 [HB_000689-000691] to provide Genius access to LZG's books and records and any other relevant documents needed to effectuate the transactions contemplated by the APA, which LZG also failed to do. Hamilton Stmt., ¶¶ 91-93.

273. LZG also breached the APA Section 6(b) requirement following execution of the APA to "not carry out any action or omission which may affect the proposed transaction under this Agreement, or which may reduce or dilute the effective ownership of the Purchaser upon the Closing, or which may change the ownership of the Assets."

274.    Clearly the Standstill / Settlement Agreements adversely impacted "the effective ownership of the Purchaser [Genius] upon the Closing" (APA Section 6(b)), because LZG never had the power to sell the assets set out in Exhibit 1 to the APA.

275.    In short, LZG breached the APA in a manner that fundamentally undermined the purpose of the APA transaction by, *inter alia*, Mr. Ritz entering into the Standstill / Settlement Agreements with the Prime Source co-founders, failing to promptly advise Genius of any event, occurrence, fact, condition, change, development, or effect that may reasonably be expected to have a Material Adverse Effect[41] on the value of the assets being sold pursuant to the APA by not informing Genius of its entry into the Standstill / Settlement Agreements until "the end of March," Hearing Tr. at 69:2-12 (Ritz), and failing to provide Genius access to "its books and records, and other relevant documents necessary for the transactions contemplated herein,"[42] which (if accurate) would have revealed the existence of the Standstill / Settlement Agreements weeks or months earlier.  *See* Genius Post Hearing Reply Mem. at 5.

276.    Additionally, LZG failed to deliver to Genius "any necessary assignments, certificates, or instructions of transfer for the Assets."  APA § 7.3(b) [HB_000726]; *see also* APA § 7.3(d). LZG breached these provisions by, *inter alia*, failing to deliver to Genius legitimate, authorized and enforceable stock powers for the Prime Source entities. LZG also failed to provide documentation demonstrating the transfer of FPBA to Genius. *See, e.g.,* Hearing Tr. at 142:9-21, (Ritz) (when asked about documentation demonstrating the transfer of LZG's ownership of FBPA to Genius, Mr. Ritz did not confirm that the FBPA Operating Agreement had been amended and did not point to any documentation in the record memorializing any such amendment).

---

[41] APA § 6.2(a) [HB_000726]; see also § 1.1(y) (defining "Material Adverse Effect" as "a material adverse effect in the …. assets, liabilities or prospects of Seller or the Subsidiaries, or any of them, or on the ability of Seller to enter into this Agreement and perform its obligations hereunder") [HB_000721].
[42] APA § 6.2(b) [HB_000726].

277.    In the Arbitral Tribunal's view, based on the language of the APA and documentary and testimonial evidence in the record, LZG failed to satisfy many of its fundamental obligations under the APA, including LZG's conditions precedent to the APA closing.  The preponderance of the evidence in the record supports a finding that LZG breached the APA.

278.    Genius invites the conclusion that LZG's failure to satisfy its closing conditions precedent means that "Closing [did] not occur [because] all of the obligations specified in this [APA] Section [7] [were not] complied with …."[43] Genius Post Hearing Reply Mem. at 5.  The Parties have disputed whether this means there was or was not a Closing as envisaged under the APA.  Clearly, there was conduct associated with a "closing" in that the Parties exchanged signed closing documents. Genius acknowledges this in its submissions.  *See* Genius Post Hearing Reply Mem. at 23 ("Indeed, as the evidentiary record clearly demonstrates, Genius never disputed that the parties *believed* … that there was a closing ...").  The core problem is that the underlying premise of the closing – that LZG was transferring unencumbered assets to Genius as represented and warranted in the APA – was untrue.

279.    In the Arbitral Tribunal's view, whether LZG's failure to satisfy its conditions precedent means there "was no closing," or alternatively that the "closing" is deemed ineffective for the purposes of binding Genius to post-closing obligations leads to the same result.

280.    The preponderance of the evidence demonstrates that LZG breached its pre-closing contractual obligations under the APA and the closing did not effectuate the transfer from LZG to Genius of unencumbered assets listed in Exhibit 1 of the APA as LZG had promised in the unambiguous language of the APA.  The words and phrases used by the Parties in the APA must, as in all cases involving contract interpretation, be given their plain meaning.  *Ellington v. EMI*

---

[43] APA § 7.4 [HB_000727].

*Music, Inc.*, 24 N.Y.3d 239, 244 (2014); *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990) ("when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms").  In interpreting the APA, the focus is on what the Parties intended as evidenced by what they wrote in the APA.  *Rodolitz v. Neptune Paper Prods*., 22 N.Y.2d 383, 387 (1968). "When two parties have made a contract and have expressed it in a writing," extrinsic evidence "of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing."  *Unisys Corp. v. Hercules, Inc*., 224 A.D.2d 365, 368-69 (1st Dep't 1996) (quoting 3 Corbin, Contracts § 573 (1960)).

281.   Here, LZG has made representations and warranties about, *inter alia*, the assets that LZG was selling to Genius pursuant to the APA being free and clear of encumbrances, which representations and warranties were untrue.  Additional representations by LZG in the APA, including for example, having obtained requisite authority from its Board of Directors to enter into the APA transaction and the delivery to Genius of audited financials, were also revealed to be untrue after the APA closing.  *See also* Genius Post-Hearing Mem. at 25-26; Hamilton Stmt., ¶ 91.  As a result, the Arbitral Tribunal finds that LZG breached the APA and is liable to Genius for breach of contract.

282.   The Arbitral Tribunal finds that LZG's breaches of the APA caused the harm suffered by Genius.  Due to LZG's misrepresentations and false warranties in the APA, Genius did not receive unencumbered assets pursuant to the APA transaction.  Genius paid $ 6,595,180.00 to LZG and received nothing of value.  Genius also conveyed 7,387,374 shares of Genius Group Ltd. common stock to LZG as further consideration pursuant to the APA.  Moreover, Genius made payments to LZG not arising out of the APA (for example, funding the audit that LZG claimed it could not afford).  Genius also incurred $728,070.04 in litigation costs related to this arbitration.

In short, Genius has suffered significant financial harm that was proximately caused by LZG's breaches of the APA.

283. LZG suggests that the conduct by Genius after the revelation of the encumbrances on the assets on Exhibit 1 to the APA should be viewed as either ratification of the APA or waiver. *See* LZG Post Hearing Mem. at 41; LZG Reply Proposed Findings at 28. LZG contends that by continuing to negotiate and work with LZG regarding how to try to remove the encumbrances on the assets LZG purportedly sold to Genius, the Arbitral Tribunal should find that Genius either ratified the APA or waived its rights to assert claims against LZG for LZG's misrepresentations and false warranties about the assets being free of encumbrances.  The Arbitral Tribunal disagrees.

284. In the Arbitral Tribunal's view, the efforts by Genius to try to salvage the APA transaction after the closing by providing some financial support to LZG (and/or its subsidiaries) in the weeks and months after the revelation of the encumbrances on the assets sold under the APA do not constitute "contractual performance" by Genius after the closing that amounts to a waiver by conduct of LZG's contractual breaches.  Waiver is the intentional relinquishment of a right, *see City of NY v. State*, 40 N.Y.2d 659, 669 (1976), and a waiver "should not be lightly presumed." *See Gilbert Frank Corp. v. Federal Ins. Co*., 70 N.Y.2d 966, 968 (1988).  Furthermore, the burden of proving a defense of waiver is on the party which asserts it. *See Rosenthal v. City of NY*, 283 A.D.2d 156, 160 (1st Dep't 2001).

285. Contractual clauses that require waivers to be in writing are valid and enforceable under New York law.  *See, e.g., Jefpaul Garage Corp. v. Presbyterian Hosp. in City of NY*, 61 N.Y.2d 442, 446 (N.Y. 1984); *Awards.com v. Kinko, Inc*., 42 A.D.3d 178 (1st Dep't 2007). Once Genius learned incrementally of the undisclosed encumbrances on the assets Genius had purchased under the APA, Genius took steps to try to salvage the transaction (without waiving its rights).

286.     In addition to the requirement of written waiver in the language of Section 5 of the APA (conditions precedent to closing),[44] the APA contained a general "no waiver" provision applicable to all provisions and obligations of the APA. *See* APA §19.7 ("Waiver. No waiver of any breach of any provision of this Agreement shall constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver shall be effective unless made in writing and signed by an authorized representative of the waiving Party."). There was no written waiver signed by Genius waiving any of its rights or LZG's obligations in the APA.

287.     Therefore, the Arbitral Tribunal concludes that there were multiple breaches of the APA by LZG and that Genius did not waive those breaches by its post-closing conduct to try (albeit unsuccessfully) to salvage the APA transaction and/or value of the assets subject to the transaction.

288.     The Arbitral Tribunal also finds that the steps taken by Genius to negotiate and work with LZG regarding how to try to remove the encumbrances on the assets LZG purportedly sold to Genius did not constitute a ratification of the APA.  The additional voluntary financial support provided by Genius to LZG after the revelation of the misrepresentations and false warranties by LZG in the APA are illustrative of good faith and fair dealing by Genius attempting to preserve the transaction before it became clear to Genius that the transaction could not be salvaged.  *P.S. Fin., LLC*, 214 A.D.3d at 30; *25 Bay Terrace Assoc., L.P.*, 144 A.D.3d at 667.

289.     LZG argues that notwithstanding its contractual breaches, LZG should not be held liable for its contractual breaches because Section 13.3 of the APA provided that Genius would make USD 15 million available to LZG for the purposes of satisfying liabilities. LZG characterizes

---

[44] APA Section 5.1 states at the start of the provision: "Purchaser Conditions Precedent to Closing. The obligations of the Purchaser to purchase the Assets on the Closing Date are subject to the satisfaction, *or waiver in writing by the Purchaser at or prior to the Closing*, of the following conditions…."

this USD 15 million funding as a condition precedent to asserting claims against LZG.  Section 13.3 of the APA states:

> "Notwithstanding anything else in this Agreement, the Seller shall have no liability for any liabilities until the entire US$15,000,000 of funding has been made available to Seller for the purpose of satisfying liabilities."

> HB_000705.

290.    In the view of the Arbitral Tribunal, LZG's argument premised on Section 13.3. of the APA is without merit.  This provision relates to funding up to USD 15 million for anticipated LZG liabilities after the APA closing. A fundamental defect of this argument is that there was no real "closing" – or put differently, the APA "closing" did not effectuate its central purpose – LZG's sale to Genius of the assets listed in Exhibit 1 – because of the undisclosed encumbrances on the assets LZG purported to sell to Genius pursuant to the APA.  The intent of the Parties must be found within the four corners of the APA, giving a practical interpretation to the language employed and reading the contract as a whole.  *See e.g., Ellington v. EMI Music, Inc*., 24 N.Y.3d 239, 244 (2014); *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990).  The APA read as a whole cannot be construed to require Genius to have funded USD 15 million – a post-closing obligation – after learning of LZG's multiple misrepresentations and false warranties in the APA, in order to assert claims against LZG for its breaches of the APA.  The Arbitral Tribunal rejects LZG's characterization of APA Section 13.3 as a condition precedent to Genius enforcing its rights under the APA and asserting claims against LZG for breaches of the APA.

291.    LZG points to the carve-out in Section 13.10 of the APA, which states:

> "Nothing in this Section 13 applies to exclude or limit the liability of either party to the extent that a Claim arises or is delayed as a result of dishonesty, fraud, willful misconduct or willful concealment by such party, its agents or advisers."

292.     In the Arbitral Tribunal's view, this language of this provision actually supports Genius' right to assert claims arising out of LZG's misrepresentations and false warranties subsequently revealed after the signing and closing for the amount of harm suffered.  As discussed further below, the Arbitral Tribunal finds as a matter of fact and contract interpretation that the representations made by LZG in the APA about the assets being free and clear of encumbrances were knowingly false when made and willfully concealed from Genius for as long as possible, including after the signing of the APA and before the closing.  The Arbitral Tribunal finds that the failure by LZG to satisfy its conditions precedent in the APA relieved Genius of its post-closing payment obligations.  *See* APA § 7.6.1-7.6.2.  Therefore, LZG is liable for its contractual breaches because the conditions precedent required to be satisfied by LZG before Genius would be required to provide such funding did not occur.

### 3)  Fraud by LZG

293.     Genius alleges that LZG committed fraud because it withheld information about the January 10, 2024 Standstill/Settlement Agreements at the time they were entered into and misrepresented that it would be selling the Assets "free and clear of all Encumbrances" when, "in fact, they were encumbered" by virtue of the secret Standstill / Debt Settlement Agreements with the Prime Source co-founders.  Genius Pre-Hearing Mem. at 24 (citing Section 2.1 of APA); Genius Post Hearing Mem. at 47.

294.     As mentioned above, the elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the claimant, and damages.  *See Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009).  Reliance on a misrepresentation must be reasonable.  *River Glen Assoc. v. Merrill Lynch Credit Corp.*, 295 A.D.2d 274, 275 (1st Dep't 2002).  The misrepresentation(s) must have

induced the defrauded party to engage in the transaction and the misrepresentation(s) must have directly caused the loss. *Laub v. Faessel*, 297 A.D.2d 28, 31 (1st Dep't 2002).

295.    LZG argued that Genius fails to meet the elements of fraud because "LZG never promised that the assets of its subsidiary were unencumbered" and "disclosed the encumbrances during the due diligence process." LZG Post Hearing Mem. at 47-48.  LZG further argued that the record does not show any attempt to conceal or mislead Genius, and that LZG offered to produce any standstill agreements prior to closing and to discuss the related payment obligations. *Id*.  Mr. Hamilton of Genius vigorously denied this. Mr. Hamilton testified that while he knew of promissory notes with the Prime Source co-founders that were due by December 31, 2023, Mr. Hamilton believed Mr. Ritz and LZG assurances that those promissory notes would be timely paid. *See* Hamilton Stmt., ¶¶ 55-58.  Mr. Hamilton testified that he did not know of the January 10, 2024 Standstill Settlement Agreements with the Prime Source co-founders after the default on the debt owed by December 31, 2023.  *See* Hearing Tr, 93:24-94:3 (Hamilton), Hamilton Stmt., ¶¶ 56-59.

296.    In the Arbitral Tribunal's view, the record establishes that the elements of fraud are met.  LZG made material representations and false warranties to Genius before the APA was signed and then in the APA itself, which were subsequently revealed to be knowingly false when made.

297.    Mr. Ritz testified that Standstill / Settlement Agreements were entered into in January 2024.  Mr. Ritz was involved in the negotiations and finalization of those standstill agreements.  Hearing Tr. at 65:8-66:8 (Ritz).  Mr. Ritz knew these standstill agreements and subsequent amendments were necessary to prevent the Prime Source co-founders from reclaiming their shares, but weight of the evidence in the record demonstrates that Mr. Ritz did not disclose the standstill agreements to Genius until after the March 14, 2024 "closing" – finally providing a

copy of the Standstill / Settlement Agreements well after the closing on March 29, 2024. Hearing Tr. at 77:18-24 (Hamilton); Hamilton Stmt., ¶¶ 35, 73; *see also* Hearing Tr. 69:5-17 (Ritz) ("I think this came at the end of March [2024]"); 125:17-20 (Ritz) (standstill agreements were not sent to Genius until March 2024).

298.     LZG nonetheless included express representations and warranties in the APA that the assets were not encumbered with the intent to induce reliance by Genius on those representations and warranties. LZG was aware that Genius would not enter into the APA transaction if the underlying assets LZG was selling to Genius were encumbered or otherwise not owned by LZG as "Seller" to convey to Genius as "Buyer" under the APA.

299.     The record demonstrates that Genius relied on LZG's representations in the negotiations - as late at the New York Meetings in January 13-24, 2024 after the secret Standstill / Securitiy Agreements had been entered but no mention was made of them – as well as the written representations and warranties in the APA – most significantly that the assets LZG was selling to Genius were not encumbered – without which Genius would not have entered into the APA. Genius relied to its detriment on, *inter alia*, LZG's representations that the assets that Genius was purchasing were free of encumbrances and that LZG had requisite authority to convey the assets and enter into the APA transaction.

300.     Based on the evidence in the record, the Arbitral Tribunal finds that LZG knew that its representations that the assets were free of encumbrances were false when made (in light of the secret January 10, 2024 Standstill / Settlement Agreements which LZG did not disclose to Genius at the January 31-14, 2024 meeting) pre-dating the APA. The Arbitral Tribunal further finds that LZG included representations and warranties that the assets were free from encumbrances in the APA so that Genius would go forward with the APA transaction.

89

301. The Arbitral Tribunal also finds that the reliance by Genius on the representations and warranties by LZG in the APA -- later revealed to be false -- was reasonable. Based on the record in this arbitration, the Arbitral Tribunal finds that Genius took diligent efforts to ensure there were no encumbrances on the assets Genius was purchasing from LZG pursuant to the APA by insisting on multiple representations and warranties from LZG about the assets being free and clear from encumbrances. Hearing Tr. 182:20-183:13 (Hamilton); Hamilton Stmt., ¶¶ 13, 21, 26, 28, 33, 35.

302. Genius had no way of independently verifying what LZG represented to it. While LZG was a public company with public reporting obligations, LZG stopped filing its disclosures around June 2023 prior to entering into the NDA in November 2023. *See* HB_001763-001764 (showing LZG's last annual/quarterly EDGAR disclosure was for the period ending February 28, 2023). Genius became further reliant on LZG's representations because Prime Source consisted of international entities; Genius was unable to conduct a lien search (or equivalent). See Genius Post Hearing Mem. at 49. Therefore, Genius had no way of independently investigating the truthfulness of LZG representations. Instead, Genius was dependent on LZG being honest and forthcoming with all relevant information in its possession, including, *inter alia*, the status of the outstanding debts that were owed to Prime Source co-founders and LZG's ability to engage in the transactions contemplated by the APA.

303. When a buyer like Genius is reliant upon a seller's representations because there are no independent means of ascertaining the truth, the "peculiar knowledge" rule applies. *See Warner Theatre Assocs. P'ship v. Metro. Life Ins. Co.*, 149 F.3d 134, 136-137 (2d Cir. 1998) (discussing the "peculiar knowledge" exception, also referred to as the "special facts" exception, namely, that if misrepresented facts are peculiarly within the seller's knowledge, even a reasonable

90

disclaimer will not undermine the buyer's reliance, and the fraudulent seller may not invoke a knowledge disclaimer).   The rule applies where, as here, the facts being misrepresented are peculiarly within the knowledge of the party invoking them, either because they are literally within its exclusive knowledge or "the truth theoretically might have been discovered, although only with extraordinary effort or great difficulty,"  *UniCredito Italiano SpA v. JPMorgan Chase Bank*, 288 F. Supp. 2d 485, 499-500 (S.D.N.Y. 2003).   Here, reliance by Genius on LZG's express representations and warranties in the APA was reasonable because LZG had superior knowledge of the essential facts and a duty to disclose them.  *P.T. Bank Cent. Asia, NY Branch v. ABN AMRO Bank N.V.*, 301 AD2d 373, 378 (1st Dep't 2003) (a party's "superior knowledge of essential facts renders a transaction without disclosure inherently unfair").

304.    Given LZG's concealment of the material facts within its exclusive knowledge – namely, that Prime Source had been encumbered on January 10, 2024, and, therefore, could not be conveyed "free from all Encumbrances," APA § 2.1(a) [HB_000688] – the Arbitral Tribunal finds that Genius' reliance on LZG's representations was reasonable.

305.    Mr. Hamilton testified at the evidentiary hearing that he "wasn't even aware that there were standstill agreements until … only when Mr. Ritz actually sent them to me after I demanded it on 29th or thereabouts of March [2024]."   Hearing Tr. at 77:18-24 (Hamilton). Mr. Hamilton was asked on cross examination "is it your testimony sitting here today under oath that you had no knowledge of this January [2024] standstill agreement until the end of March?" Mr. Hamilton responded:

> "Yes. I had – I had no knowledge of the contents of it or that it was not in the data room. The first I got to hear that there was anything signed in January [2024] was when Eugene mentioned it, you know, around the time of the asset purchase agreement [closing] in mid-March [2024]. And as I tried to get to the bottom of that, that's when I found out that there were these documents, which is why on the 29th I demanded a call with Mr. Moe and Mr. Ritz…"

Hearing Tr. 78:12-20 (Hamilton).

306.    Mr. Hamilton further testified that "if there had been a standstill agreement that we [Genius] were aware of, we would've demanded to have it for the due diligence process." Hearing Tr. at 79:1-4 (Hamilton).  When asked if the co-founders of Prime Source were the ones that owned the assets subject to the APA, Mr. Hamilton replied "No. Absolutely not. The asset was owned and represented to be owned by LZG International. If – if LZG International did not own it, they never should have entered into an asset purchase agreement for us to buy the asset." Hearing Tr. 92:3-10 (Hamilton).  Mr. Hamilton emphasized that "our deal always was and still is only with LZG International, which was at the time represented by Mr. Ritz and Mr. Moe." Hearing Tr. at 93:6-9 (Hamiton).

307.    While LZG emphasizes that "[r]easonable reliance entails a duty to investigate the legitimacy of an investment opportunity" and that "the greater the sophistication of the investor, the more inquiry that is required," *Crigger v. Fahnestock & Co., Inc.*, 443 F.3d 230, 234-35 (2d Cir. 2006) (citation omitted) (*see also* LZG Pre-Hearing Mem. at 34-35), the information that would prompt such inquiry was uncovered only after the APA "closing" in mid-March 2024.  The post-closing telephone recordings, together with the other documentary and testimonial materials in the record, portray a carefully orchestrated deception by LZG about encumbrances on the assets that LZG was determined to sell to Genius while delaying any action by the Prime Source co-founders to whom the LZG entities were indebted. As explained by Mr. Hamilton at the evidentiary hearing:

> "It became extremely important when, on the 29th of March [2024], I finally received the evidence that they had withheld very important documents in which they really never had the right to sell the – the asset in the first place and we wouldn't have entered the asset purchase agreement at that time, which I was very clear to Mr. Moe and Mr. Ritz about, that this could be seen as them just selling us [Genius] a shell with nothing in it. And we had to resolve that and they assured they would resolve that."

92

Hearing Tr. at 101:13-22 (Hamilton).

308.	Based on the clear and convincing documentary and testimonial evidence in the record, the Arbitral Tribunal finds that LZG knew its material representations and warranties were false when made and included them in the APA specifically to induce Genius to rely on the representations and enter into the transaction, that Genius relied on those representations and warranties by LZG in the APA in entering the transaction to its detriment, as discussed below.

309.	Finally, LZG's fraudulent conduct was the proximate cause of the harm suffered by Genius.  As discussed above, due to LZG's intentional misrepresentations and false warranties in the APA, Genius did not receive unencumbered assets pursuant to the APA transaction.  Genius paid US$ 6,595,180.00 to LZG and received nothing of value.  Genius also conveyed to LZG 7,387,374 shares of Genius Group Ltd. common stock as further consideration pursuant to the APA. Moreover, Genius made payments to LZG not arising out of the APA (for example, funding the audit that LZG claimed it could not afford). It has also incurred US$ 728,070.04 in New York federal court litigation costs related to this arbitration.

310.	In short, there is clear and convincing evidence that Genius has suffered significant financial damage that was proximately caused by LZG's intentional misrepresentations and false warranties that the assets LZG was purportedly selling to Genius were free from encumbrances to induce Genius to enter the APA transaction.

311.	Having found that LZG both breached the contract and committed fraud, we turn to the issue of what remedies are available to Genius for both claims.

93

312.    As discussed above, Section 13.8 of the APA contains a provision that prevents duplicative recovery for multiple claims predicated on the same conduct:

> "If the same fact, matter, event or circumstance gives rise to more than one Claim, neither party shall be entitled to recover more than once in respect of such fact, matter, event or circumstance."

HB_000706.

313.    Therefore, in light of Section 13.8 of the APA, while there is clear and convincing evidence that LZG's conduct satisfies the elements of civil fraud, that does not change the relief to be awarded in this case.  Genius' claims for breach of contract and civil fraud are based fundamentally on the same factual circumstances.  The Arbitral Tribunal grants the same monetary remedies to Genius for the harm it suffered due to LZG's breach of contract and fraud in accordance with APA Section 13.8 because both claims are predicated on the same facts and entitle Genius to the same remedies and relief.  To do otherwise would render Section 13.8 of the APA meaningless, which is not permitted under New York law.  The words and phrases used by the parties must, as in all cases involving contract interpretation, be given their plain meaning. *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244 (2014) (collecting cases); *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990) ("when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms").

314.    Moreover, in its pleading, Genius requests identical monetary damages for its breach of contract claim and fraud claim.[45]  That settles the issue as to the relief as to which Genius is entitled.

---

[45] "On its Claim for Breach of Contract, a decision awarding equitable relief in the form of rescission and ordering LZG to remit the $6,595,180.00 and 7,387,374 shares of Genius common stock." SARA ¶ 117. "On its Claim for Fraud, a decision awarding monetary damages in an amount no less than the consideration Genius delivered to LZG (including the $6,595,180.00 and 7,387,384 shares of Genius common stock) upon the expectation that LZG could, in fact, deliver its assets – including the Prime

### 4) Remedies for LZG's Wrongful Conduct

315.    Turning now to the remedies appropriate for LZG's wrongful conduct, the Arbitral Tribunal finds that the relief sought by Genius for LZG's wrongful conduct falls into several categories.  First, Genius seeks a declaration that the APA is terminated based on the conduct of LZG and the termination provision in the APA.  As discussed above in Section VIII (D)(1) *supra*, the Arbitral Tribunal finds that Genius is entitled to a declaration that the APA is terminated because LZG failed to satisfy the contractual conditions precedent to closing.

316.    Second, Genius seeks rescission.  As discussed above, as a matter of New York law, rescission for breach of contract is a matter of discretion, *see Alper v. Seavey*, 9 A.D.3d 263, 264 (1st Dep't 2004), and "should be granted where one party's breach is so substantial and fundamental that it defeats the purpose of the parties making the contract."  *Sabby Healthcare Master Fund Ltd. v. Microbot Med. Inc*., 2018 NY Slip Op 32429(U), 2018 N.Y. Misc. LEXIS 4253 at 2-3 (N.Y. Sup. Ct. 2018) ("Rescission should be granted only when a party's breach is material and willful, or if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract.") (citation omitted).

317.     However, as discussed above, in this case rescission is a remedy that the Parties agree is expressly contemplated by Section 14.1 of the APA in the event LZG failed to satisfy its APA conditions precedent to closing, which the Arbitral Tribunal has already found.

318.    APA Section 14.1 states:

> "Each of the Parties shall take all steps necessary to fulfill the Conditions Precedent promptly. Subject to Section 14.2, if the Conditions Precedent are not satisfied, or waived on or before the Closing, the non-defaulting Party may (without limiting their right to claim damages or exercise any other rights and remedies they may have under this Agreement):

---

Source Group – free and clear of any encumbrances, pledges, liens, security interests and the like." SARA ¶ 118.

a) terminate this Agreement with immediate effect…"

HB_000706.

319.    While the language of Section 14.1 focuses on the right to terminate the APA, the Parties both have interpreted Section 14.1(a) of the APA as an agreed right to rescission.  *See* Genius Post Hearing Mem. at 68-69 (Genius states that "rescission is a remedy that is expressly contemplated by the APA," citing APA § 14.1(a) [HB_000706]); HB_001310-11 (October 27, 2024 letter from Mr. Ritz of LZG to Genius proposing, *inter alia*, rescission pursuant to Section 14.1(a)) ("LZGI proposes that the parties proceed with a rescission of the Agreement, which is contemplated in Section 14.1(a) of the Agreement."); HB_001312-001313 (November 12, 2024 letter from Mr. Ritz of LZG to Genius referring to Section 14.1(a) as contractual right to rescission of the APA).[46]  Therefore, there is a contractual basis in the APA for the Arbitral Tribunal to grant rescission in this case.

320.    Even if rescission were not provided for in the APA, as discussed above, as a matter of New York law, rescission as a remedy for breach of contract is a matter of discretion and "should be granted where one party's breach is so substantial and fundamental that it defeats the purpose of the parties making the contract."  *Sabby Healthcare Master Fund Ltd. v. Microbot Med. Inc.*, 2018 NY Slip Op 32429(U), 2018 N.Y. Misc. LEXIS 4253 at 2-3 (N.Y. Sup. Ct. 2018).  Here,

---

[46] While LZG objected to the Arbitral Tribunal's consideration of this letter as a "settlement" offer, allegedly in violation of Rule 408 of the Federal Rules of Evidence, it is undisputed that the Federal Rules of Evidence do not apply in this arbitration, that the Parties agreed to include in the voluminous four-volume hearing bundle two letters from LZG to Genius that bore a designation "Subject to Rule 408 Rules of Evidence," and the portion cited herein does not discuss any alleged settlement terms.  Neither the October 27, 2024 nor the November 11, 2024 LZG letters (labeled "Rescission Notice" by LZG) bear any resemblance to a settlement or compromise, nor were they sent during settlement negotiations, and LZG submitted actual settlement agreements as evidence in New York federal court. *See* Genius Post Hearing Reply at 26 n.42 (citing *Genius Group Ltd. v. LZG Int'l, Inc., et al.*, No. 24-cv-08464 (S.D.N.Y.), ECF 60 (Declaration of Peter B. Ritz, dated Feb. 13, 2025), ECF 61-11, and Exhibits 4 and 5 to Genius Post-Hearing Reply (copies of settlement proposals filed by LZG in New York federal court).

LZG's misrepresentations and false warranties went to the heart of the APA transaction, defeating the purpose of the APA.  LZG purported to have the ability to transfer as Seller unencumbered assets (as listed in Exhibit 1 to the APA) to Genius as Purchaser, but it became known to Genius in late March of 2024 that LZG did not own or have clear title to the assets as LZG had expressly represented and warranted in the APA.  This breach was so substantial and fundamental that it defeated the purpose of the Parties in entering into the APA and meets the criteria for rescission under New York law.

321.    Therefore, the Arbitral Tribunal exercises its discretion to grant Genius rescission under New York law and pursuant to Section 14.1(a) of the APA, which requires the Parties to restore the status quo prior to the APA transaction to the extent possible.  This includes, *inter alia*, LZG returning the 7,387,374 shares of Genius common stock that LZG received as part of the APA transaction (valued at approximately $5,392,783.02 as of market close on November 25, 2025 ($0.73), taking into account the trading price of Genius' common stock)[47] and LZG returning to Genius the $6,595,180.00 that Genius paid to LZG in connection with the APA.  *See* Genius Post Hearing Mem. at 69-70.

322.    In the Arbitral Tribunal's view, based on the documentary and testimonial evidence in the record, granting rescission to Genius is the closest thing possible to restoring the Parties to the status quo prior to the APA transaction.

323.    LZG asserts as defenses to Genius' claims the election of remedies doctrine and equitable estoppel,[48] both premised on the fact that according to LZG, Genius elected to continue to the contractual relationship after it learned of LZG's misrepresentations and false warranties in

---

[47] The Genius stock value on November 25, 2025 is an appropriate benchmark given that it was the last business day before the deadline for filing the Genius Post Hearing Memorandum. The valuation as of November 25, 2025 is not disputed between the Parties.

[48] *See, e.g,* LZG Post-Hearing Mem. at 41-42, 45.

the APA.  LZG argues that "[u]nder longstanding New York law, where a party continues to perform under a contract with knowledge of the other party's alleged breach, it forfeits the right to later rescind or terminate based on that breach."  LZG Post Hearing Mem. at 41 (citing *Emigrant Indus. Sav. Bank v. Willow Builders*, 290 N.Y. 133, 144 (1943).  LZG argues that Genius failed to repudiate the January 10, 2024 Standstill Agreement and continued to perform under the APA, allegedly making multiple payments on the Standstill Agreements, thereby electing to proceed with the APA, and therefore Genius cannot now claim rescission of the contract.  *See* LZG Post Hearing Mem. at at 41-42.  LZG also argues that "Genius is equitably estopped from disavowing the APA and its three Supplemental Agreements because it knowingly performed under them, accepted their benefits, and induced LZG to rely on their continued validity."  LZG Post Hearing Mem. at 45.

324.    Genius argues that the doctrine of election of remedies can only be used where there has been a clear irrevocable election, and that it does not apply to a party that does not have full knowledge of the facts necessary to make an intelligent and deliberate choice.  *See* Genius Post Hearing Mem. at 66-67, citing *Fletcher v. Rodriguez*, 3 N.Y.S.3d 901, 905 (Queens Sup. Ct. 2015).  Genius contends that since it was never granted ownership, control or use of Prime Source, and since Genius relied on false assurances given by Mr. Ritz and Mr. Moe regarding LZG financials, which were never provided to Genius, the doctrine of election of remedies is not available to LZG.  *See* Genius Post Hearing Mem. at 67-68.

325.    Based on the documentary and testimonial in the record, the Arbitral Tribunal finds LZG's election of remedies and estoppel defenses unavailing. While the Arbitral Tribunal acknowledges that under New York law, where a party continues to perform under a contract with knowledge of the other party's alleged breach, it may forfeit the right to later rescind or terminate

based on that breach, *Emigrant Indus. Sav. Bank v. Willow Builders*, 290 N.Y. 133, 144 (1943) (cited in LZG Pre-Hearing Mem. at 40), here Genius did not "proceed with the contract, accept the benefits, and repeatedly reaffirm its obligations" as LZG contends. *See* LZG Pre-Hearing Mem. at 40. To the contrary, upon learning of the undisclosed encumbrances, Genius tried to assist LZG in paying off debts that had not been paid to the Prime Source co-founders – by both providing funding to LZG outside of the APA and assisting with the contractual amendments to the Standstill / Debt Settlement Agreements to extend the payment deadlines – but that was not an "election" by Genius to continue to perform the APA. Nor did Genius ever accept the "benefits" of the APA given that Genius never actually received the benefits the APA – LZG never transferred assets to Genius free of encumbrances.

326. Similarly, Genius is not equitably estopped from enforcing its contractual rights based on its post-closing conduct to try to find a solution to the encumbrances LZG created on the assets it purported to have the unencumbered power to sell to Genius pursuant to the APA.

327. LZG claims as follows:

> "Here, Genius made the choice to continue on the APA and Standstill over and over again. After the January 10, 2024 Standstill Agreement, Genius not only failed to repudiate—it executed three signed amendments (Supplemental Agreements Nos. 1–3), HB Nos. 308-310, HB_004166-004180 (LZG Rebuttal Production), made multiple payments on those agreements…"

> LZG Pre-Hearing Mem. at 40.

328. The Arbitral Tribunal concludes that this assertion by LZG is simply not true. Genius did <u>not</u> execute the (previously undisclosed) Standstill Agreement of January 2024 – LZG orchestrated that. Genius did <u>not</u> execute 'three signed amendments" – to the contrary, Mr. Ritz on behalf of FPBA signed those "amendments" each of which was titled "Supplemental Agreement" – not an amendment – and the other party was Mr. Nazarov or Mr. Chsherbinin,

99

respectively, as co-founders and original owners of FBPA. *See* HB_004167-HB_004172. Genius

did not execute any of these agreements.

329.    An image of portions of one of the "three signed amendments" appears below:

**SUPPLEMENTAL AGREEMENT № 1**
**TO THE STANDSTILL AGREEMENT**
**DATED JANUARY 10, 2024**

This Supplemental Agreement № 1 is made on April 3rd , 2024, between Nazarov Viktor Vladimirovich (hereinafter referred to as the "Payee") and FB PrimeSource Acquisition, LLC, registered in Delaware (hereinafter referred to as the "Obligor").

Supplemental Agreement № 1 is entered into to the Standstill Agreement dated January 10, 2024.

Whereas:

*- The Standstill Agreement dated January 10, 2024 is Exhibit A to the Debt Settlement Agreement entered into between the same parties on January 10, 2024 (the "Debt Agreement");*

*- The Standstill Agreement dated January 10, 2024 was entered into between the Payee and the Obligor with respect to the Master Stock Purchase Agreement dated May 17, 2022, concluded between the Obligor, as transferee, and the Payee and Chsherbinin Yevgeniy Mikhailovich, as sellers of the participatory interests (the "Purchase Agreement"), and in respect of the Promissory Note issued to the sellers on May 31, 2022 pursuant to the Purchase Agreement (the "Promissory Note");*

*- Under the terms of the Standstill Agreement dated January 10, 2024, the Obligor undertook (as part of the Debtor's installment plan) to repay the debt to the Payee in the amount of 4 640 311,11* **(four million six hundred and forty thousand three hundred and eleven)** *U.S. dollars no later than March 31, 2024; however, as of the date of this Agreement, the Obligor has only made a tranche of 750 000* **(seven hundred and fifty thousand)** *U.S. dollars;*

*- The Obligor declared its impossibility to repay the entire amount of the Debt by March 31, 2024, and proposed to repay the amount of the Debt under a new schedule providing for the prolongation of payment obligation.,*

The Payee and the Obligor have agreed to revise the payment terms of the Promissory Note and set forth their understanding in this Supplemental Agreement № 1 to the Standstill Agreement.

\*       \*       \*

5. If the Obligor fails to timely perform its payment obligations in full, in accordance with Clauses 2 and 3 of Supplemental Agreement № 1, the Obligor shall be deemed to have breached its obligations under the Purchase Agreement and the Promissory Note the Payee shall be entitled to pursue remedies for such breach, including remedies set forth in the Debt Agreement between the Obligor and the Payee. At the same time, any claims of the Payee based on and arising from the obligations under the Purchase Agreement, the Promissory Note and the Debt Agreement shall be recognized by the Obligor as undisputed and immediately enforceable by the Obligor in favor of the Payee both out of court and in court.

6. The Parties agree that due to the fact that the new installment payment terms provided by this Supplemental Agreement No. 1 on the part of the Obligor are of a sufficiently long-term nature, a restriction is imposed on the Obligor, consisting in the impossibility of changing the executive body in the Kazakh companies of the Prime Source group and changes in these companies' work processes, as well as responsible officials and other persons within the framework of current operational activities. Restrictions are imposed for a period of time – until the Obligor's payment obligations are fully fulfilled in accordance with paragraph 3 of this Supplemental Agreement No. 1.

7. In all things not expressly modified by this Supplemental Agreement № 1, the parties shall be governed by the provisions of the Purchase Agreement, the Promissory Note, the Debt Agreement and the Standstill Agreement dated January 10, 2024.

8. This Supplemental Agreement № 1 is an integral part of the Debt Agreement.

9. This Supplemental Agreement № 1 is an integral part of the Standstill Agreement dated January 10, 2024. Both documents shall be considered as a single document by the Parties.

OBLIGOR:                                              PAYEE:
FB PRIMESOURCE ACQUISITION, LLC

_____                    _____
Peter B. Ritz, President                    Mr. Victor Vladimirovich Nazarov

HB_004167-4169.

330.    Below shows the signature portion of the parallel Supplemental Agreement [HB_004171-172]:

8. This Supplemental Agreement № 1 is an integral part of the Debt Agreement.

9. This Supplemental Agreement № 1 is an integral part of the Standstill Agreement dated January

10, 2024. Both documents shall be considered as a single document by the Parties.

OBLIGOR:
FB PRIMESOURCE ACQUISITION, LLC

Peter B. Ritz, President

PAYEE

Mr. Yevgeniy Mikhailovich Chsherbinin

331.    It is clear from the illustrative Supplemental Agreement referenced above [HB_004167-HB_004172] that Genius did not sign or become a party to the secret Standstill / Settlement Agreements that pre-dated the APA and was not a party or signatory to the "amendments" (titled Supplemental Agreements) thereafter.

332.    It is hard to conceive how LZG could characterize financial support from Genius and the other efforts made by Genius to help LZG belatedly try to cure the significant encumbrances on the assets LZG had purported to sell to Genius pursuant to the APA as "an unmistakable election to proceed" with the APA.  Yet LZG asserts "Genius is equitably estopped from disavowing the APA and its three Supplemental Agreements because it knowingly performed

102

under them, accepted their benefits, and induced LZG to rely on their continued validity." LZG Post Hearing Mem. at 45 (citing Ritz Stmt., ¶¶ 121-147.) The documentary record does not support this assertion and appears at odds with the testimony of Mr. Ritz, who personally signed the (undisclosed) Standstill Agreement of January 2024 and the Supplemental Agreements with the original FPBA owners.

333.     In sum, the Arbitral Tribunal concludes that LZG's defenses based on the election of remedies doctrine and equitable estoppel are without merit.

334.     Accordingly, the Arbitral Tribunal concludes that Genius is entitled to the relief it has requested in this arbitration: (a) a declaration that the APA is terminated immediately; (b) rescission of the APA pursuant to which LZG remits to Genius the $6,595,180.00 paid by Genius and 7,387,374 shares of Genius common stock; (c) on its claims for breach of contract and fraud, the same relief, namely an award of monetary damages to Genius in an amount no less than the consideration Genius delivered to LZG ($6,595,180.00) and return by LZG of the 7,387,384 shares of Genius common stock to Genius; and (d) recover its reasonable legal costs for this arbitration and the judicial proceedings in aid of this arbitration (as discussed *infra* in Section IX on Costs).

E.     **Analysis of LZG Counterclaims against Genius**

1) **Breach of Contract by Genius**

335.     LZG alleges that "[b]y filing this arbitration, manufacturing a frivolous claim of breach by LZG after the fact, and thereafter repudiating any further duty to perform, Genius breached its obligations to complete performance under the Contract." LZG Pre-Hearing Mem. at 48.  Furthermore, LZG alleges that Genius did not perform its obligations under the APA because Genius did not release approximately 73 million "freely tradable" Genius shares to LZG and paid "slightly more than $6 million of the $15 million due under the APA."  *See* LZG Post Hearing

Reply at 30.  Genius contends that LZG's breach of contract counterclaim is without merit due to LZG's wrongful conduct and moreover that Genius' duty to perform obligations under the APA was never triggered.  Specifically, Genius contends that its "obligation to deliver the $15 million was conditioned upon Closing, which never occurred because, *inter alia*, LZG never satisfied its share of the Conditions Precedent to Closing."  Genius Post Hearing Mem. at 72.

336.    The Arbitral Tribunal finds that LZG's contract breaches, based on LZG's multiple misrepresentations and false warranties in the APA, bar LZG's alleged breach of contract claim against Genius.  As LZG acknowledges in its submissions, one of the elements of a breach of contract claim is the party's own performance.  *See* LZG Pre-Hearing Mem. at 47-48, citing *Harris v. Seward Park Housing Corp.*, 79 A.D.3d 425, 426 (1st Dept. 2010); *Morris v. 702 East Fifth Street HDFC*, 46 A.D.3d 478, 479 (1st Dept. 2007) (a breach of contract claim exists if the evidence establishes the existence of a contract, the party's own performance under the contract, the other party's breach of its contractual obligations, and damages resulting from the breach).

337.    The Arbitral Tribunal further finds, as discussed above, that Genius performed its obligations under the APA and did not breach the APA. Section 5.2 of the APA enumerates Genius' pre-closing obligations. [HB_000690].  Section 5.2 of the APA required Genius to perform and comply with all "agreements, obligations and conditions" set forth therein and obtain "all approvals, consents, and qualifications necessary to complete the transfer of the Assets."  It also required Genius to obtain "all necessary consents, waivers and no-objections in writing from any Person as may be required."  APA § 5.2 [HB_000690].  The record supports a finding that Genius performed these obligations and LZG does not allege that Genius breached Section 5.2 of the APA.

338.    Genius also performed its pre-closing duties under Section 6.2 of the APA. This contractual provision required Genius to promptly notify LZG in writing of any event that could

104

have a Material Adverse Effect (there was none). This provision also required Genius to provide LZG with access to Genius' books and records and other relevant documents to effectuate the APA transactions. LZG does not dispute that Genius fulfilled this obligation.  Section 6.2 also required that Genius take no act that would cause "any of the warranties set forth in Section 8 or 9 to be untrue," and to "make all required pre-transaction disclosures to the SEC as may be required" and "fulfill all other obligations required by the SEC."  APA §§ 6.2(a)-(d) [HB_000691-692]. The record supports a finding that Genius complied with these obligations.

339.    The evidence in the record also demonstrates that Genius complied with its pre-closing funding requirements of APA 9.2(d) [HB_000702].  Genius had planned an ATM months before the Parties engaged in negotiations and due diligence in connection with the APA. *See* HB_001337-001340.  In February 2023, Genius signed an engagement letter with HCW for funding through an ATM.  *See* Genius Post-Hearing Mem. at 37; HB_001337-001340.  Genius and HCW had an agreement in place for the ATM by May 2023.  Ultimately Genius had to wait an additional 12 months to seek funding via an ATM. *See* Genius Post-Hearing Mem. at 32; HB_001337-001340.  Even with this delay, the ATM the following year would provide ample funding for Genius business activities.  At the evidentiary hearing, Mr. Hamilton testified that the ATM would have provided sufficient financing to cover the LZG liabilities that Genius had agreed to pay. Hearing Tr. at 185:6-22. In short, Genius satisfied its pre-closing obligations under the APA.

340.    Furthermore, Genius complied with its contractual obligations with respect to the closing. The APA closing took place on March 13, 2024, memorialized by, *inter alia*, a Transaction Closing Document, a Bill of Sale, an Assignment and Assumption Agreement, and Stock Powers signed by LZG for each of the underlying LZG subsidiaries.  HB_003781-95.

341.     Mr. Hamilton promptly circulated, on March 14, 2024, to LZG and others the fully executed closing documents: Transaction Closing Document, a Bill of Sale, Assignment and Assumption Agreement, and Stock Powers signed by LZG for each of the underlying PSG subsidiaries.  HB_003781-95 (March 14, 2024 email from Mr. Hamilton to LZG attaching fully executed documents).

342.     As envisaged in Section 7.8 of the APA, LZG Directors were appointed to the Genius Board and in senior management positions. Mr. Moe was appointed non-executive chairman in April 2024, and Mr. Ritz was made Chief Revenue Officer as of June 3, 2024. See HB_000914-000920.   This is further evidence of Genius complying with its contractual obligations. In sum, the Arbitral Tribunal finds that Genius performed its contractual obligations under the APA.

343.     The Arbitral Tribunal finds that Genius did not breach the APA by filing this arbitration.

344.     The Arbitral Tribunal finds that Genius did not manufacture a frivolous claim of breach of contract against LZG and, to the contrary, finds that LZG breached the APA.

345.     The Arbitral Tribunal finds that Genius did not breach its obligations under the APA with respect to releasing approximately 73 million "freely tradable" Genius shares.

346.     The Arbitral Tribunal finds that Genius did not breach the APA by failing to pay $15 million after closing because such payments were excused due to LZG's failure to satisfy LZG's conditions precedent to closing.

347.     In conclusion, the Arbitral Tribunal finds that Genius did not breach the APA and is not liable to LZG.

### 2) Fraud by Genius

348.     LZG alleges that Genius committed fraud by providing false representations of fact of sufficient funding.  *See* LZG Pre-Hearing Mem. at 59-60; LZG Post Hearing Reply Mem. at 33-34. Genius contends that its representations in the form of financial metrics were accompanied by proper disclaimers and cautionary language, and that "any reliance LZG placed in the aforesaid metrics was absolutely unreasonable and, therefore, is not actionable." Genius Post Hearing Mem. at 79 (citing *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997)). Furthermore, Genius asserts that it had been transparent during the negotiations about the fact it was going to have to raise money in the markets after the APA closing to source the $15 million (or at least some of that) through the ATM (the mechanics of which are discussed *supra* in Sections VI and VII of this Final Award).

349.     As mentioned above, under New York law, a claim for fraud requires proof of a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages. *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009); *Barclay Arms, Inc. v. Barclay Arms Assocs.*, 74 N.Y.2d 644, 647 (1989). A knowingly false statement, "a reckless misstatement, or an opinion based on grounds so flimsy as to lead to the conclusion that there was no genuine brief in its truth" are all "sufficient upon which to base liability." *Curiale v Peat, Marwick, Mitchell & Co.*, 214 A.D.2d 16, 28 (1st Dep. 1995).

350.     Based on a review of the documentary and testimonial evidencein the voluminous record, the Arbitral Tribunal finds that Genius made no material misrepresentation of fact as to sufficient funding.  The record demonstrates that Genius expended a significant amount of funds on the APA transaction before the deal fell apart.  Hamilton Stmt., ¶ 89 ("on April 3, 2024, Genius

107

wired $750,000 to LZG to enable their compliance with their agreement with Chsherbinin and Nazarov"); Hamilton Stmt., ¶ 97 ("On April 30, 2024, Genius wired $750,000 to LZG […] to enable their compliance with their agreement with Chsherbinin and Nazarov."), Hamilton Stmt., ¶¶ 93, 95 (explaining that Genius provided a loan in the amount of $106,400 to LZG in order to fund an auditor to provide the audited financials that were overdue.)  Moreover, in the negotiations of the APA, Genius had made clear that ultimately after closing Genius would have to raise funds in the market through the ATM in order to pay up to $15 million under the APA. Hearing Tr. 185:8-22 (Hamilton) ("the reason that Mr. Ritz and Mr. Moe were able to persuade myself [Mr. Hamilton] and the [Genius] board that there was still value in us giving them time to solve things was because they themselves believed that they could raise money and be of value for Genius."). This was one of the reasons it was important for Genius to receive audited financials from LZG, which LZG failed to provide and had not even paid the auditor to prepare the audited financials. Genius ultimately paid the auditor fee on behalf of LZG (which it was not contractually obliged to do) and the auditor prepared the financials.  Hamilton Stmt., ¶¶ 93, 95.  Due to the delayed audit, it took Genius far longer to obtain the ATM than it otherwise would have.  In short, the Arbitral Tribunal finds that Genius made no material misrepresentation of fact with respect to the sourcing of funding for the transaction.

## IX.   COSTS

### A.     Legal Standard for Costs in ICC Arbitration and the Parties' Positions

351.    The ICC Rules give the Arbitral Tribunal discretion to award fees and costs.  *See* ICC Rules, Article 38(4) ("The final award shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties.); ICC Rules, Article 38(5) ("In making decisions as to costs, the arbitral tribunal may take into account such

circumstances as it considers relevant, including the extent to which each party has conducted the arbitration in an expeditious and cost-effective manner.")  Article 38(1) of the ICC Rules provides that the "costs of the arbitration shall include the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the [ICC] Court …and the reasonable legal and other costs incurred by the parties for the arbitration."  The Tribunal finds that the costs should be borne by LZG, pursuant to both Article 38 of the ICC Rules and Section 12 of the APA.

352.    As discussed above in Section VIII(B)(III) of this Final Award, Section 12.1 of the APA includes a provision on indemnification and damages that provides for indemnification of "arbitral costs" and expenses (including without limitation, reasonable attorney's fees and expenses)" and also includes, *inter alia*, "reasonable fees and expenses of legal counsel … and other expenses of litigation or of any Claim."  APA § 12.1.  Under New York law, a contractual provision providing for allocation of fees and costs is enforceable.  *See Steyn v. CRTV, LLC*, 175 A.D.3d 1, 7-8 (1st Dep't 2019) (exception to New York approach that each side bears its own costs is "where [cost allocation] was authorized by an express provision in the agreement"); Genius Post Hearing Mem. at 82.

353.    It is undisputed between the Parties that Section 12.1 of the APA provides for an award of reasonable legal costs.  *See* Genius Post Hearing Reply Mem. at 82-83, LZG Fee Motion at 1-2.

354.    The APA further defines "Damages" in Section 1(n) to include reasonable fees and expenses of legal counsel and other expenses of litigation or of any claim. APA § 1(n).

355.    Genius submits that in assessing attorneys' fees and expenses, the Tribunal should apply what it refers to as the "Steyn test," which recognizes "three limited exceptions to New York's special arbitration provision barring the award of attorney's fees: (1) where a statute

109

provides for such an award, (2) where it was authorized by an express provision in the agreement, or (3) where it is 'unmistakably clear' that both parties intended such an award." Genius Post Hearing Mem. at 82 (citing *Steyn v. CRTV, LLC*, 175 A.D.3d 1, 7-8 (1st Dep't 2019)). Genius maintains that it is entitled to an award of expenses and fees, including attorneys' fees, because Section 12.1 of the APA is an express provision which makes "unmistakably clear" that the Parties intended such an award in the exact circumstances from which Genius' claims arise. *See* Genius Post Hearing Mem. at 82.

356.    LZG also submits that Section 12.1 of the APA allows the recovery of all reasonable costs, fees and damages suffered by a Party as a result of a breach of warranty by the Indemnifying Party, which are expressly defined to include the reasonable costs associated with arbitration and attorneys' fees.  *See* LZG Attorneys' Fees Motion at 2.

357.    Therefore, it is not disputed that Section 12.1 of the APA allows an award of reasonable arbitration costs and legal fees and that under New York law such contractual provisions are enforceable.

### B.    Costs Sought by Genius

358.    Genius requests that the Arbitral Tribunal grant an award of $539,418.49 in arbitral attorneys' fees and expenses incurred in this arbitration.[49]   This includes (a) $530,538.85 in attorneys' fees, and (b) $8,879.64 in expenses (Fedex mailing, document requested from the Delaware Secretary of State, printing, and court reporting services).

359.    Genius also seeks to recover (a) $82,500 it paid for various ICC fees (*e.g.*, commencement fees and provisional advance) as reflected in the Financial Table enclosed with

---

[49] Genius also seeks to recover fees and expenses arising from related proceedings in aid of this arbitration in the U.S. District Court for the Southern District of New York and U.S. Court of Appeals for the Second Circuit, which the Arbitral Tribunal discusses later in Section IX(B) of the Final Award.

the Secretariat's Letter, dated November 13, 2025, and (b) $30,000 paid to the ICC on or about December 2, 2025 pursuant to the Secretariat's Payment Request, dated November 13, 2025.

360. The amount awarded in attorneys' fees, expenses and costs must be based on the reasonable value of legal services rendered. *See* ICC Rules, Art. 38(1). The burden of showing the reasonableness of the fee lies with the claimant, *see Matter of Karp [Cooper]*, 145 A.D.2d 208, 216 (1st Dep't 1989). The determination of what constitutes a reasonable fee involves consideration of the nature and value of the services rendered by the attorneys. *See Friar v. Vanguard Holding Corp.*, 125 A.D.2d 444, 447 (2d Dep't 1986). Although a party seeking to recover its attorneys' fees is not required to tender contemporaneously maintained time records, in a matter involving a large fee, it is common to present the Tribunal with an objective and detailed breakdown by the attorney(s) of the time and labor expended, together with other factors that support the fee requested. *Matter of Karp*, 145 A.D.2d at 216.[50]

361. In support of its fee application, Genius sets out the value of the legal services rendered in the Attorney Fee Declaration of Eric J. Benzenberg, Esq. ("**Benzenberg Fee Declaration**") submitted with the Genius Post Hearing Reply Memorandum as Exhibit 6. The Tribunal has reviewed the 17-page Benzenberg Fee Declaration, which sets out in detail the time spent, activities, and billing rate of each member of the legal team at the Basile Law Firm who worked on the case (itemized in a table that is more than 12 pages long).[51] The Arbitral Tribunal finds the amount requested by Genius is proven with an objective and detailed breakdown by the

---

[50] The attorneys' fees valuation process requires definite information as to the way in which the time was spent, and the experience and standing of the various lawyers performing each task. *See* Genius Post Hearing Reply Mem. at 31 (citing *Washington Fed. Sav. & Loan Assn. v. Village Mall Townhouses*, 90 Misc. 2d 227, 230-231 (Queens Sup. Ct. 1977); *see also Sheridan v. Police Pension Fund, Art. 2 of City of N.Y.*, 76 A.D.2d 800 (1st Dep't 1980)).

[51] Genius notes that it has excluded all billing attributed to the work performed in response to the LZG Derivative Shareholders who sought to intervene in this arbitration and the New York federal proceeding in aid of arbitration.

attorneys of the time and labor expended, together with other factors (expenses and ICC costs) that support the amount requested. The Arbitral Tribunal further finds the amounts sought to be reasonable and justified in light of the tasks performed by Genius' counsel in this arbitration.

362. While this is an expedited arbitration, a significant amount of activity was compressed into its short lifespan. Between July and December 2025, the Arbitral Tribunal held seven virtual procedural conferences, issued thirteen Procedural Orders and held a two-day virtual Evidentiary Hearing at which four fact witnesses and one expert testified. The documentary evidence was compiled in a four-volume electronic Hearing Bundle of approximately 10,453 pages (paginated HB 0000001-HB 0010453). In addition to amended pleadings and responses, the Parties filed pre-hearing written submissions with supporting evidence and legal authorities, and two rounds of post hearing written submissions with supporting evidence and legal authorities.

363. Genius states that while it has incurred legal fees and expenses from this ICC proceeding in the amount of $539,418.49, it has also incurred considerable legal fees and expenses arising from related proceedings in the U.S. District Court for the Southern District of New York and U.S. Court of Appeals for the Second Circuit (with the aggregate amount of such related proceedings equal to $728,070.04, inclusive of the $500,000 injunction bond that Genius was obligated to undertake). Genius therefore has incurred arbitral legal fees and expenses in connection with this arbitration in the total amount of $1,267,488.53 and Genius seeks to recover that full amount -- namely the fees and expenses of both this arbitration and the New York judicial proceedings in aid of this arbitration.

364. The Arbitral Tribunal finds that Genius is entitled pursuant to Section 12.1 and Section 1(n) of the APA to recover the reasonable fees and costs that Genius incurred in connection with the related judicial proceedings in the U.S. District Court for the Southern District of New

York and U.S. Court of Appeals for the Second Circuit to preserve the status quo during the pendency of this arbitration (with the aggregate amount of such related proceedings equal to $728,070.04, inclusive of the $500,000 injunction bond that Genius was obligated to undertake).

365.    Genius therefore has incurred aggregate reasonable attorneys' fees and expenses in connection with this arbitration in a total amount of $1,267,488.53 – namely, the fees and expenses of both this arbitration and the New York judicial proceedings in aid of this arbitration – and is entitled to recover those amounts from LZG.

366.    The Arbitral Tribunal finds that these aggregate fees and expenses are reasonable and that Genius is entitled to recover the aggregate amount of $1,267,488.53.

367.    Finally, on March 16, 2026, the ICC Court fixed the ICC costs of the arbitration at US$ 217,000.00.

368.    Genuis seeks to recover 100% of its share of ICC administrative fees and Arbitral Tribunal compensation and expenses in an aggregate amount USD 108,500.00 pursuant to Article 38 of the ICC Rules affording the Arbitral Tribunal discretion to award costs and the Parties' contractual agreement in Section 12 of the APA permitting an award of arbitration costs.

369.    The Tribunal concludes that Genius is entitled to recover 100% of the aggregate amount of USD 108,500.00 that Genius has paid for ICC administrative fees and Arbitral Tribunal compensation and expenses.

C.    Costs Sought by LZG

370.    LZG also filed a motion for attorneys' fees seeking "reasonable legal fees incurred in this proceeding, as well as related proceedings,"[52] based on "Genius's repeated bad faith conduct

---

[52] The Arbitral Tribunal notes that LZG submitted the Affirmation of John New, a current member of the LZG Board of Directors, in support of LZG's application for attorneys' fees with an attached Exhibit A summarizing legal fees and costs of nearly $2 million incurred by LZG in this proceeding and "related cases" but supplying very little detail on how it arrived at that amount.  As discussed above in footnote 9 of

in this proceeding, including tampering with evidence and perjury, manipulation of evidence and false and misleading testimony."

371.    LZG argued APA Section 12.1 allows the recovery of all costs, fees and damages suffered by a party as a result of a breach of warranty by the Indemnifying Party and that the ICC Rules also allow the Tribunal discretion to award costs and fees in appropriate circumstances.

372.    LZG argued that Genius breached several warranties in the APA, entitling LZG to its costs and fees in this proceeding. As explained above, the Arbitral Tribunal concluded that Genius did not breach any warranties in the APA and instead that it was LZG that breached the APA.  The Arbitral Tribunal also found that Genius did not tamper or manipulate evidence.  The Arbitral Tribunal also found that Genius did not submit false or misleading testimony.

373.    It is unnecessary to go into detail regarding the LZG fee application because the Arbitral Tribunal has exercised its discretion to award Genius its reasonable costs of this proceeding as the prevailing party in this arbitration, to be borne by LZG, pursuant to Article 38 of the ICC Rules and APA Section 12.  On the issue of reasonableness, it is noted that LZG co-counsel in this arbitration since mid-July 2025 have incurred nearly double in fees and expenses in this arbitration than the legal team for Genius since commencing the arbitration in October 2024.

374.    The Arbitral Tribunal declines to award any of the attorneys' fees, expenses and costs to LZG in this Final Award.

---

this Final Award, LZG has been represented by four different law firms or solo practitioners during this arbitration.  According to the New Declaration, since his first Notice of Appearance on July 21, 2025, Mr. Serbagi of The Serbagi Law Firm, P.C. has been paid $800,000 in connection with his work as counsel for LZG in this arbitration. Mr. Serbagi's co-counsel in this arbitration, Mr. Fini of Catafago Fini LLP, has been paid $96,240 since his Notice of Appearance on September 2, 2025. Leaving aside the fees and expenses incurred by LZG's original counsel King & Spalding LLP appearing for LZG in four separate proceedings relating to the transaction at issue in this arbitration, the co-counsel for LZG in this arbitration since mid-July 2025 have incurred nearly double what the legal team for Genius legal team incurred over a longer period for work on this arbitration.

## X.       FINAL AWARD

375.    For the reasons set forth above, the Arbitral Tribunal renders and makes the following Final Award as to the issues presented in this case:

a.      Declares that the Asset Purchase Agreement between Claimant Genius Group Ltd. and Respondent LZG International, Inc. is terminated pursuant to Section 14.1 of the Asset Purchase Agreement, effective immediately as of the date of this Final Award.

b.      Declares that Respondent LZG International, Inc. materially breached its contractual obligations to Claimant Genius Group Ltd. under the Asset Purchase Agreement.

c.      Declares that Respondent LZG International Inc. fraudulently induced Genius to enter into the Asset Purchase Agreement.

d.      Awards Claimant Genius Group Ltd. rescission of the Asset Purchase Agreement.

e.      Based on the award of rescission above, orders Respondent LZG International, Inc. to remit to Claimant Genius Group Ltd. the 7,387,374 (seven million, three hundred and eighty seven thousand, three hundred and seventy four) shares of Genius Group Ltd. common stock that Respondent LZG International, Inc. received pursuant to the Asset Purchase Agreement and orders LZG International, Inc. to pay Claimant Genius Group Ltd. US$ 6,595,180.00 (six million, five hundred and ninety-five thousand, one hundred and eighty dollars and zero cents), which is the amount that Claimant Genius Group Ltd. paid Respondent LZG International, Inc. in connection with the Asset Purchase Agreement.

f.      Denies the affirmative defenses asserted by Respondent LZG International, Inc. in this arbitration.

g.      Dismisses the counterclaims asserted by Respondent LZG International, Inc. against Claimant Genius Group Ltd. in this arbitration.

h.      Awards Claimant Genius Group Ltd. 100% (one hundred percent) of its share of the ICC administrative fees and Arbitral Tribunal compensation and expenses. Claimant Genius Group Ltd.'s share of ICC administrative fees, Arbitral Tribunal compensation, and expenses, which the ICC Court fixed in the aggregate at US$ 217,000.00 (two hundred and seventeen thousand dollars and zero cents). Respondent LZG International, Inc. is ordered to pay Claimant Genius Group Ltd. for its share of such administrative fees, Arbitral Tribunal compensation, and expenses in such amount – half the aggregate total, which is US$ 108,500.00 (one hundred and eight thousand, five hundred dollars and zero cents).

i.      Awards Claimant Genius Group Ltd. its reasonable attorneys' fees and expenses from this ICC proceeding in the amount of US$ 539,418.49 (five hundred and thirty-nine thousand, four hundred and eighteen dollars and forty-nine cents). Respondent LZG International, Inc. is ordered to pay Claimant Genius Group Ltd. US$ 539,418.49 (five hundred and thirty-nine thousand, four hundred and eighteen dollars and forty-nine cents).

j.      Awards Claimant Genius Group Ltd. its reasonable attorneys' fees and expenses arising from related proceedings in the U.S. District Court for the Southern District of New York and U.S. Court of Appeals for the Second Circuit in the amount of US$ 728,070.04 (seven hundred and twenty-eight thousand and seventy dollars and four cents).  Respondent LZG International, Inc. is ordered to pay Claimant Genius Group Ltd., US$ 728,070.04 (seven hundred and twenty-eight thousand and seventy dollars and four cents).

116

376.    This Final Award is in full settlement of all claims, counterclaims and defenses submitted to this Arbitration. All claims, counterclaims and defenses not expressly granted herein are hereby denied in their entirety.

Dated: April 16, 2026

Place of Arbitration: New York, New York, U.S.A.

Dana MacGrath
Sole Arbitrator

The undersigned Sole Arbitrator hereby certifies that, for the purposes of Article I of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York City, New York, U.S.A.

Dated:   April 16, 2026

Place of Arbitration: New York, New York U.S.A.

Dana MacGrath
Sole Arbitrator

117